**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | | |
|---|---|---|
| **Caron Nazario** | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:21-cv-00169 |
| | ) | **TRIAL BY JURY DEMANDED** |
| **Joe Gutierrez** | ) | |
| *In his Personal Capacity* | ) | |
| | ) | |
| **Serve: Windsor Police Department** | ) | |
| **56 E. Windsor Blvd.** | ) | |
| **Windsor, VA 23487** | ) | |
| | ) | |
| **And** | ) | |
| | ) | |
| **Daniel Crocker,** | ) | |
| *In his Personal Capacity.* | ) | |
| **Serve: Windsor Police Department** | ) | |
| **56 E. Windsor Blvd.** | ) | |
| **Windsor, VA 23487.** | ) | |
| *Defendants.* | ) | |

## COMPLAINT

COMES NOW the Plaintiff, Caron Nazario, by counsel, and files this action against Defendants Joe Gutierrez and Daniel Crocker, in their personal capacities, and in support thereof states as follows:

## INTRODUCTION

1.      This is an action brought pursuant to, *inter alia*, 42 USC §§ 1983, alleging violation of the First and Fourth Amendments to the Constitution of the United States of America, and attendant state law claims.

2.      This action arises from the behaviors of two Windsor police officers, Joe Gutierrez and Daniel Crocker (jointly, the "Defendants"), who, while on duty and in uniform, initiated a traffic stop against a uniformed U.S. Army Officer, Lt. Caron Nazario, who was

driving back from his duty station.  The Defendants did so ostensibly because they alleged that

Lt. Nazario did not have a license plate on the rear of his newly purchased Chevrolet Tahoe.

3.      Notwithstanding the fact that, by the time the Defendants approached Lt.

Nazario's vehicle, they had actual knowledge that there was a license plate on the rear of his

vehicle, the Defendants decided to escalate the traffic stop, report it as a high-risk felony stop,

pull their weapons, illegally detain Lt. Nazario, threaten to murder him, illegally spray him with

OC, and illegally searched his vehicle.  Finally, to cover up their illegal actions and to extort

silence from Lt. Nazario, the Defendants threatened to destroy Lt. Nazario's military career with

a series of baseless criminal charges if Lt. Nazario decided to seek redress regarding their

conduct.  They escalated this traffic stop with what they acknowledged was an 80% certainty that

Lt. Nazario was a minority.

4.      This encounter was recorded from three different angles:

a.  Lt. Nazario's cellphone footage (attached hereto as **Exhibit 1 and 2**).

b.   Defendant Gutierrez' body worn camera footage (attached hereto as **Exhibit 3**),
    and

c.  Defendant Crocker's body worn camera footage (attached hereto as **Exhibits 4
    and 5**).

5.      These cameras captured footage of behavior consistent with a disgusting

nationwide trend of law enforcement officers, who, believing they can operate with complete

impunity, engage in unprofessional, discourteous, racially biased, dangerous, and sometimes

deadly abuses of authority, (including issuing unreasonable comply-or-die commands,) ignore

the clearly established mandates of the Constitution of these United States and the state and local

laws, and usurp the roles of legislator, judge, jury, and executioner; substituting the rule of law for their arbitrary and illegal conduct.

6.     These three camera angles demonstrate that on December 5, 2020, Lt. Nazario, an active member of the United States Army, who was at the time *in uniform*, became a victim of this alarming and unacceptable trend at the hands of Defendants Gutierrez and Crocker.  This has got to stop.

## VENUE AND JURSIDICTION

7.     This Court has subject matter jurisdiction over the Plaintiffs' Federal Constitutional claims pursuant to 28 U.S.C. § 1331. This Court has subject matter jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.  This Court has jurisdiction to issue declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57.

8.     Venue is proper in the Norfolk Division of the Federal District Court for the Eastern District of Virginia pursuant to 28 U.S.C. §§ 127, 1391 and Local Civil Rule 3, as a substantial part of the events giving rise to the claims herein occurred in the Town of Windsor in Isle of Wight County, and is thus within the Norfolk Division of the United States District Courts for the Eastern District of Virginia.

## PARTIES

9.     Plaintiff Caron Nazario ("Lt. Nazario" or "Plaintiff") a citizen of the United States, a resident of Virginia, and of Latinx and African American descent.  At all times relevant hereto, Lt. Nazario was a Second Lieutenant in the United States Army Medical Corps, having sworn an oath to uphold and defend the United States Constitution from all enemies, foreign and domestic.

10.     Defendant Joe Gutierrez ("Gutierrez", or "Defendant Gutierrez") is a citizen of the United States, a resident of Virginia, and at all times relevant hereto, he was employed, uniformed, and on duty with the Town of Windsor Police Department and was acting under color of law.

11.     Defendant D. Crocker ("Crocker" or "Defendant Crocker") is a citizen of the United States, a resident of Virginia, and at all times relevant hereto he was employed, uniformed, and on duty with the Town of Windsor Police Department and was acting under color of law.

12.     The defendants are joined, pursuant to Federal Rule of Civil Procedure 20, as the claims against the defendants arise from the same occurrence or series of occurrences.

## FACTS

13.     On or around December 5, 2020, at approximately 18:34 (6:34 p.m.), Lt. Nazario was headed westbound on US 460 in his newly purchased 2020 Chevrolet Tahoe, in the vicinity of the Food Lion, in the Town of Windsor, Virginia.  The vehicle was so new to Lt. Nazario that the DMV had yet to provide Lt. Nazario with permanent plates, and thus Lt. Nazario had his cardboard temporary plates taped to the inside of the rear window of the vehicle at the top and on the passenger side, visible from behind.[1]  Lt. Nazario was in uniform.

14.     On or around December 5, 2020, at approximately 18:34, Defendant Crocker initiated a traffic stop of Lt. Nazario on US 460 westbound in the Town of Windsor, near the

---

[1] E.g., Exhibit 3 at 02:10 to 2:36 (Gutierrez arm and weapon placement occlude the camera's view of Lt. Nazario's vehicle from the time he exits the vehicle at 01:18 until 02:10, at which time the temporary tags are visible to the camera.) Exhibit 4 at 2:40 to 3:16 and 16:52 (Crocker's body worn camera demonstrates that the temporary tags are visible in the upper left); Exhibit 5 at 00:46 to 01:00 (Crocker's admission that he saw the temporary tags at the beginning of the stop).

  
Food Lion, where the speed limit is 35 miles per hour,[2] by activating his emergency lights.[3] The traffic stop was ostensibly for the lack of a rear license plate[4], though the temporary tags were affixed to the back of the vehicle and visible to Crocker during the pursuit.  Defendant Gutierrez then joined in the pursuit.[5]

15.     Within seconds, Lt. Nazario submitted to Defendant Crocker's display of authority and began to slow down.[6]  Lt. Nazario also activated his turn signal, to signal his compliance with Crocker's implied directive to pull over. Crocker admits in real time that Lt. Nazario was complying, by relaying to dispatch that Lt. Nazario was slowing down.[7] Gutierrez, who was listening to Crocker over the radio, was aware of both the reasons for the stop as well as Lt. Nazario's compliance with Crocker's signal to slow down and pull over.[8]

16.     It was dark, however, and it appeared to Lt. Nazario that there was no good location in the immediate vicinity to stop safely.  So, for the benefit of the officer's safety and his own, Lt. Nazario continued slowly down US 460, below the posted speed limit, for a less than under a mile, until he spotted a well-lighted BP gas station. He pulled over in the parking lot.[9] From the time that Defendant Crocker initiated the traffic stop until the time Lt. Nazario pulled

---

[2] Exhibit 12; See Also, VDOT Speed Limit Map; https://www.virginiaroads.org/datasets/vdot-speed-limits-map?geometry=-76.778%2C36.802%2C-76.705%2C36.814 (last accessed 3/3/2021 at 13:52)/

[3] Exhibit 4, at 00:00

[4] Exhibit 3 at 03:35 to 03:42; Exhibit 5 at 00:46 to 01:00; Exhibit 7, p. 2 (Crocker); Exhibit 10 (Gutierrez).

