## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## NORFOLK DIVISION

| | | |
|---|---|---|
| **Caron Nazario** | : | |
| *Plaintiff,* | : | |
| v. | : | Civil Action No. 2:21-cv-00169 |
| | : | |
| **Joe Gutierrez**, | : | JURY DEMANDED BY |
| *In his personal capacity* | : | PLAINTIFF |
| | : | |
| and | : | |
| **Daniel Crocker** | : | |
| *In his personal capacity,* | : | |
| *Defendants.* | : | |

### DEFENDANT DANIEL CROCKER'S MEMORANDUM OF LAW
### IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Now Comes Defendant Daniel Crocker ("Crocker"), by counsel, pursuant to Rule 56 of the Federal Rules of Civil Procedure and submits this memorandum of law in support of his motion for summary judgment against the Plaintiff, Caron Nazario ("Nazario"):

## I.  INTRODUCTION AND EXHIBITS

This case involves claims by Caron Nazario, a reservist in the U.S. Army/Virginia National Guard, for alleged Constitutional violations and psychological injuries sustained during a December 5, 2020 traffic stop in Windsor, Virginia, in which the Plaintiff was pepper sprayed following refusal to comply with numerous commands of the Defendants Crocker and Joe Gutierrez ("Gutierrez"), both uniformed law enforcement officers with the Town of Windsor Police Department operating in marked police cars at the time of the traffic stop.

The following videos were attached to Nazario's Complaint as Exhibits and incorporated by reference into this memorandum of law in support of Defendant Crocker's motion for summary judgment. The Exhibit numbers correspond to the Complaint Exhibits:

A.  Nazario's own cell phone video was attached as Exhibit 1 and Exhibit 2 to the Complaint

and is referred to herein as Exhibit 1 and Exhibit 2. [1]

B. Gutierrez' body camera video was attached as Exhibit 3 to the Complaint and is referred to herein as Exhibit 3.

C. Crocker's body camera video was attached as Exhibit 4 and Exhibit 5 to the Complaint and is referred to herein as Exhibit 4 and Exhibit 5.

Additionally, the following Exhibits are attached to this memorandum of law in support of

Defendant Crocker's motion for summary judgment:

D. The deposition of Defendant Daniel Crocker is attached hereto as Exhibit 6 and cited herein as "Crocker depo".

E. The deposition of Defendant Joe Gutierrez is attached hereto as Exhibit 7 and cited herein as "Gutierrez depo".

F. The deposition of Chief of the Windsor Police Department Rodney Riddle is attached hereto as Exhibit 8 and cited herein as "Riddle depo".

G. The deposition of Plaintiff Caron Nazario is attached hereto as Exhibit 9 and cited herein as "Nazario depo".

H. Body camera video (redacted) from Windsor Police Officer Wiliford Owens from a November 7, 2020 traffic stop of Nazario is attached hereto as Exhibit 10 and cited herein as "Nov. 2020 bodycam". This video was identified and produced by the Plaintiff in discovery with Plaintiff's Bates number CN-3064.

I. Crocker video and affidavit, attached hereto as Exhibit 11 and produced to Plaintiff as a supplemental response to discovery.

Additional exhibits with singular citations will referenced separately in the brief that follows.

## II.     **Statement of Undisputed Material Facts Pursuant to Local Rule 56(B)**

1.     Plaintiff Caron Nazario ("Nazario") is a resident of Petersburg, Virginia and member

of the United States Army Reserve with the Virginia National Guard, under the Department of the

Army of the United States. See https://va.ng.mil/Mission/ (About the Virginia National Guard).

---

[1] Nazario attached Exhibits 1 through 5 to his Complaint initiating this lawsuit. His attorneys further reiterated that the "video speaks for itself" during Nazario's deposition. See Nazario Depo at 102:20 (in reference to Exhibit 11 of this motion) and 122:10-11 (in reference to Exhibit 4). Additionally, to the extent that the body camera footage differs from the Plaintiff's allegations, the "exhibit prevails" rule states that the exhibit – the body camera footage – overrides the Plaintiff's narrative to the contrary. Fayetteville Inv'rs v. Commercial Builders, Inc., 936 F.2d 1462, 1465 (4th Cir. 1991) ("in the event of conflict between the bare allegations of the complaint and any exhibit attached . . . , the exhibit prevails.").

2.      Following his graduation from Virginia State University in 2016, Nazario worked full-time with the Virginia Department of Health. Depo of Caron Nazario, pp. 21-22. He also owned and operated a real estate business, which he still does today. [Nazario Depo, pp. 8 and 23]. At all times relevant to the lawsuit, Nazario additionally worked part time campus security at Richard Bland College[2]. [Nazario depo, p. 27].

3.      At all times relevant to this lawsuit, Nazario was- and still is – a reservist medical officer in the United States Army Reserve and typically works in this capacity one weekend per month or less.  [Nazario depo, pp. 8 – 10].

4.      Defendant Daniel Crocker is a police officer with the Windsor Police Department in Windsor, Virginia. Officer Daniel Crocker began working for the Windsor Police Department in May 2020.  Crocker depo, p 8. Upon being hired with the Windsor PD, Crocker attended initial police training at the Hampton Roads Criminal Justice Academy from May 2020 until October 2020 and was in field training status on December 5, 2020.  Crocker depo, p 14 and 21. Crocker's primary field training officer ("FTO") was Officer Owens and Gutierrez was Crocker's FTO on December 5, 2020.   [Crocker depo, pp 16-18; 126].

5.      Defendant Joe Gutierrez was employed as a police officer with the Windsor Police Department at the time of the December 5, 2020 traffic stop. [Comp. ¶ 2; Gutierrez depo, p. 56-59].

6.      The Windsor Police Department is a seven-member police force located in the Town of Windsor, Virginia, in Isle of Wight County. All officers who are hired are given a policy procedure

---

[2] Note that the Richard Bland College expressly excludes pepper spray from the definition of weapons and permits students to possess pepper spray on campus for self-defense purposes. See, e.g., Richard Bland College Code of Conduct 2020-2021, p. 14, 18 https://www.rbc.edu/wp-content/uploads/2020/10/2020-21-Code-of-Conduct.pdf. A simple Google search reveals that pepper spray is widely available for public purchase at such places as Wal-Mart, Home Depot, RiteAid, and 7-11.

manual and go through the field training program. [Riddle depo, p. 21]. U.S. Route 460 is a major east-west thoroughfare between Hampton Roads/Coastal Virginia and Petersburg/Richmond and western parts of the Commonwealth of Virginia. *See* https://en.wikipedia.org/wiki/U.S._Route_460. As it travels through Windsor, this road is also known as Windsor Blvd. and E. Windsor Blvd.

7.      On November 7, 2020, at approximately 6:18 am., Nazario was driving eastbound on US Route 460 in a new model 2020 Chevrolet Tahoe with heavily tinted windows. Windsor Police Officer Wiliford "Bill" Owens initiated a traffic stop of Nazario's Chevrolet Tahoe for exceeding the posted speed limit traveling 54mph in a 35mph zone. [Nazario depo, pp. 93 -95]. While pursuing Nazario, Officer Owens informed dispatch that the Chevrolet Tahoe had no rear license tag displayed. [Nov. 2020 bodycam, Ex. 10 at 6:19:22 (elapsed 1:04)].

8.      Nazario eventually pulled into the Food Lion parking lot. When Officer Owens approached the driver's side of the vehicle, Nazario informed Officer Owens that there was a temporary tag taped to the inside of the rear window, and Officer Owens proceeded to the rear window to observe the temporary tag, which even in daylight can only be seen when Officer Owens shines his flashlight directly onto the rear window of the Tahoe. [Nazario depo, pp. 102; Nov. 2020 bodycam, Ex. 10 at 06:20:36 (elapsed 3:09); 06:21:30 to 49 (elapsed 3:17 to 3:36)].