[5] Exhibit 3 at 00:00.

[6] Exhibit 4 at 00:04 – 00:16 (The video demonstrates that  Crocker passes an Amazon tractor-trailer and then the Amazon tractor-trailer, in turn passes Crocker.  This demonstrates that Lt. Nazario and Defendant Crocker have begun to slow down).

[7] Exhibit 4 at 00:43 ("Speeds are 22 [mph]" - 13 mph below the posted speed limit of 35 mph); 00:57 ("central, speeds are 23 [mph]," -  12 mph below the posted speed limit); 1:23 ("speeds are 18 [mph]"- 17 mph below the posted speed limit); Exhibit 3 at 00:56 to 1:00 (18mph).

[8] Exhibit 3 at 00:30 ("Speeds are 23[mph] "), at 00:56 ("Speeds are 18 [mph]").  Thus, audio from Gutierrez' body worn camera demonstrates that Gutierrez had actual knowledge of Lt. Nazario's speeds and Lt. Nazario's submission to authority, in real time.

[9] Exhibit 3 at 01:11 to 01:14; Exhibit 4 at 01:37 to 01:45.

over into the BP parking lot, approximately 1 minute and 40 seconds elapsed.[10] and Lt. Nazario had traveled less than a mile.[11]

17.     The Defendants admitted that they knew why Lt. Nazario waited until the BP to pull over (for his and their safety), with Gutierrez admitting that "it happens all the time." And that it happens to him "a lot"[12]  Defendant Gutierrez also stated that the maneuver informed him, based on his training and experience, that Lt. Nazario was "almost certainly," or with "at least 80%" probability, a minority.[13]

18.     However, despite knowing why Lt. Nazario had waited to pull over at a well-lit public space[14], with the knowledge that Lt. Nazario was "almost certainly" a minority[15], the Defendants decided, prior to pulling over, to report the routine traffic stop as a "felony traffic stop"[16] and a "high risk traffic stop,"[17] without justification or excuse.[18]  Likewise, without justification or excuse, the Defendants chose to immediately escalate the encounter by threatening deadly force and a homicide.

19.     Particularly, they exited their vehicles and immediately trained their firearms on Lt. Nazario[19] and subsequently threatened to murder him,[20]notwithstanding the fact that by this

---

[10] Exhibit 3 at 00:00 to 01:14; Exhibit 4 at 00:00-01:41.
[11] Exhibit 11.
[12] Exhibit 5 at 09:07 to 09:17.
[13] Exhibit 5 at 09:14 to 09:21.
[14] See Note 11, supra.  Exhibit 5 at 09:07 to 09:17.
[15] See Note 12, supra.  Exhibit 5 at 09:14 to 09:21.
[16] Exhibit 3 at 01:25 to 01:27; Exhibit 4 at 01:51 to 01:54.
[17] Exhibit 7
[18] See Note 1, supra.  Exhibit 3 at 02:10 to 02:36(Gutierrez); Exhibit 4 at 2:40 to 3:16 and 16:52 (Crocker); Exhibit 5 at 00:46 to 01:00 (Crocker).
[19] Exhibit 3 at 01:16 to 01:25; Exhibit 4 at 01:44 to 01:50.
[20] Exhibit 1 at 01:04 to 01:15; Exhibit 3 at 03:04 to 03:09; Exhibit 4 at 03:33 to 03:35.

time the Defendants lacked probable cause or a reasonable articulable suspicion that Lt. Nazario's vehicle lacked license plates.[21]

20.     This was precisely the sort of reaction Lt. Nazario sought to avoid by clearly submitting to their authority on the road and pulling over in a protected, well-lit place for everyone's safety.

21.     As both Gutierrez and Crocker exited their vehicles with their firearms drawn and trained on Lt. Nazario, Lt. Nazario's rear license plate--ostensibly the reason for this encounter[22]--was visible, and the defendants saw it on their approach.[23]

22.     Notwithstanding the fact that the Defendants could see Lt. Nazario's license plates when they exited their vehicles[24], the Defendants unreasonable and unjustifiable decision to escalate this "simple traffic stop" caused the following to unfold:

23.     After parking his vehicle under the lights of the BP Gas Station, Lt. Nazario complied with the Defendant's orders, put the vehicle in park.  He turned on his phone's camera to record the interaction, and complied with the Defendants orders to roll his window down and show them his hands by putting his hands outside the window, and then asked the Defendants, "What's going on? "[25]

24.     The Defendants, with their firearms already drawn and trained on Lt. Nazario, refused Lt. Nazario even the minor courtesy of an explanation. Instead, the Defendants repeated

---

[21]See, note 1, *supra*. Exhibit 3 at 02:10 to 02:36(Gutierrez); Exhibit 4 at 2:40 to 3:16 and 16:52 (Crocker); Exhibit 5 at 00:46 to 01:00 (Crocker).

[22] See note 4, *supra*. Exhibit 3 at 03:35 to 03:42; Exhibit 5 at 00:46 to 01:00; Exhibit 7, p. 2; Exhibit 10.

[23] See Note 1, supra.  Exhibit 3 at 02:10 to 02:36(Gutierrez); Exhibit 4 at 2:40 to 3:16 and 16:52 (Crocker); Exhibit 5 at 00:46 to 01:00 (Crocker).

[24] See Note 1, supra.  Exhibit 3 at 02:10 to 02:36(Gutierrez); Exhibit 4 at 2:40 to 3:16 and 16:52 (Crocker); Exhibit 5 at 00:46 to 01:00 (Crocker).

[25] Exhibit 1 at 00:00 to 00:14; Exhibit 4 at 01:51 to 02:10.

their command for Lt. Nazario to place his hands outside the window, which Lt. Nazario had already done.[26]

25.     The Defendants then asked how many persons were in the vehicle, and with his hands still out of the vehicle, Lt. Nazario answered their question.  Lt. Nazario again asked the Defendants what was going on and, importantly, why they had their guns drawn.[27] The Defendants still refused Lt. Nazario the courtesy of informing Lt. Nazario of the reason for the stop, let alone the justification for their display of lethal force.[28]

26.     Instead, the Defendants began to shout inconsistent commands at Lt. Nazario, at times telling him to keep his hands outside the window[29] and other times, demanding that he open the door and exit the vehicle.[30]

27.     Though Nazario was shocked at the ferociousness of these Defendants and the very real possibility that the Defendants may murder him because he could not comply with their inconsistent demands,[31] Lt. Nazario remained calm, kept his hands outside the window, and continued to calmly ask the Defendants why they pulled him over,[32] and to explain what was going on.[33] Neither of the Defendants were willing or able to articulate why they had initiated the traffic stop.

28.     Defendant Gutierrez, who instead of providing any justification for the traffic stop, or any explanation at all to Lt. Nazario, told Lt. Nazario that Lt. Nazario was "fixin' to ride

---

[26] Exhibit 1 at 00:10 to 00:13 Exhibit 3 at 02:10 to 02:14
[27] Exhibit 1 at 00:04 to 00:19. Exhibit 3 at 02:00 to 02:14; Exhibit 4 at 02:30 to 02:42.
[28] Exhibit 1 at 00:19 to 00:33. Exhibit 3 at 02:14 to 02:29; Exhibit 4 at 02:42 to 02:56.
[29] E.g., Exhibit 1 at 00:42 to 00:49; Exhibit 3 at 02:16 to 02:46.
[30] E.g., Exhibit 3 at 02:16 to 02:46.
[31] Exhibit 1 at 00:31 to 00:51; Exhibit 3 at 2:16 to 02:46; Exhibit 4 at 02:57 – 03:11.
[32] E.g., Exhibit 1 at 00:30 – 0:55; Exhibit 3 at 02:24 to 02:31; 03:00 to 03:07
[33] Note 32, *supra*.  Exhibit 1 at 00:30 – 0:55; Exhibit 3 at 02:24 to 02:31; 03:00 to 03:07.

the lightning.'"[34]  This is a colloquial expression for an execution, originating from glib reference to execution by the electric chair.[35]

29.     Defendant Gutierrez intended this statement to mean, and this statement would be reasonably understood to mean, that Gutierrez was going to execute Lt. Nazario right there in the gas station parking lot, for some reason that the Defendants were unwilling and unable to articulate to Lt. Nazario.