9.      Nazario's New York In-Transit temporary tag expired on October 1, 2020, a copy of which is attached as Exhibit 12, labeled as CN-4536 and was not properly displayed under either New York or Virginia law.[3]

---

[3] Applicable New York Laws: 1) NY Consolidated Laws VAT § 402(1)(a) (license tags be "conspicuously displayed, … and placed, whenever reasonably possible, not higher than forty-eight inches and not lower than twelve inches from the ground"); and 2) NY Consolidated Laws VAT § 402(1)(b) (license tags "shall not be covered by glass or any plastic material, and shall not be knowingly covered or coated with any artificial or synthetic material or substance that conceals or obscures such number plates."). A 2020 Chevrolet Tahoe is 75.9 inches in height and the license tag was placed in the upper corner of the passenger side of Nazario's vehicle, clearly more than

10.     On December 5, 2020, Nazario was traveling in his 2020 Chevrolet Tahoe SUV westbound on the same section of U.S. Route 460 where Officer Owens stopped him on November 7, 2020. [Nazario depo, pp. 93 -95]. His New York temporary in-transit license tag remained in the same position as it had been on November 7, 2020, at which time it had been invisible to Officer Owens without the aid of a flashlight. [Ex. 5 at 19:02:27; Nov. 2020 bodycam, Ex. 10 at 06:21:30].[4]

11.     At approximately 6:34 p.m., Crocker observed the Tahoe traveling on U.S. Route 460 with no visible license tag and initiated a traffic stop by activating the blue emergency lights of his marked police cruiser [Complaint, ¶ 14; Ex. 4 at 18:34 (elapsed 0:00)] and activating his siren when Nazario did not signal an intent to pull over [Ex. 4 at 18:35:01 (elapsed 0:40)]. Nazario continued traveling for more than one mile through the Town of Windsor, passing multiple, well-lit or suitable locations to pull over on the right-hand side of the roadway, including Old Pointe National Bank; the Windsor Fire Department; Anna's Pizza; the Windsor Police Department; Farmer's Bank; and CVS Pharmacy, before pulling into the BP Service Station on the left-hand side of the road as he approached an intersection where the traffic light was red. [Nazario depo, pp. 103-111; Ex. 11].

12.     Gutierrez joined the pursuit in a separate, marked police cruiser with blue lights and siren activated.  [Ex. 3 at 18:35:01 (elapsed time 0:01)].

13.     Nazario continued driving along U.S. Route 460 in the right-hand lane below the speed limit with both officers behind him before slowly going from the right lane to the left lane and then abruptly going across the oncoming two lanes to the BP parking lot on the other side of the road.[5] Nazario did not make it through the approaching intersection before the light turned red.

---

48inches above the ground. https://www.caranddriver.com/chevrolet/tahoe/specs

Applicable Virginia Law: Va. Code Ann. § 46.2-716(A)(2) and (3); (B), (prohibiting placing any cover including glass that obscures a license tag or renders any portion illegible).

[4] See also Comp. ¶ 13, stating no external license plate displayed.

[5] "Not really a turn. It was kind of just across – a diagonal across into the parking lot." Crocker

14.     At approximately 18:36:00 (6:36 pm), Plaintiff stopped his vehicle at a BP service station located on the opposite side (eastbound side) of U.S. Route 460. [Ex. 4 at 18:36:00 (elapsed 1:39); Ex. 3 at 18:36:10 (elapsed 1:22)] Nazario's manner of driving necessitated Crocker's classification of the stop as a high risk traffic stop. [Crocker depo, p. 85-92][6].

15.     Officer Crocker exited his police vehicle, drew his firearm, commanded Nazario: "Driver roll the window down" and reported to dispatch that the encounter was a high risk a/k/a "felony traffic stop".  [Ex. 4 at 18:36:10 (elapsed 1:49); Ex. 3 at 18:36:22 (elapsed 1:34)]. The terms "felony traffic stop" and "high-risk traffic stop" are often used interchangeably, and procedures followed by officers are the same for both types of stops. [Crocker depo, p 92-93]. [7]

16.     After Crocker gave multiple commands to Nazario to show his hands, Nazario finally revealed his left elbow in the driver's side window but did not show either of his hands to Crocker

---

depo, p. 90:14-15.

[6] Crocker deposition at p. 93:21 – 94:17:
Crocker: I mean, that's a classic sign of a stolen vehicle that we were taught in our police academy.
Q. What is?
Crocker: A newer, newer vehicle, no tags displayed on it, dark tinted windows you can't see inside, you have no number – no idea the number of occupants inside that vehicle, no license plates to identify whose vehicle it may be, not stopping, continuing to travel; those are all the criteria that you may run across with stolen vehicles.
---
Crocker: It definitely heightened my suspicions. I mean, at 23 miles an hour, if you have a firearm, or even if you loaded it, at that point you could be waiting for – to practically assassinate me when I walk to the window if you don't elevate the rest of the traffic stop, not to mention he had the gun.

[7] Crocker depo at p. 92:11-24.
Arthur: is that – now, is there a difference between a high risk and a felony stop?
Crocker: No, sir. They're interchangeable words…as my understanding goes.
Arthur: All right. Some departments seem to use it interchangeably, some seem to have –
Crocker: No, sir, we –
Arthur: -- separate thing
Crocker: --we kind of use them interchangeably --… -- in ours. In fact, it was taught interchangeably in our academy as well.

at first. As Crocker was shouting "Let me see your hands," Plaintiff was setting up his cell phone on the dashboard of his vehicle to record the interaction. [Ex. 1 at 00:12].

17.     The rear lights of the Plaintiff's vehicle remained on and it is not clear whether Plaintiff complied with the order to turn the vehicle off. [Ex. 4 at 18:36:23 (elapsed 2:02)][8]

18.     Nazario responded: "I'm not getting out the vehicle, what's going on?" [Ex. 1 at 0:22], as Crocker continued commanding Nazario to exit the vehicle, which Nazario continued to ignore, prompting Gutierrez to take the lead and command Nazario to "Get out of the car now".

19.     Nazario ignored these clear police commands, asking "What's going on?" no less than nine more times while remaining in his vehicle in defiance of Gutierrez and Crocker's lawful commands.  [Ex. 1, at 0:01 to 2:05].

20.     At that point, Gutierrez responded to Plaintiff's question by stating "What's going on is you're fixin' to ride the lightening, son."[9]  [Ex. 4 at 18:37:55 (elapsed 3:33); Ex. 3 at 18:37:58 (elapsed 3:06)], and holstered his firearm and drew his Taser, and continued to order Nazario to exit the vehicle, which commands Nazario continued to refuse.[10]

21.     Gutierrez then attempted to open his driver's side door but the door was locked.

22.     Nazario continued arguing with the officers, repeating "What's going on?" and pronouncing "I have not committed any crimes," at which point Gutierrez informed Nazario that he

---

[8] Crocker observing the body camera video [Complaint Ex. 4]: "[The vehicle] appears to still be running;" "the lights typically go off when their vehicle is off;" "If I wrote in my report that [the vehicle] was running, then I remember, for some reason, that it was running." Crocker depo, p. 99:17-101:22.

[9] "Ride the lightning" is a common term for a taser. Crocker depo, p. 66:15-19; Gutierrez depo, p. 109 ("I rode the lightning; a lot of cops have.").