30.     The footage of Gutierrez' body worn camera showing Crocker's relaxed demeanor during this encounter demonstrates that neither Defendant reasonably believed Lt. Nazario to be a threat.[36]

31.     The footage of Gutierrez' body worn camera and from Lt. Nazario's phone camera showing Lt. Nazario's calm demeanor during this encounter demonstrates that neither Defendant reasonably believed Lt. Nazario to be a threat.[37]

32.     Lt. Nazario, continuing to remain calm and, while keeping his hands outside the vehicle and visible, tried to deescalate the situation. He kept calmly asking what was wrong.  The Defendants still refused or were unable to answer.[38]

33.     Exhibiting extraordinary calmness in the face of the unconstitutional, unlawful actions of the officers and the express threat against his life,  Lt. Nazario disclosed to Defendant Gutierrez that Lt. Nazario was afraid to get out of the vehicle.[39]  This fear was justifiable under the circumstances.

---

[34] Exhibit 1 at 01:09 to 01:15; Exhibit 3 at 03:04 to 03:09; Exhibit 4 at 03:33 to 03:36.
[35] https://www.urbandictionary.com/define.php?term=ride%20the%20lightning (last visited 3/3/2021 at 12:26 PM).  Exhibit 6.
[36] Exhibit 3 at 03:04 to 03:49.
[37] Exhibit 1 00:00 to 01:29, and Exhibit 3 at 03:24 to 03:49.
[38] E.g., Exhibit 1 at 01:04 to 01:27.
[39] Exhibit 1 at 01:26 to 01:34; Exhibit 3 at 03:22 to 03:30; Exhibit 4 at 03:39 to 03:56.

34.     Upon hearing that Lt. Nazario was afraid to exit the vehicle, Gutierrez further reinforced the reasonableness of this fear by confirming to Lt. Nazario: "Yeah, you should be."[40]

35.     Lt. Nazario continued to protest his innocence and his confusion as to why he was being threatened with death.  He stated correctly that he has committed no crimes (especially no crimes which would warrant two officers, with their guns trained on him, to threaten him with summary execution).

36.     Finally, Gutierrez provided some excuse for this unreasonable, wanton display of force and death threat, telling Lt. Nazario that while Lt. Nazario had initially been pulled for a "traffic infraction," he was now "being arrested - no, being detained for obstruction of justice"[41] since Lt. Nazario was "not cooperating."[42]

37.     As Crocker watched calmly with a bemused smirk on his face,[43] Gutierrez attempted to remove Lt. Nazario from his vehicle with an arm-bar, which failed.[44]

38.      Lt. Nazario's protested and demanded that Gutierrez take his hand off of him.[45] Crocker then attempted to open the door but failed to do so, notwithstanding the fact that Lt. Nazario had his hands up and out of the vehicle the entire time.[46]  At no time does Lt. Nazario touch or smack either Gutierrez or Crocker during this interaction.  At no time does Lt. Nazario make any threatening statements or actions towards the Defendants.[47]  To the extent that Lt. Nazario may pull away from Gutierrez' attempt at an arm-bar, this is an excusable reaction to the

---

[40] Exhibit 1 at 1:27 to 01:35; Exhibit 3 at 03:22 to 03:30; Exhibit 4 at 03:49 to 03:57.  This occurs approximately 19 seconds after Gutierrez threatened to kill Lt. Nazario over a traffic violation.
[41] Exhibit 1 at 01:35 to 01:48; Exhibit 3 at 03:30 to 03:44; Exhibit 4 at 03:57 to 04:11.
[42]  Note 41, *supra.* Exhibit 1 at 01:35 to 01:48; Exhibit 3 at 03:30 to 03:44; Exhibit 4 at 03:57 to 04:11.
[43] Exhibit 3 at 03:42 to 03:48.
[44] Exhibit 1 at 01:51 to 02:02; Exhibit 3 at 03:42 to 03:54 Exhibit 4 at 04:14  to 04:21.
[45] Exhibit 1 at 01:51 to 02:03; Exhibit 4 at 04:14  to 04:21.
[46] Exhibit 1 at 02:04 to 02:25; Exhibit 3 at 04:03 to 04:20; Exhibit 4 at 04:30 to 04:47.
[47] Notes 44 and 46, *supra.*  Exhibit 1 at 01:51 to 02:25; Exhibit 3 at 03:42 to 04:20; Exhibit 4 at 04:14  to 04:47.

Defendants' sudden and unjustifiable use of force and express threats, and  the express confirmation that he should be afraid to exit his vehicle.

39.     In response to Lt. Nazario's demands for a supervisor, Gutierrez stepped back from the vehicle and, without warning, sprayed Lt. Nazario with OC spray multiple times in rapid succession,[48] notwithstanding the fact that Lt. Nazario's hands were clearly visible and Lt. Nazario had made no threatening moves or statements to the Defendants.[49]

40.     In shock, Lt. Nazario responded that Gutierrez unprovoked actions were "fucked up."[50] This is, and was, a true statement.[51]

41.     The OC spray had the effect of, *inter alia*, almost immediately incapacitating Lt. Nazario by causing him substantial and immediate pain, choking and blinding him, causing his lungs and throat face and skin to burn, causing his mucosal membranes to swell and produce excessive amounts of mucus.

42.     The Defendants had actual knowledge of these effects and first-hand knowledge of what happens when one is sprayed, as the Defendants were sprayed with OC spray as part of their own training.   The Defendants' use of the OC spray also caused substantial property damage to Lt. Nazario's vehicle and choked Lt. Nazario's dog, who was sitting in the rear of Lt. Nazario's vehicle, secured in a crate.

43.     Gutierrez responded that if Nazario, now blinded from the chemical agent, did not exit the vehicle, Lt. Nazario would be sprayed again.[52]  At this point, both Gutierrez and Crocker knew that Lt. Nazario had been blinded and incapacitated by the OC spray.  Lt Nazario asked for

---

[48] Exhibit 1 at 02:24 to 02:40; Exhibit 3 at 04:19 to 04:30; Exhibit 4 at 04:47 to 04:57.
[49] Note 47, *supra*. Exhibit 1 at 00:00 to 02:37; Exhibit 4 at 0:00 to 04:56.
[50] Exhibit 1 at 02:37 to 02:50; Exhibit 3 at 04:34 to 04:37.
[51] Exhibit 1 at 00:00 to 02:39; Exhibit 3 at 00:00 to 04:29; Exhibit 4 at 00:00 to 04:56.
[52] Exhibit 1 at 02:49 to 02:53; Exhibit 3 at 04:45 to 04:50; Exhibit 4 at 05:08 to 05:26.

help to take his seatbelt off, as he was afraid to even put his hands down for fear of being murdered under the pretense of self-defense and officer safety.[53]  The Defendants refused to assist him. Lt. Nazario, fearing that he would be executed when his hands were no longer in plain sight and reaching for the belt-release, but likewise expecting to be sprayed again or shot if he did not comply, removed the belt himself.[54]

44.     Lt. Nazario, choking, and intermittently expressing worry not about himself, but about his dog who was caged and in the back of the vehicle, allowed Gutierrez to remove him from the vehicle, keeping his hands in the air at all times.[55]

45.     Gutierrez removed Lt. Nazario, with Lt. Nazario's hands raised in the air. Lt Nazario, demonstrating compliance, again asked for a supervisor and asked the Defendants to explain to him what was going on.[56]

46.     Gutierrez responded with knee-strikes to Lt. Nazario's legs[57] to force an already compliant and blinded Lt. Nazario down on his face[58] ostensibly so they could handcuff him. Notwithstanding the fact that Nazario was on the ground and in tears, Gutierrez and Crocker continued to strike Lt. Nazario.[59]  As was previously noted, by this time the Defendants both had at least *scienter* if not actual knowledge that there was no reason for the traffic stop, as both actually knew, or should have known, that Lt. Nazario's vehicle had license plates lawfully displayed.[60]