[10] As Nazario defied commands by Gutierrez to exit the vehicle, Officer Crocker pleaded with Nazario - "Sir, just get out of the car!  Work with us and we'll talk to you.  Get out of the car." Plaintiff continued to refuse to comply. Exhibit 4 at 18:38:07 (elapsed time 3:46)

was being stopped for a traffic violation; and that he was not cooperating and was being detained for obstruction of justice.  [Ex. 4 at 18:38:25 (elapsed 4:04)].

23.      Plaintiff heard and understood the multiple commands from Crocker and Gutierrez but did not comply, [Nazario depo, p 112; 121] and incorrectly stated, "For a traffic violation I do not have to get out of the vehicle."  [Ex. 4 at 18:38:29 (elapsed 4:08)].

24.      At 18:38:39 (6:38:39 pm), Officer Gutierrez put away his taser and went hands-on with Nazario, attempting an arm bar maneuver to remove him from the vehicle, while Nazario resisted, telling Gutierrez repeatedly to "Get your hands off of me." [Complaint Ex. 4 at 18:38:40 (elapsed 4:18); Ex 1, elapsed time 1:56 to 2:02.]

25.      At that point, and in plain view of Nazario, Gutierrez pulled out his OC spray[11] and started shaking it. [Ex. 4 at 18:38:43 (elapsed 4:22)]. Nazario saw Gutierrez shaking the OC spray, turned his head away slightly, and repeated "Don't do that" four times,  [Ex. 4 at 18:38:48 (elapsed 4:27); Ex. 1 at 2:01 to 2:08], while Crocker calmly said, "Sir, sir, hey sir, I'm going to talk to you, just get out the car, just get out." [Ex. 4 at 18:38:49 (elapsed 4:28)].[12]

26.      Crocker then reached into the vehicle, unlocked and partially opened the door before Nazario used his elbow to pull the door closed and lock it again.  [Complaint, ¶ 37; Complaint fn 4 citing Exs. 1, 3, and 4; Ex. 1 at 2:18 to 2:24]. When Gutierrez attempted to open the door immediately thereafter, the door was locked. [Ex. 4 at 18:38:59 (elapsed 4:37)].

27.      Gutierrez and Crocker commanded Nazario an additional six times to get out of the

---

[11] OC Spray, sometimes called pepper spray, is a non-lethal chemical agent commonly employed by police to stop suspects from resisting arrest.  *See, e.g.,* https://www.sabrered.com/pepper-spray-frequently-asked-questions-0

[12] "We can agree that when [Gutierrez] shakes – takes a can of OC spray and shakes it while the person is looking at you, then telling your partner to back up, we could agree that's a – but could we agree that's a good warning? That's my answer." [Crocker depo, p. 117:3-11].

car, and when Nazario did not comply, Gutierrez deployed OC spray on Nazario and Crocker immediately informed dispatch that OC spray had been deployed. [Exhibit 4 at 18:38:50 to 18:39:15 (elapsed 4:38 to 4:53)].

28. Nazario still refused to exit the vehicle until Gutierrez commanded Nazario to get out the car and get onto the ground, "or you're going to get it again." [Ex. 4 at 18:39:35 (elapsed 5:13)]. At this point, Nazario had refused the officers' commands for approximately three and a half minutes since pulling into the BP service station.

29. Gutierrez then commanded Nazario at least nine more times over nearly a full minute before Nazario finally unhooked his seatbelt, after which Gutierrez told him to get "straight onto the ground," which Nazario refused to do. [Ex. 4 at 18:39:55 to 18:40:39 (elapsed 5:34 to 6:17)].

30. After another 10 seconds of noncompliance, Gutierrez took Nazario by the arm and instructed him twice more to get onto the ground, all the while Nazario struggled with Gutierrez to prevent him from handcuffing him, leading Gutierrez to perform a "knee strike" in order to get Nazario onto the ground as he continued to resist. [Ex. 4 at 18:40:58 (elapsed 6:37)].

31. Crocker then took hold of Nazario's arm to assist Gutierrez. Once on his knees, Nazario resisted for another minute before finally complying when Gutierrez warned Nazario that if he continued to resist he would be tased. [Ex. 4 at 18:41:01 (elapsed time 7:41)].

32. With Nazario finally placed in handcuffs, Gutierrez and Crocker immediately brought Nazario back to a standing position and the paramedics from the Isle of Wight Emergency Services Department arrived on scene within minutes in response to Crocker's earlier request after Gutierrez initially deployed the OC spray.

33. While attending to Nazario, one of the paramedics asked Nazario if he had weapons on him or in the vehicle to which Nazario responded "yes". [Ex. 4 at 18:42:42 (elapsed 8:21)].

34.     At Nazario's request, Crocker went into the service station and got some water for Nazario, opened the windows of Nazario's Tahoe for the benefit of Nazario's dog who was in the rear of the vehicle, and adjusted the handcuffs to make Nazario more comfortable. [Ex. 4 at 18:43:25 to 18:54:24 (elapsed 9:04 to 20:03)].

35.     One of the paramedics asked Nazario if he had any weapons in the vehicle to which Nazario stated "Yes" and, when asked what kind of weapons he had, Nazario responded, "It's right there, I'm sure you saw it already" and told the officers exactly where to find his weapon – a loaded 9-millimeter handgun – on the driver's side of the center console near Nazario's right leg, where it had been throughout the encounter with police. Crocker then went to Nazario's vehicle, immediately saw the handgun from the exact location Nazario described, used his radio to call in the weapon's serial number, and returned it to the vehicle immediately upon receiving confirmation that it had not been reported stolen. In total, the handgun was in Crocker's possession for less than one minute. [Ex. 4 at 18:43:25 to 18:54:24 (elapsed 9:04 to 20:03); Crocker depo, pp 131-132].

36.     Once the scene had calmed down and the effect of the OC spray was lessening, Crocker explained to Nazario that he had initiated the traffic stop because the license tag was not visible, and that he could not see the license tag until he approached the vehicle under the BP service station lights after the stop at which point Nazario's own actions caused Crocker's attention to be focused on Nazario and not the license tag.  [Ex. 5 at 19:02:17 (elapsed 0:35)].

37.     Crocker explained to Nazario that a high-risk traffic stop was conducted because Nazario drove for over a mile with Crocker in pursuit with lights and sirens activated, while Nazario drove well under the speed limit but gave no indication of intent to pull over, passing multiple places to stop, all of which raised the officers' suspicions.  [Ex. 5 at 19:03:13 (elapsed 1:32)].

38.     Crocker explained that Nazario's refusal to comply with their commands had

escalated the situation, and pointed out that Plaintiff had a gun at his right leg the entire time. [Ex. 5 at 19:03:50 (elapsed 2:09)]. [13]

39.     Gutierrez informed Nazario that the Chief of Police who arrived on-scene had okayed giving Nazario the option of 1) waiting until his eyes cleared and he could safely drive and not being charged, or 2) being charged with obstruction of justice if he wanted to speak to the Judge and fight the charges in Court.   [Ex. 5 at 19:06:03 to 19:10:34 (elapsed 4:22 to 8:52)].

40.     Nazario indicated that he did not want the officers to charge him and elected to have the officers wait at the scene until he was safe to drive. Nazario also stated that notwithstanding the fact that the officers would not notify his Command that he would be informing his Command of the incident himself. [Ex. 5 at 19:10:03-19:10:34; (elapsed 8:23-8:52)].

41.     Crocker removed the handcuffs and the officers waited with Nazario until he could safely drive, at which point he was released.  [Ex. 5 at 19:10:36 (elapsed 8:55); Crocker depo, p 145].

42.     As the officers waited with Plaintiff to allow his eyesight to recover, they engaged in casual conversation with Plaintiff; offered advice on how to overcome the effects of the OC spray; and wiped Plaintiff's eyes several times at Plaintiff's request. [Crocker depo, p 145-147].