---

[53] See Note 34, *supra*. Exhibit 1 at 01:09 to 01:15; Exhibit 3 at 03:04 to 03:09; Exhibit 4 at 03:33 to 03:36 (The "ride the lightning" death threat) and Note 40, *supra*. Exhibit 1 at 1:27 to 01:35; Exhibit 3 at 03:22 to 03:30; Exhibit 4 at 03:49 to 03:57. (Confirming that Lt. Nazario should be afraid to get out of the car).
[54] Exhibit 1 at 02:56 to 03:54.
[55] Exhibit 1 at 03:54 to 04:07; Exhibit 3 at 04:47 to 05:53; Exhibit 4 at 05:09 to 06:22.
[56] Exhibit 1 at 04:00 to 04:10; Exhibit 3 at 05:47 to 06:09; Exhibit 4 at 06:28 to 06:37.
[57] Exhibit 1 at 04:09 to 04:18; Exhibit 3 at 06:06 to 06:16; Exhibit 4 at 06:34 to 06:41; Exhibit 9; Exhibit 10.
[58] Exhibit 4 at 06:40 to 07:25.
[59] Exhibit 1 at 04:10 to 05:01; Exhibit 4 at 07:20 to 07:55.
[60] E.g., Note 1, *supra*. Exhibit 3 at 02:10 to 2:36; Exhibit 4 at 2:40 to 3:16 and 16:52; Exhibit 5 at 00:46 to 01:00.

47.     On his face, in between the sobs of pain, betrayal, and fear, Lt. Nazario continually asked not about himself, but his dog.[61]

48.     Eventually, after the Defendants placed Lt. Nazario in handcuffs and removed him from the ground and from reaching distance of the vehicle. they sat him on a trashcan and began an interrogation that was, in fact, a thinly veiled attempt to get Lt. Nazario to agree to their attempt to reframe the events to obscure their culpability and to frame Lt. Nazario as being at fault,[62] without any attempt to read Lt. Nazario his Miranda rights.

49.     Lt. Nazario stated that he was looking for a well-lit place to pull over because he had respect for law enforcement.[63]  Gutierrez retorted that Lt. Nazario had no respect for law enforcement, because if he did, he would not find himself in this situation.[64]

50.     However, Gutierrez finally admitted that the issue was *not* that Lt. Nazario had waited to the BP to pull over (Gutierrez admitted that it was reasonable and that he knew what was going on when Lt. Nazario pulled over to the BP because as it happens all the time[65]) but that it was problematic that Lt. Nazario refused to exit the vehicle,[66] even though Defendant Gutierrez had confirmed to Lt. Nazario that Lt. Nazario should have been afraid to exit.[67]

51.     This explanation (which also later shows up on the Defendant's use of force reports and reporting officer narratives)[68] ignores and intentionally omits material facts of the Defendant's escalation, use of firearms, and the threats of murder within a minute of pulling Lt.

---

[61] Exhibit 4 at 08:01 to 08:10.
[62] Exhibit 4 beginning at 08:43.  During this time, Defendant Gutierrez continues to interrogate Nazario as to why he did not stop when the Crocker activated his flashing lights (notwithstanding the fact that Crocker informed all involved that Lt. Nazario began to slow down immediately via radio traffic.)
[63] Exhibit 4 at 08:40 to 08:57.
[64] Exhibit 4 at 08:57 to 09:04.
[65] See Notes 11 and 12, supra.  Exhibit 5 at 09:07 to 09:21.
[66] Exhibit 4 at 13:09 to 13:22.
[67] See Note 40, *supra*. Exhibit 1 at 1:27 to 01:35; Exhibit 3 at 03:22 to 03:30; Exhibit 4 at 03:49 to 03:57.
[68] Exhibits 7 – 10.

Nazario over, and that the Defendants were either unable or unwilling to provide the slightest courtesy or to articulate a reasonable suspicion to justify the stop, the escalation, and the continued detention.

52.     With Lt. Nazario in handcuffs, blinded by the OC spray, and in the custody of Gutierrez, Crocker, and the EMTs, the EMT asked Lt. Nazario if he had any firearms in the vehicle.  Lt. Nazario stated that he did and where in the vehicle it was located.[69]

53.     While Gutierrez watched, Crocker left Lt. Nazario (who was blind, in handcuffs, and in the possession of Defendant Gutierrez and an EMT) and, without permission or authority, entered Lt. Nazario's vehicle and searched for the firearm.[70]

54.      When Crocker located the firearm, he did not secure it for the protection of the Defendants. Rather, Crocker searched the firearm for its serial number and radioed the serial number back to dispatch to see if the firearm was stolen.[71]  When the firearm came back clean, Crocker placed the weapon back in the vehicle.[72]  Gutierrez watched this unfold and failed to stop Crocker or intervene in this unlawful search, despite having reasonable opportunity to do so.

55.     As Lt. Nazario's vision began to return, the Defendants realized the excessive, illegal, and unconstitutional nature of what they had done.  Defendant Gutierrez reiterated that he understood *why* Lt. Nazario did what he did by pulling over at the BP Gas station, stating: "I get it, the media spewing race relations between law enforcement and minorities, I get it"[73] that pulling over at the well-lit BP "happens *all the time*," and that "80% of the time, it is a minority."[74]

---

[69] Exhibit 4 at 18:46 to 19:00.
[70] Exhibit 4 at 18:54 to 19:12.
[71] Exhibit 4 at 19:12 to 19:59.
[72] Exhibit 4 at 19:59 to 20:05.
[73] Exhibit 5 at 08:55 to 09:08.
[74] See Notes 11 and 12, supra.  Exhibit 5 at 09:07 to 09:21.

56.     Then Defendants Gutierrez and Crocker, realizing that they had acted illegally, and that if Lt. Nazario complained, they would be in substantial trouble, threatened Lt. Nazario's job and his commission in the United States Army if he spoke out knowing the harm criminal charges would cause him[75].  They stated that if "[Lt. Nazario] fought it [or if he] argued…which was his right as a citizen, [they] would charge [Lt. Nazario with crimes], have [Lt. Nazario] go to court, notify command, and do all that." [76] However, they stated that if Lt. Nazario would "chill and let this go," they wouldn't file charges and would take the handcuffs off and let Lt. Nazario go.[77]

57.     The Defendants intended, and Nazario understood, that the Defendants were attempting to extort Lt. Nazario's silence in exchange for not initiating an illegal prosecution. The Defendants intended, and Nazario understood, that if Lt. Nazario would agree to remain silent about their misconduct and to "let this go," he would be released.  However, if Lt. Nazario spoke out, which was "his right as a citizen," the Defendants would charge him with *something* (for which they lacked probable cause), knowing that he was a "[l]ieutenant up for promotion, and [] the military could also discipline [him] for the incident."[78] The Defendants, to cover up their own illegal conduct, were threatening to destroy Lt. Nazario's nascent military career if Lt. Nazario spoke out.

58.     Then, in keeping with their threats, on the same day the traffic stop ended, and Lt. Nazario had left, both Defendants coordinated their efforts to hide their misdeeds and stage excuses for subsequent criminal charges.  Specifically, the Defendants submitted false narratives of the events in their official records, making near identical material misstatements of fact and

---

[75] Exhibit 5 at 08:40 to 08:49.
[76] Exhibit 5 at 05:34 to 05:48.
[77] Exhibit 5 at 06:23 to 06:57.
[78] Exhibit 5 at 04:30 to 07:06.

omissions to support both their conduct and false charges against Lt. Nazario of *inter alia*, felony obstruction of justice with force, eluding, and assault on a law enforcement,[79] charges they agreed to deploy should Lt. Nazario decide to not remain silent.[80]

59.     The Defendants thereby intentionally corrupted the official written record to support false criminal charges and to cover up their own misdeeds.

60.     Crocker's reports are attached hereto as Exhibits 7 and 8.  The fabrications that Crocker placed in his report, in the official record, include but are not limited to the following:

  a.   At the time he initiated the stop, Lt. Nazario's vehicle "had no license plate displayed."[81]  This is false.[82] Crocker knew of the falsity of the statement at the time he put it in the official record.[83]

  b.  Lt. Nazario "willfully and wantonly disregarded [his] patrol vehicle's blue lights and sirens and continued to travel westbound down Route 460."[84]  This is false.[85] Crocker's own contemporaneous statements[86] and those of Gutierrez,[87] demonstrate that Crocker knew that this statement was false at the time he put it in the official record.