43.     Nazario asked for the officers' business cards, which the officers provided, and

---

[13]  On June 29, 2020, approximately five months prior to the December 5, 2020 traffic stop that is the subject of this lawsuit, a strikingly similar traffic stop in Tulsa, Oklahoma left one officer dead and a second officer fighting for his life. In that stop, one of the officers had completed his training just one month before and had been on patrol on his own for less than six weeks. The other officer was a 15-year veteran. In that stop, the officers pulled over a driver in a vehicle with expired paper tags. When the officers informed the driver that his vehicle would have to be towed, the driver refused to get out of the car and became argumentative, saying the officers were violating his rights. After three minutes of arguing, one of the officers used his taser which the driver removed the prongs from his body and continued arguing. The officer then deployed pepper spray which failed to deter the driver. When both officers then tried to pull the driver from the vehicle, he fought them, grabbed a gun from under the seat, and fired upon the officers, shooting each several times. "Suspect captured after 2 Tulsa police officers shot, critically wounded," https://ktul.com/news/local/2-police-officers-shot-in-east-tulsa (June 29, 2020).

remarked "Wow, these are thick.  Y'all must have some money."  [Crocker depo, p 145].

44.     Nazario was then released from the scene after his eyes had recovered from the OC spray and was not issued any summons for a traffic citation or for obstruction of justice.

45.     Neither Crocker nor Gutierrez had any further interaction with Nazario at any time after the December 5, 2020 traffic stop.

## III.   ARGUMENT

### A.   Standard of Review – Motion for Summary Judgment (FRCP Rule 56)

Summary judgment is appropriate in the absence of any genuine issue of material fact.  Fed. R. Civ. P. 56; Anderson v. Liberty Lobby Inc., 477 U.S. 242, 255 (1986).  Where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, such as where the non-moving party fails to make a sufficient showing on an essential element of the claims on which he bears the burden of proof, the moving party prevails.  Id. at 248-49; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

While the court draws all inferences in favor of the non-moving party, speculative assertions will not suffice.  Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1989).  Further, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  Scott v. Harris, 550 U.S. 372, 380 (2007).

### B.   Qualified Immunity Overview

In cases where qualified immunity applies, it serves as an immunity from suit; not an affirmative defense to liability. As such, qualified immunity should be decided at the earliest possible stage of litigation. See, e.g., Ussery v. Mansfield, 786 F.3d 332, 337 (4th Cir. 2015).  Qualified

immunity protects law enforcement and other government officials from civil damages liability for alleged constitutional violations stemming from their discretionary functions. Raub v. Campbell, 785 F.3d 876, 880-81 (4th Cir. 2015).

The protection is broad. It extends to "all but the plainly incompetent or those who knowingly violate the law, and officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Id. Determining whether qualified immunity applies is a two-pronged inquiry: (1) whether the facts make out a violation of a constitutional right and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct. The Court may address either prong of the analysis first. Id.

For a right to be clearly established, the law must have been sufficiently clear that every reasonable officer would understand that what he is doing is unlawful. District of Columbia v. Wesby, 138 S. Ct. 577, 589-90 (2018) (legal principle must be settled law, dictated by controlling authority or a robust consensus of cases; it is not enough that the rule is suggested by then-existing precedent). Before concluding that an officer violated a right, a case must be identified where an officer acting under similar circumstances was held to have violated the right in the same way. Id; see also City of Escondido, California v. Emmons, 139 S. Ct. 500, 202 L. Ed. 455, 459-60 (2019) (specificity in identifying clearly established right especially important in Fourth Amendment context, where it is sometimes difficult for an officer to determine how the relevant legal doctrine will apply to factual situation).

When determining whether Officer Crocker is entitled to qualified immunity the Court must take into account the facts and circumstances of this particular case. This is because the right at issue is the Fourth Amendment right to be free from unreasonable searches and seizures *under the circumstances of this case*; not simply a general right. Graham v. Gagnon, 831 F.3d 176, 182 fn. 1

(4th Cir. 2016) (Framing a Fourth Amendment right in general terms "would mean that the 'clearly established' prong would automatically be met in every suit alleging an arrest [or search] without probable cause . . . eliminating the 'breathing room' to make reasonable mistakes.").  Here, the task of determining whether Officer Crocker acted reasonably is made immeasurably easier because the entire encounter is preserved on video.   When the videos are viewed in their entirety, it becomes clear that Officer Crocker acted with professionalism and restraint in the face of a non-compliant and resisting suspect and is therefore immune from this suit.

**C.  <u>Nazario's Constitutional Claims</u>**

Nazario alleges Fourth Amendment violations in Counts One (I) through Three (III) of his Complaint: unreasonable seizure, excessive force, and illegal search.

**1.  <u>Count I – 4th Amendment Unreasonable Seizure</u>**

**a.   <u>The traffic stop was lawful and did not constitute an unreasonable seizure.</u>**

For a traffic stop to be an unlawful seizure, Nazario must prove that Officer Crocker unreasonably stopped him without reasonable suspicion or probable cause. *See*, e.g., <u>Hupp v. Cook</u>, 931 F.3d 307, 318 (4th Cir. 2019).  Reasonable suspicion requires only that from which officers reasonably infer that criminal activity "may be afoot."  <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002).  "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause."  <u>Kansas v. Glover</u>, 140 S. Ct. 1183, 1187 (2020).  In <u>Glover</u>, the U.S. Supreme Court held that a traffic stop based on an officer's commonsense inferences based on observations of a vehicle license plate is objectively reasonable, and that, while specialized training and law enforcement experience are important, inferences are not required to be based on such experience in every instance in order to be justified.  <u>Id</u>. at 1189-90(finding an officer

had at least reasonable suspicion to justify initiating a traffic stop of a vehicle when the scan of the license plate revealed that vehicle's registered owner's driver's license had been revoked). The National Fraternal Order of Police submitted an amicus curiae brief to the Supreme Court addressing the reasonable suspicion necessary for an officer to initiate a traffic stop; attached as Exhibit 13. [14]

On the night of December 5th, 2020, Crocker was in uniform and on patrol a marked police cruiser in the Town of Windsor when he observed a new model, dark-colored Chevrolet Tahoe traveling westbound on U.S. Route 460. Crocker initiated a routine traffic stop by activating his blue emergency lights and sirens after he observed the Tahoe without a visible rear license plate.

Virginia Code § 46.2-715 requires all motor vehicles in the Commonwealth to have front and rear license plates attached.   Va. Code §46.2-716(A)(2) further requires that the license plates be clearly visible, and §46.2-716(B) explicitly states that license plates must not be mounted behind glass or any other covering which obscures them from view. Display of a temporary license tag in the upper right (passenger side) of the rear window behind heavily-tinted glass is undisputedly a violation of Virginia law.

Nazario's temporary tag was not visible to Crocker when he initiated the traffic stop, and Nazario knew his temporary tag was not readily visible having been informed of this on November 7, 2020, when Windsor Police Department Officer Bill Owens pulled him over on the same stretch of U.S. Route 460 in the morning for exceeding the speed limited by 19 miles per hour.  During the course of that traffic stop, Officer Owens radioed dispatch that Nazario's vehicle had no rear license plate and informed Nazario when he approached the vehicle after the stop, at which time Nazario

---

[14] Brief for the National Fraternal Order of Police as Amicus Curiae, Kansas v. Glover, 140 S. Ct. 1183 (2020). Here the National Fraternal Order of Police filed an amicus curiae brief addressing the dangers facing police in traffic stops, when it is appropriate for an officer to initiate a stop, and what inquiries an officer may make during a stop.

told Officer Owens that he had just purchased the vehicle in New York.  When Officer Owens walked to the rear of the vehicle to check the license tag, he needed to use his flashlight to illuminate it through the heavily tinted window. Furthermore, the temporary tag had expired on October 1, 2020. Thus, there can be no question that Officer Crocker had reasonable suspicion to initiate the lawful traffic stop because Plaintiff was in actual violation of the law.