---

[79] Exhibits 8 - 9, and 13 – 14.
[80] Exhibit 5 at 05:34 to 05:45 and 06:23 to 06:58 and Exhibits 8-9.
[81] Exhibit 7, p.2; Exhibit 8, p. 1.
[82] E.g., Note 1, *supra*. Exhibit 3 at 02:10 to 2:36;  Exhibit 4 at 2:40 to 3:16 and 16:52; Exhibit 5 at 00:46 to 01:00.
[83] E.g., Exhibit 5 at 00:44 to 01:00.
[84] Exhibit 8.
[85] E.g., Notes 6-8, *supra*.
[86] E.g., Notes 6-8, *supra*.; Exhibit 5 at 08:56 to 09:21.
[87] E.g., Notes 6-8, *supra.* Exhibit 5 at 08:56 to 09:21.

    c.   The "[d]river would not comply with orders to turn the vehicle off and place his hands outside the vehicle."[88] This is false,[89] and Crocker knew of the falsity of this statement when he put it in the official record.[90]

    d.   "When officer [Crocker] attempted to unlock and open driver's door, the driver hit officer's hand away."[91] This statement was false,[92] and Crocker *knew* that the statement was false he entered it into the official record.[93]

    e.   "The driver was actively resisting. When I attempted to unlock and open the driver's door, the driver assaulted myself, by striking my hand away and pulled away from Officer Gutierrez grip."[94]  This statement was false,[95] and Crocker knew that the statement was false he entered it into the official record.[96]

    f.   "Officer Gutierrez gave several more commands to comply with orders or he would by [sic] sprayed with his OC spray."[97] This statement is false.[98] Crocker had at least *scienter* that the same was false when he entered it into the official record.[99]

61.    Further, Crocker's reports omitted multiple material facts including but not limited to:

    a.   That Lt. Nazario had a rear tag properly displayed.

---

[88] Exhibit 7, p.1; Exhibit 8, p. 1.
[89] Exhibit 1 at 00:00 to 00:18; Exhibit 4 at 02:00 to 02:04.
[90] Exhibit 1 at 00:00 to 00:18; Exhibit 4 at 02:00 to 02:04.
[91] Exhibit 7, p.2.
[92] Exhibit 1 at 01:27 to 02:40;  Exhibit 3 at 03:20 to 04:40; Exhibit 4 at 03:45 to 05:00.
[93] Exhibit 1 at 01:27 to 02:40;  Exhibit 3 at 03:20 to 04:40; Exhibit 4 at 03:45 to 05:00.
[94] Exhibit 8, p.1.
[95] Exhibit 1 at 01:27 to 02:40;  Exhibit 3 at 03:20 to 04:40; Exhibit 4 at 03:45 to 05:00.
[96] Exhibit 1 at 01:27 to 02:40;  Exhibit 3 at 03:20 to 04:40; Exhibit 4 at 03:45 to 05:00.
[97]Exhibit 8 at p.1.
[98] Exhibit 1 at 01:27 to 02:40;  Exhibit 3 at 03:20 to 04:40; Exhibit 4 at 03:45 to 05:00.
[99] Exhibit 1 at 01:27 to 02:40;  Exhibit 3 at 03:20 to 04:40; Exhibit 4 at 03:45 to 05:00.

b.  That the vehicle's tag was visible as Crocker was pursuing Lt. Gutierrez down 460 westbound.

c.  That Crocker saw the license plate at least at the beginning of the personal stop.

d.  That Lt. Nazario had complied with their commands, both explicit and implied, to slow down, pull over, turn off the vehicle, and put his hands out of the vehicle.

e.  That the officers understood why Lt. Nazario had waited until the BP to pull over, that it was reasonable, and that it happened all the time.

f.  That they immediately drew their weapons on Lt. Nazario.

g.  That Gutierrez threatened to execute Lt. Nazario.

h.  That Gutierrez expressly confirmed that Lt. Nazario was rightly and reasonably afraid to get out of his vehicle.

i.  That the Defendants were either unwilling or unable to provide a reasonable articulable suspicion or justification to escalate or even continue the traffic stop to Lt. Nazario notwithstanding his repeated, calm requests that they do so.

j.  That the Defendants had threatened to destroy Lt. Nazario's military career if he exercised his right as a citizen to complain about the Defendant's excessive, unreasonable, and illegal conduct.

62.  Gutierrez's reports are attached hereto as Exhibits 9 and 10. The fabrications that Gutierrez placed in his report, in the official record, include but are not limited to the following:

a.  "The occupant, later identified as CARON NAZARIO, was told approximately 6 times to show his hands and he refused."[100] This statement is false[101] and

---

[100] Exhibit 9 and Exhibit 10.
[101] Exhibit 1 at 00:00 to 00:18; Exhibit 4 at 02:00 to 02:05.

Gutierrez had at least *scienter* that the same was false when he entered it into the official record.[102]

b. "Crocker attempted to reach in and unlock the vehicle and NAZARIO slapped his hands away."[103] This statement is false,[104] and Gutierrez knew that the same was false when he entered it into the official record.[105]

c. "I then deployed my pepper spray however NAZARIO was able to block my first attempt with his left hand. I sprayed a second time and NAZARIO turned away and hit the side of his head and neck. My third spray was to his face."[106] This statement is false as Gutierrez's spray connected to Nazario' face on the first, second, and third spray, and Gutierrez actually sprayed him a fourth time.[107] Gutierrez knew that the same was false when he entered it into the official record to justify the multiple, unnecessary sprays.[108]

63. Further, Gutierrez reports omitted multiple material facts including but not limited to:

a. That Lt. Nazario had a rear tag properly displayed.

b. That the license plate was visible as Crocker pursued Lt. Nazario westbound down 460.

c. Crocker saw the license plate, and the license plate was in Gutierrez plain view at the beginning of the personal stop.

---

[102] Exhibit 1 at 00:00 to 00:18; Exhibit 3 at 02:28 to 02:40; Exhibit 4 at 02:00 to 02:04.
[103] Exhibit 9 and Exhibit 10.
[104] Exhibit 1 at 01:27 to 02:25;  Exhibit 3 at 03:23 to 04:21; Exhibit 4 at 03:45 to 04:47.
[105] Exhibit 1 at 01:27 to 02:25;  Exhibit 3 at 03:23 to 04:21; Exhibit 4 at 03:45 to 04:47.
[106] Exhibit 9, p.1 and Exhibit 10.
[107] Exhibit 1 at 02:23 to 02:40; Exhibit 3 at 04:19 to 04:35; Exhibit 4 at 04:46 to 05:03.
[108] Exhibit 1 at 02:23 to 02:40; Exhibit 3 at 04:19 to 04:35; Exhibit 4 at 04:46 to 05:03.

d.  The tag was visible to Gutierrez when Gutierrez exited his vehicle at the beginning of the encounter.

e.  That Lt. Nazario had complied with their commands, both explicit and implied to slow down, pull over, turn off the vehicle, and put his hands out of the air.

f.  That the Defendants understood why Lt. Nazario had waited until the BP to pull over, that it was reasonable, and that it happened all the time.

g.  That the Defendants immediately drew their weapons on Lt. Nazario.

h.  That Gutierrez threatened to execute Lt. Nazario.

i.  That Gutierrez stated vocally to Lt. Nazario that Lt. Nazario should be afraid to get out of his vehicle.

j.  That the Defendants were either unwilling or unable to provide a reasonable articulable suspicion or justification to escalate or even continue the traffic stop to Nazario notwithstanding his repeated, calm requests that they do so.

k.  That the Defendants had threatened to destroy Lt. Nazario's military career if he exercised his right as a citizen to complain about the Defendant's excessive, unreasonable, and illegal conduct.