      **b.**  **<u>Nazario's own actions extended the high-risk nature of the traffic stop after he pulled into the BP Service Station</u>**

Nazario argues that reasonable suspicion for the traffic stop evaporated the moment either of the officers saw the temporary tag affixed to the inside of the heavily-tinted rear window, implying that Crocker and Gutierrez should have immediately returned to their vehicles and left at that very moment. The law says otherwise. The failure to properly display the license tag – which Nazario knew was not visible having been advised of the same four weeks prior by Officer Owens – provided the reasonable suspicion necessary to justify the traffic stop. Nazario's own actions in the manner in which he drove after the officers initiated the stop and his refusal to cooperate once he finally pulled into the BP service station justified classification of the stop as a felony/ high-risk traffic stop and justified the officers' continued actions.

The U.S. Supreme Court has repeatedly explained that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion," <u>Illinois v. Wardlow</u>, 528 U.S. 119, 124, 120 S. Ct. 673, 676 (2000), and that "Courts must look at the 'totality of the circumstances' when reviewing an officer's basis for an investigatory stop."   <u>Arvizu</u>, 534 U.S. at 273.  This totality-of-the-circumstances test expressly recognizes that trained police officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" <u>Id</u>.

Due to the inherently unpredictable and sometimes violent nature of traffic stops, [15] police officers are trained to recognize cues that may be indicators of concern for officers' safety and the safety of the public.  Here, Plaintiff displayed multiple cues that are consistent with felony / high-risk traffic stops.  Aside from the fact that the heavily tinted vehicle had no visible license plate, Nazario also failed to yield after a clear attempt by a marked patrol vehicle utilizing lights and sirens, and passed by several locations that would be reasonable common places for a vehicle to pull over for marked patrol units. The vehicle was also traveling at slower than usual speeds without any attempt to stop, which is indicative of occupants searching for a place to escape a vehicle or preparing for an assault on police officers.

Furthermore, the officers' repeated commands to exit the vehicle were legal and objectively reasonable.  The Supreme Court has explicitly recognized that once a traffic stop has been initiated, police officers may ask the occupants to exit the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." Pennsylvania v. Mimms, 434 U.S. 106, 111 n.6, 98 S. Ct. 330, 333 (1977). In Mimms, police officers pulled over a vehicle with an expired license plate and requested the driver exit the vehicle. When the driver exited the vehicle, the officers noticed a bulge in the driver's jacket and performed a pat-down search which revealed a concealed, unlicensed handgun and the driver was arrested. The issue on appeal was whether the officers were justified in ordering the driver to exit the vehicle during the traffic stop. The Supreme Court held that when officers are justified in detaining a vehicle for a traffic citation, such as an expired license plate,

---

[15] See, e.g., "1 arrest in fatal carjacking, shooting of Burleson police officer during traffic stop," https://www.dallasnews.com/news/crime/2021/04/14/burleson-police-officer-shot-multiple-times-during-traffic-stop-suspect-still-at-large/ (driver initially stopped for defective taillight); "Wisconsin traffic stop shootout highlights the risk they pose to police officers," https://www.foxnews.com/us/greenfield-wisconsin-police-bodycam-released-dangers-police (driver pulled for running a red light).

the "additional intrusion [in ordering the driver to exit the vehicle] can only be described as *de minimis*…[and] [w]hat is at most a mere inconvenience [to the driver] cannot prevail when balanced against legitimate concerns for the officer's safety." Id. at 111. *See also*, Rodriguez v. United States, 575 U.S. 348, 356 (2015)("traffic stops are 'especially fraught with danger to police officers, [internal citation omitted], so an officer may need to take certain negligently burdensome precautions in order to complete his mission safely."). Thus, having lawfully stopped Nazario for failure to display a license tag in accordance with Virginia law, Crocker and Gutierrez were justified in ordering Nazario to exit the vehicle. Nonetheless, Nazario ignored or refused at least six commands to show his hands and/or put his hands out the window, opting instead to set up his cell phone on the vehicle dashboard. Nazario also ignored or refused at least forty-one separate commands to exit the vehicle. Although Nazario admits that he heard and understood the officers' commands, he refused to obey, stating "I'm not getting out the vehicle" and "For a traffic violation I do not have to get out of the vehicle."

Nazario further alleges that he was unlawfully handcuffed and placed in custody by Officers Crocker and Gutierrez. This is not accurate. Probable cause existed to arrest Nazario for obstruction of justice, because Nazario actively resisted the officers' attempt to detain him, including when Gutierrez attempted to remove Nazario from the vehicle with an "arm bar maneuver," and Nazario pulled away and told Gutierrez to "Get your hands off me" multiple times. When Crocker attempted to open the driver's side door, Nazario used his elbow to pull the door closed and lock it.[16] And when officers were finally able to get him out of the vehicle, Nazario continued to struggle and actively resist the officers' attempt to handcuff him for almost a full two minutes.

---

[16] The door lock of Nazario's Tahoe has a pop up lock that Nazario was able to press/hold down with his elbow when Crocker and Gutierrez attempted to unlock the door [Ex. 1 at 1:50-2:22; 3:09-3:12].

Nazario's actions during the traffic stop were an obstruction of justice for which he could have been arrested and could certainly be detained.  Virginia Code § 18.2-460(A) imposes a Class 1 misdemeanor when "any person without just cause knowingly obstructs . . . any law enforcement officer . . . in the performance of his duties as such or fails or refuses without just cause to cease such obstruction when requested to do so."  Va. Code §18.2-460(A).  The Fourth Circuit defers to the Supreme Court of Virginia for interpretation of Virginia Code §18.2-460(A).  The Virginia Supreme Court has made it clear that to be a violation of §18.2-460(A), it is not necessary that a suspect physically assault an officer.  Any act which clearly indicates an intention to prevent the officer from performing his/her duty is obstruction of justice.  Ware v. James City Cty., 652 F. Supp. 2d 693, 707 (E.D. Va. 2009), citing Jones v. Commonwealth, 141 Va. 471, 478-79, 126 S.E. 74 (1925).

It is well-settled that, "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."  Carter v. Khan, No. 1:15-cv-00572 (JCC/JFA), 2015 U.S. Dist. LEXIS 149955 (E.D. Va. Nov. 4, 2015) citing Atwater v. City of Lago Vista, 532 U.S. 318, 354, 121 S. Ct. 1536, 149 L. Ed. 2d 549 (2001).  "[A]n arrest, though warrantless, is valid where the officer had probable cause to believe that a misdemeanor was committed in his presence, even though the action he observed did not in fact constitute a misdemeanor."  Id. at *15.

For example, in Carter v. Khan, officers conducted a traffic stop for a malfunctioning brake light.  After pulling his vehicle into motel parking lot, Carter exited the vehicle and refused repeated commands to get back inside.  Id. at *4-5.  After asking repeatedly why he had been pulled over, Carter finally began to walk back towards his truck.  At that point Officer Khan deployed a 50,000-volt taser into Carter's back and arrested him.  Id. at *5.  Carter filed a lawsuit for various alleged Fourth Amendment violations and associated state law tort claims.  The Court determined Officer

Khan had probable cause to arrest Carter for obstruction of justice under Va. Code §18.2-460(A), among other possible charges.