## DAMAGES

64.  As a direct and proximate cause of the Defendants' actions, Lt. Nazario suffered the following:

a.  Bodily injury from the effects of the OC spray other physical touching.

b.  Injury to his clearly established constitutional rights.

c.  Past, present, and future physical pain and suffering from the effects of the OC spray and other physical touching.

d.  Past, present, and future mental anguish and damages from the initial incident as well as the lingering effects of fear and mental anguish predicated upon whether the Defendants will make good on their threats to retaliate against Lt. Nazario for exercising his Constitutional rights.

e.  Humiliation and embarrassment from being detained and battered on the side of the road and in a public space as well as having to subsequently tell his command and family about the incident.

f.  Damage to his personal property caused to his dog and his vehicle from the Defendants use of the OC spray.

g.  Actual deterrence from exercising his First Amendment rights.

## CLAIMS FOR RELIEF

### COUNT I – VIOLATION OF THE FOURTH AMENDMENT – UNREASONABLE SEIZURE
**Seeking Declaratory Relief, and Compensatory and Punitive Damages
Against All Defendants**

65.    Lt. Nazario repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

66.    The Defendants seized Lt. Nazario and placed him in a full custodial arrest using force and words that a reasonable person would have been afraid to ignore by, *inter alia*, requiring him to pull over, using their sirens and flashing lights, then by pulling their firearms on him and threatening to kill him, then by OC spraying him, blinding him, beating him, forcing him on his face, placing him in handcuffs, and interrogating him.

67.    The initial detention became unlawful from *at least* when the Defendants exited their vehicles at the BP station, as they at that point knew or should have known that Lt. Nazario

had license plates properly displayed on the vehicle and thus they lacked probable cause or a reasonable articulable suspicion to continue the detention.

68.     By continuing the detention and escalating it to a full custodial arrest by the use of firearms, death threats, OC spray, handcuffs, and interrogation, the Defendants continued the unreasonable, unlawful seizure of Lt. Nazario's person.

69.     Further, the Defendants temporarily illegally and unreasonably seized Lt. Nazario's lawfully purchased and possessed firearm, as when Defendant Crocker entered into Lt. Nazario's vehicle and seized the firearm, with Gutierrez knowledge, encouragement, and participation, Lt. Nazario was in handcuffs, in Gutierrez' custody and the custody of two EMT's, sitting on a trashcan far removed from the grabbing distance of the vehicle and blind from OC spray.

70.     When the Defendants seized the firearm, it was not pursuant to a lawful arrest, it was not for officer safety, the firearm was not evidence of any traffic infraction (or even of any of the crimes for which the Defendants threatened to charge Lt. Nazario with in violation of his clearly established rights), and neither defendant had even a reasonable articulable suspicion that the firearm was illegal.

71.     Thus, Lt. Nazario is entitled to compensatory damages, costs, and attorney's fees pursuant to 42 U.S.C. § 1983 and 1988 jointly and severally against the Defendants for their violation of Lt. Nazario's clearly established Fourth Amendment right to be free of illegal and unreasonable seizures.

72.     Further, the circumstances demonstrate that the Defendants actions were done intentionally, maliciously, and in a manner demonstrating a callous indifference to Lt. Nazario's

protected rights.  Therefore, the Defendants are liable to Lt. Nazario for punitive damages for the unreasonable seizures.

## COUNT II –VIOLATION OF THE FOURTH AMENDMENT – EXCESSIVE FORCE
### Seeking Declaratory Relief, and Compensatory and Punitive Damages
### Against All Defendants.

73.     Lt. Nazario repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

74.     The Defendants either directly, or via their presence, encouragement, and/or failure to intervene, deployed force that was objectively unreasonable against Lt. Nazario under the circumstances, by, *inter alia*, grabbing him, spraying him with OC, and striking him with their fists, knees, and hands, forcing Lt. Nazario onto his face, and placing him in handcuffs.

75.     At the time that the Defendants used this force on Lt. Nazario, they lacked probable cause to believe that Lt. Nazario had committed *any* crime, and they lacked even a reasonable articulable suspicion that Lt. Nazario had committed any crime. Lt. Nazario was not charged with any crime.

76.     At the time that the Defendants used this force on Lt. Nazario they had *at least* scienter that the Lt. Nazario had a license plate displayed on his vehicle, and thus they lacked probable cause or a reasonable articulable suspicion that Lt. Nazario had even committed the traffic infraction which was the ostensible justification for the initial stop.  Lt. Nazario was not charged with any traffic infraction.

77.     At the time that the Defendants used this force on Lt. Nazario, Lt. Nazario had given the Defendants no signals, taken no actions, or made threats, nor done anything that would have led a reasonable person to believe that Lt. Nazario posed a threat to the Defendants.  Quite the contrary, by slowing down, pulling over at a well-lit public space in a parking lot, turning off

23

his vehicle, placing his hands outside the vehicle, and remaining calm, a reasonable person and officer would have believed that Lt. Nazario was courteous, cognizant of officer safety, and ready, willing, able, and attempting to comply.

78.     At the time that the Defendants used this force on Lt. Nazario, Lt. Nazario had given the Defendants no signals, taken no actions, or made no threats that would have led a reasonable person to believe that Lt. Nazario was attempting to evade arrest by flight.  Lt. Nazario complied with the Defendants implied commands to slow down and pull over.  Lt Nazario pulled over in a well-lit BP gas station for his safety and for that of the Defendants, which the Defendants admitted happened all the time, and was a reasonable thing to do.  Lt. Nazario complied with the Defendants' commands to turn his vehicle off and place his hands outside the vehicle.  At no point did he take any action to restart his vehicle, close his window, or to flee on foot.

79.     At the time that the Defendants used this force on Lt. Nazario, Lt. Nazario had given the Defendants no signals, taken no actions, or made no threats that would have led a reasonable person to believe that Lt. Nazario was actively resisting a lawful arrest.  By this time the Defendants lacked probable cause to believe that Lt. Nazario had committed any crime or any traffic violation.  Lt. Nazario complied with the Defendants implied commands to slow down and pull over.  Lt Nazario pulled over in a well-lit BP gas station for his safety and for that of the Defendants, which the Defendants admitted happened all the time, and was a reasonable thing to do.  Lt. Nazario complied with the Defendants' commands to turn his vehicle off and place his hands outside the vehicle.  He made calm inquiries as to the reason for the stop, and receive no answer.

24

80.     It was reasonable that Lt. Nazario refused to exit the vehicle, given that the Defendants were unwilling and/or unable to explain the reason for the firearms or the traffic stop. despite Lt. Nazario's multiple calm requests that they do so, and further given that the officers were shouting inconsistent commands, had threatened to murder Lt. Nazario, and had confirmed that he should, in fact, be afraid to exit the vehicle.

81.     To the extent that Lt. Nazario pulled away from the Defendant's attempt to grab him, or in any way impeded their attempts to remove him from the vehicle, such actions were justifiable instinctive reaction to the Defendants sudden and unexplained threat of and use of force, by the fact that the arrest and detention were without probable cause or reasonable articulable suspicion, that the Defendants were unwilling and/or unable to explain the reason for the firearms or the traffic stop despite Lt. Nazario's multiple calm requests that they do so, were shouting inconsistent commands, had threatened to murder Lt. Nazario, and had confirmed that he should, in fact, be afraid to exit the vehicle.

82.     Therefore, no reasonable officer would have believed that Lt. Nazario was actively resisting a arrest (lawful or not) or attempting to evade an arrest (lawful or not) by flight, and to the extent that Lt. Nazario had decided to use force, such force would have been legal as Lt. Nazario would have been defending himself from the Defendants illegal and unreasonable use of force (lethal and otherwise) and their unreasonable, illegal arrest and detention.

83.     Further the Defendants lacked probable cause or even a reasonable articulable suspicion to believe that Lt. Nazario had committed *any* crime or traffic infraction and lacked even a reasonable articulable suspicion that Lt. Nazario had committed any crime or traffic infraction.

84.     To the extent that either of the Defendants did not personally and actively participate in any particular discrete use of force, the use of force under these circumstances violated Lt. Nazario's clearly established constitutional rights to be free from excessive force, the Defendant knew that the use of force would and did violate Lt. Nazario's rights, and such Defendant failed to intervene and stop it.