Like <u>Carter</u>, in the present case Nazario committed a traffic violation leading to the initiation of the subject traffic stop. And just as in <u>Carter</u>, Nazario's failure to follow police commands – including at least forty-seven separate commands to show his hands and/or exit the vehicle; closing and locking the door; and physically resisting the officers' attempts to handcuff him – were clear violations of Virginia's obstruction of justice statute, a misdemeanor criminal offense.

The outcome in <u>Carter v. Khan</u> is consistent with the approach taken throughout the Fourth Circuit. For example, in <u>Coffey v. Morris</u>, 401 F. Supp. 2d 542, 547 (W.D. Va. 2005) the District Court found qualified immunity based on probable cause to arrest for obstruction of justice when a passenger exited a stopped vehicle after the officer ordered both the passenger and driver to remain inside the car. <u>Id</u>. at *16-17. Similarly, in <u>Durney v. Doss</u>, 106 F. App'x 166, 170 (4th Cir. 2004), the Fourth Circuit found that an officer had probable cause to arrest a driver who refused to comply with an officer's request for identifying information, returned to her vehicle without providing the information, and started her ignition. <u>Id</u>. at *17.

c. **Crocker is entitled to qualified immunity even if the traffic stop constituted an unreasonable seizure under the 4th amendment**

Significantly, even if Officer Crocker didn't have probable cause to place Nazario in custody, he would nonetheless be entitled to qualified immunity. It is well-established that qualified immunity applies unless the right alleged to have been violated was a clearly established right "such that a reasonable police officer would have known, under the same circumstances, that his behavior violated the right." <u>Ware v. James City Cty.</u>, at 709 (holding that officers were protected by qualified immunity even if the arrest was unconstitutional, because case law did not clearly establish that a

resisting suspect's actions did not constitute obstruction of justice). *See also*, Pegg v. Klempa, 651 Fed.Appx. 207, 210-11 (4th Cir. 2016) (officers justified in detaining vehicle for inoperative license plate light, ordering driver out of the vehicle, and arresting driver for obstruction of justice when he refused to get out of the car).

2. **Count II – 4th Amendment Claim – Excessive Force**

a. **Crocker did not use excessive force on Nazario**

Nazario's claim of excessive use of force against Crocker apparently arises solely from the fact that Crocker was present at the scene with Gutierrez, who was his training officer. As stated above, Nazario actively resisted Crocker and Gutierrez' attempts to remove him from the vehicle after Nazario refused dozens of commands to get out of his car. The only force Crocker used on Nazario was hands-on contact in the course of attempting to remove Nazario from the vehicle and to assist Gutierrez in placing Nazario in handcuffs to secure control of the scene. Such force was reasonable and necessary and not excessive under the circumstances. As explained in the next section, even if the use of force were excessive, Officer Crocker nonetheless is entitled to qualified immunity and immune from suit.

The U.S. Supreme Court has explained: "Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham v. Connor, 490 U.S. 386, 396 (1989), citing Terry v. Ohio, 392 U.S., at 22-27. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment." Id., quoting Johnson v. Glick, 481 F.2d 1028 (2d Cir. 1973). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - - in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is

necessary in a particular situation." Id. at 396-97.

To prove excessive force the plaintiff must show "that the officer's use of force to achieve arrest was objectively unreasonable under the circumstances." Miller v. Parrish, No. 3:12cv873, 2013 U.S. Dist. LEXIS 63162, 2013 WL 1868028, at *7 (E.D. Va. May 2, 2013) (citing Graham v. Connor, 490 U.S. 386, 395 109 S. Ct. 1865 (1989). Objective reasonableness is a fact dependent standard in which the court considers the totality of the circumstances "judged from the perspective of a reasonable officer at the scene, rather than with the 20/20 vision of hindsight." Carter v. Khan, citing Gray v. Bd. of Cnty. Com'r of Frederick Cnty., 551 F. App'x 666, 672-73 (4th Cir. 2014).

### b.   Crocker is entitled to qualified immunity on the excessive force claims

Critically, even if the use of force is found to be unreasonable, officers are still entitled to qualified immunity unless any reasonable officer would have understood that, under those particular facts and circumstances, his actions were in violation of a clearly established law.   Id. at 23-28 (numerous citations omitted).

For example, in the case of Carter v. Khan, *supra*, Officer Khan deployed a 50,000-volt taser into the back of a motorist who was disobeying police commands.  Id. at *5.  In analyzing whether Officer Khan's use of the taser constituted a violation of a clearly established right, the Court conducted an extensive examination of case law pertaining to the use of tasers in effecting arrests.

> If Khan was to deploy any force at all, a single five-second shock from his taser was the least amount of force reasonably available. Falls Church police policy describes the "typical escalation of force pattern" as "officer presence, verbal commands, physical force, chemical munitions, electronic control device (ECD), baton, less lethal (kinetic energy) munitions, firearm."  Khan's use of force complied with this policy.  When Khan deployed his taser, verbal commands had proven insufficient to control Carter. Furthermore, Carter was too far from Khan for the effective use of physical restraints or pepper spray. Thus, the lowest degree of force available was an electronic control device, or taser. And although a taser is "more than a non-serious or trivial use of force," Thomas v. Holly, 533 F. App'x 208, 217 (4th Cir. 2013), the taser in this case caused no injury other than the initial shock and a minor puncture wound to Carter's lower back.

Id. at 21- 22

The Court concluded that Khan's use of the taser was not unreasonable under the circumstances.  Id. at 19.  Furthermore, the Court explained that even if the deployment of the taser had been unreasonable, Khan still would have been protected by qualified immunity.  This is because there is no clearly established case law regarding the use of tasers during arrests, so the officer's use of the device could not have violated a clearly established right.  Id.  at 23-28.

In the present case, it is abundantly clear that Officers Crocker and Gutierrez acted with restraint.  Much like in Carter v. Khan, Nazario refused repeated lawful commands to show his hands and/or exit the vehicle.  Despite Nazario's blatant obstruction of justice, the officers effectively de-escalated the situation and used the least amount of force available.  Even as Nazario refused to get out of the vehicle, Gutierrez put away his firearm and de-escalated to a taser, which he warned Nazario would be employed against him if Nazario continued to disobey. Despite the fact that Nazario *did* continue to disobey, Gutierrez then de-escalated even further, putting away the taser and attempting to execute a standard "arm bar" technique, which Nazario actively resisted. Nazario resisted Crocker by using his arm to keep the car door locked when Crocker attempted to open it.

With Nazario continuing to actively resist, Gutierrez removed his OC spray and shook it in plain view of the Nazario, who recognized the warning, turned his head away, and said "Don't do that" four separate times while still refusing to comply with police orders. Between the time that Gutierrez warned Nazario of the OC spray and the time that OC Spray was actually employed, twenty-five seconds had passed. During this period the officers instructed Nazario to get out of the vehicle seven more times and made at least two failed attempts to open the driver's door which Plaintiff resisted.  Only then did Gutierrez employ OC spray as Crocker holstered his firearm. OC spray was the lowest amount of force reasonably available under the circumstances. Hands-on

maneuvers had failed and Nazario continued to resist. OC spray was the next lowest force available and is far less severe than a taser, which was found to be reasonable in <u>Carter v. Khan</u> under similar circumstances.

Furthermore, even after he had been sprayed with OC spray, Nazario continued to actively resist the officers' attempts to detain him.  Although Gutierrez warned Nazario on several occasions that he would be sprayed again or tased if he continued resisting, Nazario *did* continue resisting, but was not sprayed again and was never tased.  As Nazario continued to resist, Gutierrez performed several standard knee strikes.  Eventually Nazario was placed in handcuffs, after which he was immediately assisted to his feet by the officers. The officers never punched, kicked, struck with batons, or otherwise physically assaulted Nazario.  Crocker brought Nazario water from the BP station and assisted him in clearing the effects of the OC spray from his eyes.  Crocker even adjusted Nazario's handcuffs at his request to make him more comfortable. No reasonable officer would believe this very minimal use of force to be blatantly unconstitutional. Nazario suffered no physical injuries and the officers assisted in treating his eyes as soon as he began to comply.