85.     Thus, Lt. Nazario is entitled to compensatory damages, costs, and attorney's fees pursuant to 42 U.S.C. § 1983 and 1988 jointly and severally against the Defendants for their violation of Lt. Nazario's clearly established Fourth Amendment right to be free of excessive force.

86.     Further, the circumstances demonstrate that the Defendants actions were done intentionally, maliciously, and in a manner demonstrating a callous indifference to Lt. Nazario's protected rights.  Therefore, the Defendants are liable to Lt. Nazario for punitive damages for their objectively unreasonable use of force.

## COUNT III – VIOLATION OF THE FOURTH AMENDMENT (ILLEGAL SEARCH)
### Seeking Declaratory Relief, and Compensatory and Punitive Damages
### Against All Defendants

87.     Lt. Nazario repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

88.     Defendant Crocker, with the knowledge, consent, and participation of Defendant Gutierrez, entered into Lt. Nazario's vehicle, searched for his firearm, searched the firearm for its serial number, and transmitted the same to dispatch to determine whether the firearm was stolen. When the firearm came back clean, Crocker placed it back in the vehicle.

89.     At the time that Defendant Crocker entered into Lt. Nazario's vehicle to search for and seize Lt. Nazario's firearm, search the firearm for its serial number, and transmit the

same to dispatch to determine if the firearm was stolen, with Gutierrez' knowledge, participation, and consent, Lt. Nazario was in handcuffs, in the custody of Defendant Gutierrez and two EMTs, incapacitated, blinded by OC spray, and away from the grabbing distance of the interior of the vehicle.  Thus, such search and seizure could not have been done under the guise of "officer safety."[109]

90.     At the time that Defendant Crocker entered into Lt. Nazario's vehicle to search for and seize Lt. Nazario's firearm, search the firearm for its serial number, and transmit the same to dispatch to determine if the firearm was stolen, with Gutierrez' knowledge, participation, and consent, no reasonable officer would have believed that the presence or absence of a firearm would have been evidence in any way of the "crimes" for which the Defendants' had purportedly detained Lt. Nazario, *to wit:* a traffic infraction, obstruction of justice with force, and assault of a law enforcement officer.

91.     At the time that Defendant Crocker entered into Lt. Nazario's vehicle to search for and seize Lt. Nazario's firearm, search the firearm for its serial number, and transmit the same to dispatch to determine if the firearm was stolen, with Gutierrez' knowledge, participation, and consent, neither of the Defendants had any reasonable articulable suspicion to support any claim that Lt. Nazario was possessed of an illegal firearm or that such firearm was illegal.

92.     At the time that Defendant Crocker entered into Lt. Nazario's vehicle to search for and seize Lt. Nazario's firearm, search the firearm for its serial number, and transmit the same to dispatch to determine if the firearm was stolen, with Gutierrez' knowledge, participation, and consent, the Defendants lacked probable cause to have arrested or even continued to detain

---

[109] Indeed, such a claim at this point, that the Defendants searched the vehicle for the firearm and seized it for "officer safety" would be both specious and spurious at best, given that the Defendants have already provided the reason for searching for and seizing the firearm and relaying its serial number to dispatch, and this reason was *not* officer safety.

Lt. Nazario, and thus *any* search was illegal, and could not have been conducted pursuant to a lawful arrest.

93.     At the time that Defendant Crocker entered into Lt. Nazario's vehicle to search for and seize Lt. Nazario's firearm, search the firearm for its serial number, and transmit the same to dispatch to determine if the firearm was stolen, with Gutierrez' knowledge, participation, and consent, neither of the Defendants had sought or received Lt Nazario's consent to search his vehicle for the firearm, and neither Defendant sought or possessed a warrant for such search.

94.     At the time of the search, and during such search, Gutierrez (and Crocker) and a reasonable officer would have known that the search was violating Lt. Nazario's clearly established constitutional rights, Gutierrez had the opportunity to intervene and stop the search, and yet Gutierrez failed to do so.

95.     Thus, Lt. Nazario is entitled to compensatory damages, costs, and attorney's fees pursuant to 42 U.S.C. § 1983 and 1988 jointly and severally against the Defendants for their violation of Lt. Nazario's clearly established Fourth Amendment rights to be free of an unreasonable search.

96.     Further, the circumstances demonstrate that the Defendants actions were done intentionally, maliciously, and in a manner demonstrating a callous indifference to Lt. Nazario's protected rights.  Therefore, the Defendants are liable to Lt. Nazario for punitive damages for their objectively unreasonable warrantless search in violation of Lt. Nazario's clearly established right to be free from unreasonable searches.

## COUNT IV – VIOLATION OF THE FIRST AMENDMENT
### Seeking Compensatory and Punitive Damages
### Against All Defendants

97.     Lt. Nazario repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

98.     As the Defendants admitted in their conversations with Lt. Nazario, speaking out about the Defendant's misconduct, and seeking redress for it was a protected First Amendment activity, are parts of our "right[s] as a citizen."

99.     Contrary to these rights, the Defendants engaged in conduct in an attempt to extort Lt. Nazario's silence, to knowingly and adversely affect Lt. Nazario's willingness to exercise his First Amendment rights, and their conduct had such affect.  The Defendants stated in no uncertain terms that unless Lt. Nazario were to remain silent, or if Lt. Nazario chose to exercise his First Amendment protected right as a citizen to complain about their unreasonable, illegal conduct, they would charge him with multiple crimes (for which they lacked probable cause) such as felony obstruction with force, eluding, and assault on a law enforcement officer, in order to, *inter alia*, destroy his military career.

100.    To the extent that either of the Defendants did not personally and actively participate in any particular, discrete threats knowingly intended to chill Lt. Nazario's exercise of his First Amendment rights and coverup the Defendants' wrong doing, such threats for such a purpose under these circumstances violated Lt. Nazario's clearly established constitutional rights that the First Amendment protects, such Defendant knew that the use of force would and did violate Lt. Nazario's rights, and such Defendant failed to intervene and stop it.

101.    In fact, upon returning to the police station, the Defendants took the steps necessary to retaliate.  They falsified and prepared the documents necessary to charge Lt.

Nazario with such as felony obstruction with force, eluding, and assault on a law enforcement officer.  No reasonable officer or person would have that it was more likely than not that Lt. Nazario had committed any of the above.

102.    These threats and actions in an attempt to preclude First Amendment activity has would deter a person of ordinary firmness similarly situated to the plaintiff in the exercise of First Amendment rights.  In fact, Lt. Nazario's First Amendment activity was chilled, he has experienced heightened fear and anxiety regarding any decision about whether to exercise his First Amendment to call into question and petition the government for a redress of the Defendants violation of Lt. Nazario's clearly established rights, including filing this lawsuit, due to fear of the threatened retaliation and his command's response to the illegally procured criminal charges.

103.    Thus, Lt. Nazario is entitled to compensatory damages, costs, and attorney's fees pursuant to 42 U.S.C. § 1983 and 1988 jointly and severally against the Defendants for their violation of Lt. Nazario's clearly established First Amendment rights.

104.    Further, as the Defendant's conduct was taken to silence Lt. Nazario and to cover up their knowingly illegal conduct violating Lt. Nazario's clearly established rights, and was done intentionally, maliciously, and in a manner demonstrating a callous indifference to Lt. Nazario's protected rights.  Thus, the Defendants are liable to Lt. Nazario for punitive damages for the violations of Lt. Nazario's clearly established First Amendment rights.

### COUNT V – Common Law Assault.
**Seeking Compensatory and Punitive Damages
Against all appropriate Defendants, jointly and/or severally**

105.    Lt. Nazario repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

106.     This is a claim for common law assault against all Defendants.

107.     The Defendants knowingly, willfully and wantonly, intentionally, directly and/or by being present and explicitly encouraging such behavior, assaulted Lt. Nazario by, *inter alia*, pointing their firearms at him, grabbing him to try to pull him out of the vehicle, spraying him with OC spray, striking him on his face, back and legs, grabbing him, and placing him in handcuffs.