Highlighting the current state of the law, the 5th Circuit held yesterday in a case that involved "no disputed facts because the encounter was captured on [the officer's] bodycam," that an officer was justified in ultimately using his taser on a driver initially pulled for speeding who refused to obey the officer's commands to exit the truck. <u>Betts, Sr. v. Brennan</u>, Case No. 21-30101 (5th Cir., appeal from USDV 2:19-cv-14680) at p. 2-3, 5 (Jan. 11, 2022), attached as Exhibit 14.

### 3.  Count III – 4th Amendment – Illegal Search

#### a.  <u>Officer Crocker did not unreasonably search Nazario's vehicle</u>

Nazario alleges that after he was finally brought under control, his vehicle was unlawfully searched.  This is not accurate, because no search took place.  "Before the reasonableness or legality

of an alleged search may be questioned it is necessary to first determine whether there has actually been a search.  A search ordinarily implies, a quest by an officer of the law, a prying into hidden places for that which is concealed." Duffield v. Peyton, 209 Va. 178, 182-83, 162 S.E.2d 915, 918 (1968).  "It implies 'some exploratory investigation, or an invasion and quest, a looking for or seeking out . . . [It] is generally held that the mere looking at that which is open to view is not a search.'" Id., quoting 79 C.J.S., Searches and Seizures, § 1, pp. 775, 776.

Furthermore, the U.S. Supreme Court has recognized that the right to privacy guaranteed by the Fourth Amendment is greatly reduced with vehicles.  "[T]he configuration, use, and regulation of automobiles often may dilute the reasonable expectation of privacy that exists with respect to differently situated property."   Arkansas v. Sanders, 442 U.S. 753, 761 (1979).  "One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. . . . It travels public thoroughfares where both its occupants and its contents are in plain view.'" Cardwell v. Lewis, 417 U.S. 583, 590 (1974).

In this case, when speaking about the gun which had been at his right leg but about which he chose not to inform the officers, Nazario stated, "It's right there, I'm sure you saw it already" then told the officers exactly where to find his weapon. Crocker went to the vehicle and immediately saw the gun in plain view.  This was not an "exploratory investigation, or an invasion and quest, a looking for or seeking out." Duffield v. Peyton at 182-83. To the extent this constituted a search, it is not clearly established such that any reasonable officer would know it to violate a constitutional right.

**b.  Officer Crocker did not unreasonably search or seize Nazario's firearm.**

Nazario makes the creative argument that by viewing the serial number on the gun and checking the number over the radio, Crocker conducted an unreasonable "search" of the gun.   There is no reasonable expectation of privacy in a serial number etched in plain view on a firearm.  Crocker

did not invade the sanctity of Nazario's gun in attempt to ferret out hidden information.  He simply looked at a number.  This is not a search.

Likewise, Crocker did not unreasonably seize Nazario's weapon or its serial number in violation of the Fourth Amendment.  The Supreme Court has recognized that when officers reasonably suspect someone to be traveling with illegal items, a brief seizure and investigation is not a violation of the Fourth Amendment.  For example, in United States v. Place, the Supreme Court found no constitutional violation when a traveler's luggage was briefly seized to be sniffed by a drug-sniffing canine.  This was because the brief seizure impinged only lightly on the traveler's privacy interest in the contents of personal luggage, and therefore did not constitute a search within the meaning of the Fourth Amendment.  United States v. Place, 462 U.S. 696, 709 (1983).

Here, after Nazario was finally handcuffed, Crocker asked Nazario where his driver's license was, and Nazario told him that the license was in his pocket.  Gutierrez then removed the license and handed it to Crocker who used the computer in his patrol vehicle to check for warrants.  Nazario rightly does not allege that this was an unlawful search and seizure of his drivers' license number. This is no different than using a firearm serial number to verify that the weapon is not stolen.

### c.   Crocker is entitled to qualified immunity

Crocker held the gun for less than one minute, just long enough to trace the serial number, which was in plain sight on the weapon, after which the gun was immediately returned to Nazario's vehicle. Even if this is somehow found to have been improper, Crocker is still immune from suit because the right to privacy in a handgun serial number is not so well-established that any reasonable police officer would know that tracing the number was a violation of a clearly established right. Anderson v. Creighton, 483 U.S. 635, 641, 107 S. Ct. 3034, 3040 (1987)(qualified immunity exists

if a reasonable officer could have believed a warrantless search to be reasonable, regardless of the officer's subjective beliefs about the search).  Defendants challenge Nazario to show such a case.

Therefore, because Crocker did not violate any of Nazario's constitutionally-protected Fourth Amendment rights, Counts One (1) through Three (3) should be dismissed with prejudice. Additionally, even if Nazario's rights were violated, Crocker is immune from suit because his actions did not violate any clearly established rights of which any reasonable officer would be aware.

### 4.  Count IV – First Amendment Claim

#### a.  <u>Neither Crocker nor Gutierrez violated Nazario's First Amendment Rights.</u>

Nazario's First Amendment violation claims arise, ironically, from Crocker and Gutierrez *not charging him* with any crime or citing him for any infraction arising out of the December 5, 2020 stop. In this classic case of "no good deed goes unpunished," Nazario claims that his rights were violated because of the stress he experienced wondering *if* Crocker and Gutierrez would file charges for obstruction of justice – a misdemeanor – or issue a citation for the improperly displayed tag.[17] Nazario told the officers that he was going to inform his command of the stop even though he was being released with a warning; thus Nazario could not have plausibly feared his command learning of the incident when he intended to inform them directly himself.

In order to sustain a First Amendment retaliation claim under Section 1983, Nazario is required to prove three elements: (1) he was engaged in constitutionally protected First Amendment activity, (2) that Crocker's and/or Gutierrez' action(s) caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in the protected activity, and (3) there was a causal relationship between Nazario's protected activity and the

---

[17] Virginia's statute of limitations on misdemeanors requires that any charges be brought within one year of the alleged incident, thus from December 5, 2021 onward, any fear of facing such charges was moot.

Defendants' conduct.  Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 686 (4th Cir. 2000); *See*

*also*, Keenan v. Tejeda, 290 F.3d 252, 258 (5th Cir. 2002).

When probable cause exists, a retaliatory arrest claim fails as a matter of law. Nieves v.

Bartlett, 139 S. Ct. 1715, 1728 (2019). In Snoeyenbos v. Curtis, 439 F.Supp.3d 719, 731-32 (E.D.

Va. 2020), this Court held that, based on Nieves, "to the extent that Plaintiff alleges a chilling effect

from [a] citation, [he] must show the absence of probable cause for the citation." If probable cause

exists to issue the citation, "qualified immunity shields Defendant from liability … because Plaintiff

fails to show a violation of [his] constitutional rights." Snoeyenbos, at 732.  As set forth herein,

Crocker and Gutierrez had probable cause to arrest Nazario for obstruction of justice and cite him

for failure to display a valid license tag in accordance with Virginia law. In light of the foregoing,

even if Crocker and Gutierrez violated Nazario's First Amendment rights in giving Nazario the

choice of whether to be charged or not (which Nazario declined) and by completing their required

paperwork for the Windsor Police Department following the traffic stop, since probable cause existed

to issue the citation(s) against Nazario, Crocker and Gutierrez are entitled to qualified immunity.