108.     Lt. Nazario was aware of each of these actions, and prior to and as a result of such contact, each put him in reasonable fear of the forthcoming batteries.

109.     In each instance, the Defendants acted with *at least* scienter that their actions were likely to place Lt. Nazario in reasonable fear of an imminent physical battery, and such actions were designed to elicit such a reaction from Lt. Nazario.

110.     In each instance, the Defendants lacked any legal justification or excuse for their conduct.  And under these circumstances, the Defendants are not entitled to sovereign immunity. Further as assault is an intentional tort, the doctrine of sovereign immunity does not apply.

111.     These actions were the legal and proximate cause of Lt. Nazario's damages as complained of herein and thus Lt. Nazario is entitled to compensatory damages for common-law assault.

112.     Further, these actions were taken under circumstances that amount to *at least* a willful and wanton disregard for Lt. Nazario's rights, and thus punitive damages for common-law assault are warranted.

## COUNT VI – Common Law Battery.
### Seeking Compensatory and Punitive Damages
### Against all Defendants

113.    Lt. Nazario repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

114.    This is a common law claim of battery against the Defendants.

115.    The Defendants, either directly or via their presence and encouragement, intentionally touched Lt. Nazario by, *inter alia*, grabbing him, spraying him with OC spray, striking him with the Defendants' hands and knees, and placing Lt. Nazario in handcuffs.

116.    The Defendants' touching of Lt. Nazario was harmful, offensive, excessive and disproportionate, and conducted without lawful justification or excuse.

117.    At no time during these batteries was Lt. Nazario combative or presenting such a threat to the Defendants such as to warrant such violence and harmful and offensive touchings.

118.    As a direct and proximate cause of the Defendant's battery of him (either directly or by their presence and encouragement), Lt. Nazario suffered damages as described herein, and therefore, the Defendants are liable to Lt. Nazario for compensatory damages for the common law tort of battery.

119.    Further, these actions were taken under circumstances that amount to *at least* a willful and wanton disregard for Lt. Nazario's rights, and thus punitive damages for common-law tort of battery are warranted.

## COUNT VII – Common Law False Imprisonment.
### Seeking Compensatory and Punitive Damages
### Against all Defendants

120.    Lt. Nazario repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

121.     This is a claim for common law false imprisonment.

122.     The Defendants seized Lt. Nazario without legal justification or excuse, and/or failed to release Lt. Nazario after it became apparent they lacked probable cause or a reasonable articulable suspicion sufficient to provide legal justification or excuse for such continued seizure, which amounted to a full custodial arrest.

123.     At all times relevant herein, the Defendants acted with the intention of confining Lt. Nazario within fixed boundaries, and their conduct directly or indirectly resulted in such confinement, and Lt. Nazario was aware of such the confinement.

124.     The Defendants imposed by force and threats of force this unlawful restraint upon Lt. Nazario's freedom of movement by, *inter alia*, using firearms, threatening to murder Lt. Nazario, spraying Lt. Nazario with OC spray thereby blinding him, striking him with their hands and knees, grabbing Lt. Nazario, and placing Lt. Nazario in hand cuffs.

125.     At no time during these actions did the Defendants inform Lt. Nazario that he was free to leave, and under the circumstances, no reasonable person would have believed that he or she was free to leave, effectively limiting Lt. Nazario's free movement under the auspices of unfounded legal authority.

126.     At the time of this continuing detention, the Defendants knew or should have known that they neither had a reasonable articulable suspicion or probable cause to believe that Lt. Nazario had committed any crime or posed any danger to the Defendants or any other person.

127.     In restricting Lt. Nazario's freedom of movement in such a manner, the Defendants acted intentionally, willfully, maliciously, and recklessly.

128.    As a direct and proximate cause of the Defendant's battery, Lt. Nazario suffered damages as described herein, and therefore, the Defendants are liable to Lt. Nazario for compensatory damages for the common-law tort of false imprisonment.

129.    Further, these actions were taken under circumstances that amount to *at least* a willful and wanton disregard for Lt. Nazario's rights, and thus punitive damages for common-law tort of false imprisonment are warranted.

**COUNT VIII – Illegal Search in Violation of Virginia Code § 19.2-59.**
**Seeking Compensatory and Punitive Damages**
**Against all Defendants**

130.    Lt. Nazario repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

131.    This is a state law claim for a civilly enable Virginia criminal statute prohibiting warrantless searches that violate the Fourth Amendment to the Constitution of the United States.

132.    As described herein, the Defendants (either directly or by their presence and encouragement) entered into Lt Nazario's vehicle to search for a firearm, and (once finding and seizing the firearm) searched it for its serial number to check to see if it had been stolen.

133.    At the time that the Defendants searched Lt. Nazario's vehicle and subsequently his firearm, Lt. Nazario was in handcuffs, blinded by OC spray, removed from the grabbing distance of the interior of the vehicle, and seated some distance away on a trashcan and in the custody of one of the Defendants and two EMTs.

134.    At the time that the Defendants searched Lt. Nazario's vehicle and subsequently his firearm, the Defendants lacked any reasonable articulable suspicion that the firearm was stolen or otherwise illegal.

135.    At the time that the Defendants searched Lt. Nazario's vehicle and subsequently his firearm, no reasonable person would have believed that the firearm was evidence of the traffic infraction that the Defendants used to initially justify the stop, nor of any of the myriad of other crimes that the Defendants threatened to charge Lt. Nazario with.

136.    In fact, the Defendants lacked probable cause or a reasonable articulable belief to charge Lt. Nazario with *any* crime stemming from the encounter or with the initially suspected traffic infraction.

137.    As is evidenced by, *inter alia*, the Defendants' violation of Lt. Nazario's clearly established laws prohibiting warrantless searches, the Defendants' actions were *at least* grossly negligent and thus they are not entitled to sovereign immunity.

138.    Therefore, these Defendants are guilty of having committed malfeasance in office.

139.    As a direct and proximate cause of the Defendants' illegal search (either directly or via their presence and encouragement), Lt. Nazario suffered damages as described herein, and therefore, the Defendants are liable to Lt. Nazario for compensatory damages for their violation of Virginia Code § 19.2-59.

140.    Further, these actions were taken under circumstances that amount to *at least* a willful and wanton disregard for Lt. Nazario's rights, and thus punitive damages for their violation of Virginia Code § 19.2-59 are warranted.

## PRAYER FOR RELIEF

**WHEREFORE,** the above premises considered, Plaintiff respectfully prays that this Honorable Court:

(1) Enter judgment against the Defendants jointly and severally and in favor of Lt.

Nazario for compensatory damages in the amount of One Million Dollars

($1,000,000.00), or such amounts as a jury may award for the violations of Counts I through VIII as complained of herein.

(2) Enter judgment against the Defendants jointly and severally and in favor of Lt. Nazario for compensatory and punitive damages in such amounts as a jury may determine for the violations of Counts I through VIII as complained of herein.

(3) Declare that the Defendants' actions violated Lt. Nazario's clearly established First and Fourth Amendment Rights as complained of in Counts I, II, III, and IV.

(4) Declare that the Defendants have committed malfeasance in office pursuant to Virginia Code § 19.2-59 for their violation as described in Count VIII.

(5) Lt. Nazario's reasonable costs, expenses, and attorneys' fees as provide by, *inter alia* 42 U.S.C. § 1988 and its attendant case law.

(6) Pre- and post-judgment interest, and

(7) Any such further relief as this Court deems warranted.


**Respectfully submitted,**

By:  /s/  Jonathan M. Arthur, Esq.
Counsel

Jonathan M. Arthur, Esq. VSB # 86323
j.arthur@robertslaw.org
Thomas H. Roberts, Esq. VSB # 26014
tom.roberts@robertslaw.org
Andrew T. Bodoh, Esq. VSB # 80143
andrew.bodoh@robertslaw.org
Thomas H. Roberts & Associates, P.C.
105 South 1st Street
Richmond, VA 23219
(804) 991-4308 (Direct)
(804) 783-2000 (Firm)
(804) 783-2105 (Fax)
*Counsel for Plaintiff*