### D.  Common Law Tort Claims

In addition to his allegations of various Constitutional violations, Nazario alleges several

common law tort claims against Nazario.  None of these claims have merit.

### 1.  Counts V and VI – Assault and Battery

The federal courts look to the Supreme Court of Virginia for guidance on common law tort

claims.  *See* Ware v. James City Cty., at 693 (E.D. Va. 2009).  A plaintiff's assault or battery claim

can be defeated by a legal justification for the act.  Id.  Virginia law recognizes that police officers

are legally justified in using reasonable force to execute their lawful duties.  Id. at 712, citing Pike v.

Eubank, 197 Va. 692, 90 S.E.2d 821 (1956).  "Accordingly, if reasonable force is used by police

officers in execution of their lawful duties, they are immune from suit for such acts." Id. (finding that because Officer Khan's use of the taser was objectively reasonable under the Fourth Amendment, the use of force under the common law battery claim was also reasonable and not a battery).

Crocker did not use unreasonable or unnecessary force upon Nazario.  To the extent Crocker's actions in assisting Gutierrez with handcuffing Nazario as he resisted, the common law assault and battery allegations must fail for the same reasons that the Fourth Amendment claims must fail, because the use of force was objectively reasonable under the circumstances.

## 2. Count VII – False Imprisonment.

"False imprisonment is the restraint of one's liberty without any sufficient legal excuse." Lewis v. Kei, 281 Va. 715, 708 S.E.2d 884, 890 (Va. 2011).  The Supreme Court of Virginia has made it clear that a law enforcement officer may not be held liable for a false arrest if the officer acted "in good faith and with probable cause." Id. at 712-13, citing DeChene v. Smallwood, 226 Va. 475,311 S.E.2d 749 (1984).  "To establish the defense, an officer 'need not allege and prove probable cause in the constitutional sense.' " Id., quoting Bivens v. Six Unknown Named Agents of Fed Bur. of Narc, 456 F.2d 1339, 1347 (2d Cir. 1972).  "If an arrest is lawful, the plaintiff cannot prevail on a claim of false imprisonment." Carter v. Khan at 31.  Crocker had more than enough probable cause to detain or arrest Nazario for the traffic infraction and obstruction of justice and .  Because the detention was lawful, a cause of action for false imprisonment is not available as a matter of law.

## 3. Count VIII –Nazario has no cause of action under Virginia Code §19.2-59 for his alleged illegal search

The Virginia Supreme Court has made it abundantly clear that Virginia Code §19.2-59, which on its face appears to make any warrantless search illegal, in fact affords in substance only the same protection as that afforded by the Fourth Amendment.  Carter v. Commonwealth, 209 Va. 317,

163 S.E.2d 589 (1968), cert. denied, 394 U.S. 991, 89 S. Ct. 1479, 22 L. Ed. 2d 766 (1969);

Thompson v. Slayton, 334 F. Supp. 352 (W.D. Va. 1971).   This Code section does not afford any

greater protection than that provided under the Fourth Amendment.  Gordon v. Commonwealth, No.

1717-88-1 (Ct. of Appeals Apr. 10, 1990).

Sovereign immunity applies to actions brought under section 19.2-59, and "only the

constitutional standard of conduct . . . should apply for purposes of determining sovereign immunity

in actions brought under section 19.2-59."   Shafer v. Virginia, No. 6:20-cv-00044, 2021 U.S. Dist.

LEXIS 58265, *18 (W.D. Va. Mar. 26, 2021).  If a search is performed in accordance with well-

established law and does not violate the Fourth Amendment . . . an officer is entitled to sovereign

immunity for that search.  Id. citing Cromartie v. Billings, S.E.2d 247, 254-55 (2020). As explained

previously, Crocker did not search Nazario's vehicle or his gun in violation of the Fourth

Amendment.  And even if this Court were to find that such a violation did occur, Crocker would

nonetheless be entitled to qualified immunity because any such violation would not be so egregious

that any reasonable officer would have known that a brief search under these circumstances violated

a clearly established right.

**IV.**   **Conclusion**

Crocker acted with patience and restraint during this interaction with an actively resisting

suspect.  As the video evidence clearly shows, even if Crocker's actions violated Nazario's Fourth

or First Amendment rights – which they did not – Crocker has qualified immunity from such claims.

For the same reasons, Nazario cannot prevail on his common law tort claims, nor his claim under

Virginia Code §19.2-59.  Therefore, Defendant Daniel Crocker respectfully requests that this Court

GRANT his motion for summary judgment as to all eight of the Plaintiff's claims.

Respectfully submitted this 12th day of January, 2022.

**DANIEL CROCKER**

By:  _/s/ Anne C. Lahren___

Robert L. Samuel, Jr., Esq.
Virginia State Bar No. 18605
***Pender & Coward, P.C.***
222 Central Park Avenue, Suite 400
Virginia Beach, VA  23462-3026
(757) 502-7338 – Telephone
(757) 497-1914 – Facsimile
Email: rsamuel@pendercoward.com
*Counsel for Daniel Crocker*

Richard H. Matthews, Esq.
Virginia State Bar No. 16318
***Pender & Coward, P.C.***
222 Central Park Avenue, Suite 400
Virginia Beach, VA  23462-3026
(757) 490-6256 – Telephone
(757) 497-1914 – Facsimile
Email: rmatthew@pendercoward.com
*Counsel for Daniel Crocker*

Anne C. Lahren, Esq.
Virginia State Bar No. 73125
***Pender & Coward, P.C.***
222 Central Park Avenue, Suite 400
Virginia Beach, VA  23462-3026
(757) 490-6293 – Telephone
(757) 497-1914 – Facsimile
E-Mail: alahren@pendercoward.com
*Counsel for Daniel Crocker*

Bryan S. Peeples, Esq.
Virginia State Bar No. 93709
***Pender & Coward, P.C.***
222 Central Park Avenue, Suite 400
Virginia Beach, VA  23462-3026
(757) 490-6283 – Telephone
(757) 5020-7380 – Facsimile
E-Mail: bpeeples@pendercoward.com
*Counsel for Daniel Crocker*

## CERTIFICATE OF SERVICE

I hereby certify that on this the 12th day of January, 2022, I will electronically file the foregoing *MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT* with the Clerk of Court using the CM/ECF system, which will then notification of such electronic filing (NEF) to the following:

Jonathan M. Arthur, Esq (VSB# 86323)
j.arthur@robertslaw.org
Thomas H. Roberts, Esq. (VSB# 26014)
Tom.roberts@robertslaw.org
Andrew T. Bodoh, Esq. (VSB# 80143)
Andrew.bodoh@robertslaw.org
15 South First Street
Richmond, VA 23219
(804) 991-4308 (Direct)
(804) 783-2000 (Firm)
(804) 783-2105 (Fax)
*Counsel for the Plaintiff*

John B. Mumford, Jr. (VSB No. 38764)
Coreen A. Silverman (VSB No. 43873)
Dustin J. H. Plumadore (VSB No. 97334)
HANCOCK, DANIEL & JOHNSON, P.C.
4701 Cox Road, Suite 400
Glen Allen, Virginia 23060
Telephone: (804) 967-9604
Facsimile: (804) 967-9888
jmumford@hancockdaniel.com
csilverman@hancockdaniel.com
*Counsel for Defendant Joe Gutierrez*

　　　/s/ Anne C. Lahren
Anne C. Lahren, Esq.
Virginia State Bar No. 73125
***Pender & Coward, P.C.***
222 Central Park Avenue, Suite 400
Virginia Beach, VA  23462-3026
(757) 490-6293 – Telephone
(757) 502-7370 – Facsimile
Email: alahren@pendercoward.com
*Counsel for Daniel Crocker*