**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | | |
|---|---|---|
| **Caron Nazario,** | ) | |
| *Plaintiff,* | ) | |
| v. | ) | Civil Action No. 2:21-cv-00169 |
| | ) | |
| **Joe Gutierrez, et. al.** | ) | |
| *Defendants.* | ) | |

**PLAINTIFF CARON NAZARIO'S BRIEF IN SUPPORT OF HIS MOTION FOR**
**PARTIAL SUMMARY JUDGMENT ON LIABILITY**

I.      **INTRODUCTION**

This suit brings constitutional and state common law claims against Joe Gutierrez and

Daniel Crocker, police officers with the Town of Winsor, in connection with a traffic stop of Lt.

Caron Nazario, on December 5, 2020. This motion for partial summary judgment seeks a

determination of the defendants' liability, including a judgment overruling the defense of

qualified immunity.

II.     **STATEMENT OF UNDISPUTED FACTS**

1.      Exhibit 1 is Lt. Nazario's affidavit in support of summary judgment.

2.      Exhibits 2 and 3 are affidavits authenticating Exhibits 6 to 8, 11, 16, and 17. *See*

*also* **Ex. 13 at 78:16-79:9**.

3.      Exhibits 4 (bates CN-1) and 5 (bates CN-2[1]) is Lt. Nazario's cell phone footage

from the December 5, 2021, traffic stop. **Ex. 1 ¶ 1a**. These are on file with the Clerk's office,

having been filed as Exhibits 1 and 2 respectively with the Complaint. *See* **ECF Doc. 1-2**.

---

[1] This motion, and the depositions, refer to the defendant's body worn camera footage, by the
time stamps on the defendant's body worn camera footage as the body worn camera recorded it,
located in the upper right-hand side of the frame.  It refers to Lt. Nazario's cell phone footage by
referring to the timestamps by the timecode on the media player, located at the bottom.

4.      Exhibit 6 (Bates CN-3) is defendant Gutierrez' body worn camera footage from the December 5, 2021, traffic stop. **Ex. 12 at 78:10-79:8; Ex. 2; Ex. 3; Ex. 8 at 15, Nos. 1- 3.** It is on file with the Clerk's office, having been filed as Exhibit 3 with the Complaint. *See* **ECF Doc. 1-2.**

5.      Exhibit 7 (Bates CN-4) and 8 (bates CN-5) are defendant Crocker's body worn camera footage from the December 5, 2021, traffic stop. **Ex. 12 at 78:10-79:8; Ex. 2; Ex. 3; Ex. 9 at 15, Nos. 1-3.** These are on file with the Clerk's office, having been filed as Exhibits 4 and 5 respectively with the Complaint. *See* **ECF Doc. 1-2.**

6.      Exhibit 9 is defendant Daniel Crocker's answers to plaintiff Caron Nazario's first discovery requests, to include requests for admission.

7.      Exhibit 10 is defendant Crocker's supplemented answers to Plaintiff Caron Nazario's interrogatories.

8.      Exhibit 11 is defendant Crocker's Incident Based Report ("IBR" or "Baseline IBR") regarding the December 5, 2020, traffic stop. **Ex. 12 at 31:15-34:19; Ex. 9 at 16, Nos. 4-6; Ex. 13 at 25:13-27:25, 31:23-32:7; Ex. 2; Ex. 3.** When asked in deposition if defendant Crocker reviewed the body worn camera footage prior to drafting his IBR, defendant Crocker confirmed that he reviewed his body worn camera footage prior to drafting the IBR to ensure the report's accuracy. **Ex. 12 at 34:7-19.**

9.      Exhibit 12 is the transcript of the December 15, 2021, deposition of defendant Crocker.

10.     Exhibit 13 is the transcript of the December 15, 2021, deposition of Rodney Riddle, chief of the Town of Windsor Police Department, individually and as designee for the Town of Windsor Police Department. **Ex. 13 at 6:7-20.**

11.      Exhibit 14 is the transcript of the December 5, 2021, deposition of defendant Gutierrez.

12.      Exhibit 15 are Executive Directives 7 as amended, and Executive Directive 8.

13.      Exhibit 16 is Gutierrez's supplement to Crocker's IBR regarding the December 5, 2020, traffic stop, and Exhibit 17 is Gutierrez's Use of Force Report regarding the December 5, 2020, traffic stop. **Ex. 13 at 29:24-31:2, 5:10-24; Ex. 14 at 81:25-82:20, 119:1-17;  Ex. 2; Ex. 3.** Gutierrez cannot recall whether he reviewed the body worn camera footage prior to drafting these reports but admits that he might have. **Ex. 14 at 111:15-25.**

14.      Exhibit 18 is defendant Gutierrez supplemental answers to Lt. Nazario's first set of interrogatories. **Ex. 14 at 19:9-20:5.**

15.      Crocker and Gutierrez were under legal obligations to be honest and truthful when drafting their Baseline IBR's, supplements thereto, and their use of force reports. **Ex. 12 at 39:4-9; Ex. 13 at 28:3-29:7, 29:24-31:2, 35:10-24; Ex. 14 at 81:25-82:20, 119:1-17.**

16.      Defendants Gutierrez and Crocker use the IBRs (Ex. 11) and Supplements (Ex. 16) to refresh their memory when they testify in court. **Ex. 12 at 32:1-33:14; Ex. 14 at 82:2-83:14.**

17.      On December 5, 2020, defendants Gutierrez and Crocker were sworn officers employed with the Town of Windsor Police department, on duty, and acting under the color of law. Defendant Gutierrez was defendant Crocker's field training officer. **Ex. 12 at 126:1; Ex 14 at 79:19-80:21.** Defendant Crocker was still in his field training phase and had conducted somewhere between 10 and 70 traffic stops at the time of the incident, but was not sure Ex.12 at 51:3-12, and at the time of his depositions, over a year after the incident, had never pulled over a

stolen vehicle.  **Ex. 12 at 94:1 – 95:3.** The town of Windsor has never lost an officer in the line of duty and is not an accredited police agency.  **Ex. 13 at 12:25-13:8.**

18.     Notwithstanding statements that Gutierrez made to Lt. Nazario, Gutierrez never deployed to Somalia, Desert Storm/Desert Shield, or LA for the riots, and he was never a Corporal in the Marine Corps. **Ex. 14 at 136:4-20**.

19.     On or around December 5, 2020, at approximately 18:34 (6:34 p.m.), Lt. Nazario was headed westbound on US 460 in a 2020 Chevrolet Tahoe, in the vicinity of the Food Lion, in the Town of Windsor, Virginia. **Ex. 11; Ex. 16.** The speed limit was 35 miles per hour. Ex. 9 at 17, No. 10; **Ex. 12 at 36:8-12.**

20.     Lt. Nazario's Tahoe has a seating capacity of 5 people. It is built on a truck frame and has 4-wheel drive capabilities, and its rear window and side passenger windows had factory tint. **Ex.1, ¶ 1(b).**  Virginia law has no window tint level restrictions for the rear side windows and rear windows for vehicles like the Tahoe.  Virginia Code § 46.2-1052(H).  Lt. Nazario had leased the Tahoe in September of 2020, in New York, and its temporary tag was affixed by the dealer in New York to the upper right hand inside corner of the rear window, **Ex.1, ¶ 1(c), (d)**, and is visible on the body worn cameras shortly after the defendants exits their vehicles. Ex. 6 at **18:37:01; Ex. 7 at 18:36:43.** During the traffic stop, the defendants saw the license plate. **Ex. 12 at 82:21-83:24.**

21.     This incident occurred during the COVID-19 emergency, after the Virginia Governor had issued multiple executive directives and amendments extending the times to register vehicles. **Ex. 15.** The officers of the Windsor Police Department were informed of the changes to the DMV registration requirements via the National Law Enforcement Telecommunications System.  **Ex. 13 at 50:19-52:18.**

22.      Lt. Nazario possessed a valid Virginia concealed carry permit. **Ex. 12 at 133:10-16; Ex.1, ¶ 1(j).** On December 5, 2020, Lt. Nazario legally possessed a firearm in his vehicle. **Ex. 12 at 95:7-12. It was** concealed, that is, not in plain view, in a pocket in on the driver's side of the center console of his vehicle. **Ex. 12 at 130:4-9; Ex. 11 at 4.** During this traffic stop, he made no threatening statements or gestures to the defendants. Exs. 4-8.

23.      On December 5, 2020, defendant Crocker was on duty, on a routine patrol of the Windsor town limits, on US 460, and was sitting in the parking lot of the Food Lion. **Ex. 3 at 2; Ex. 4 at 3.** Defendant Crocker alleges that, because Lt. Nazario lacked a rear license plate, he initiated a traffic stop by turning on his emergency lights. **Ex.11 at 2-3; Ex. 7 at 18:34:21.** He states in his interrogatories, "From my training at the police academy, I knew that the combination of a newer model vehicle without license tags can be the sign of a stolen vehicle." Ex. 9 at 2.

24.      Promptly after Crocker activated his lights, Lt. Nazario slowed down, and began traveling below the posted speed limit, about 22 to 23 miles per hour, and both officers were aware of this. **Ex.1, ¶ 1(e) ; Ex. 12 at 87:2-89:19; Ex. 14 at 84:9-25**. Lt. Nazario drove to the most well-lighted space that he could see, for his safety and officer's safety. This was a BP Gas Station. He used his turn signal appropriately to enter the gas station parking lot, parked the car, and turned off the vehicle for officer safety. **Ex. 7, beginning to 18:36:06; Ex.1, ¶ 1(f), (h).** The distance between where defendant Crocker turned on his emergency lights (at The Food Lion) and the BP gas station where Lt. Nazario pulled over is approximately 1.1 miles, **Ex. 9 at 17, No. 11; Ex. 14 at 105:24-106:1.** Approximately two minutes and ten second elapsed between the time defendant Crocker initiated his emergency lights and when Lt. Nazario pulled over in the BP Gas station. **Ex. 7, beginning to 18:36:06**.

25.     At BP Gas Station, defendant Gutierrez, in the presence of defendant Crocker, admitted that drivers waiting to pull over happens to them all the time and that eighty percent of the time, it is a minority. **Ex. 12 at.126:13-16; Ex. 14 at 105:14-19; Ex. 8 at 19:10:50**.

26.     However, as Lt. Nazario pulled over, defendant Crocker decided to initiate a high-risk (or felony), notwithstanding the fact that he had not seen a felony occur.  **Ex. 12 at 92:5-93:18**. Crocker claims that, though he had never seen a vehicle slow down and continue driving in this manner, he "had to consider the possibility that a driver traveling at a slow rate of speed would more likely have the ability to prepare for aggressive action."  **Ex. 10 at 2**.

27.     Immediately upon stopping, defendant Crocker exited his vehicle and drew his firearm, pointing it at the driver's door. **Ex. 7 at 18:36:11**. It appears the engine of the vehicle is off, but the brake lights are active. Crocker yelled, "Driver, roll the window down!" **Ex. 7 at 18:36:11-:13**. He issued two more rapid-fire commands to "Put your hands out the window!" within the next nine seconds, followed by a command to "Turn the vehicle off, put your hands out the window!" **Ex. 7 at 18:36:22-:25**. Within fifteen seconds of the initial command, Lt. Nazario has a window down and a hand out the window. **Ex. 7 at 18:36:26**. After five seconds, Lt. Nazario asked, "What's going on?" and Crocker yells again, "Put your hands out the window, and turn the vehicle off!" **Ex. 7 at 18:36:31-35.** By 18:36:40, the brake lights go off, with the vehicle remaining in place. Crocker yelled again, "Put your hands out the window!" By 18:36:42-:46, despite the fact that the vehicle was parked, off, and at least one hand was visible, Crocker asserted to Gutierrez, "He's not complying, Joe." At 18:36:50, Crocker yells, "Let me see your hands!" Nazario's phone records this command at 0:05 (**Ex. 4**), as Nazario puts both hands out the window. He activated his video camera on his phone, because he looked in his mirrors and saw officers with their firearms drawn.  Crocker calls out, "How many occupants are

in the vehicle?" Lt. Nazario responds, asking, "What's going on?" and Crocker repeats his command. As he does so, Gutierrez crosses behind Crocker, and trains his weapon on the door. **Ex. 6 at 18:36:55-37:01**. Lt. Nazario responds truthfully, "It's only myself. Why are your weapons drawn? What's going on?" **Ex. 4 at 0:05-:19; Ex. 7 at 18:36:50-:37:01**. Crocker then yells, "Open the door slowly and step out. Open the door!" **Ex. 7 at 18:36:50-:37:03-:05**. It was impossible for Lt. Nazario to do as he could not both keep his hands outside of the vehicle and open the door to exit as the door was locked. **Ex.1, ¶ 1(i).** This was the first in a series of mutually inconsistent commands that the defendant issued to Lt. Nazario. For example, over the course of six seconds defendant Gutierrez and Crocker twice told Lt. Nazario to keep his hand outside of the vehicle and three times told him to exit the vehicle**. Ex. 7 at 18:37:27.** All of this has occurred within the first 55 seconds of Crocker drawing his weapon and issuing the first command.

28.     Over the next 30 seconds, the officers repeatedly yell at Lt. Nazario to get out of the vehicle. He calmly declines once, and repeatedly asks, "What's going on?" The officers advance to the point that Lt. Nazario can turn and talk face to face with Gutierrez, which he does. **Ex. 7 at 18:36:50-:37:05-:35; Ex. 4 at 0:19-:49; Ex. 6 at 18:37:08-:38**. About 20 seconds later, at 18:37:57-:38:04 on Ex. 4, Gutierrez responds to Lt. Nazario's repeated inquiry "What's going on?" by stating, "What's going on is your fixin' to ride the lightning son." He then switches to a Taser and walks directly toward the door. Lt. Nazario keeps puts his hands up, outside the window, but moves his head so that it is within the vehicle.

29.     By 18:38:10-:34 on Exhibit 4, the officers were adjacent, or nearly adjacent to the vehicle, both pointing their weapons at Lt. Nazario. Lt. Nazario's hands were clearly visible, raised outside the window of the vehicle. Crocker states, "Sir, just get out of the car. Work with

us and we'll talk to you. Get out the car." Gutierrez tells this uniformed, military officer, who he

had just threatened, "You received an order. Obey it." Lt. Nazario responded, with hands raised,

"I'm honestly afraid to get out. Can I—" Gutierrez interrupts and says, "Yeah, you should be," as

tries to open the door of the vehicle, himself, finding it locked. The officers have no cover and

are practically within an arm's reach of Lt. Nazario, who is speaking calmly and directly to them,

with hands raised outside the vehicle, in clear sight. Gutierrez claims that Lt. Nazario is being

detained for obstruction of justice.

30.     Five seconds later, Gutierrez is grabbing Lt. Nazario, over Lt. Nazario's verbal

protests. He then releases Lt. Nazario, withdraws his OC spray, as Lt. Nazario asks him not to

"do that." Crocker places his arm inside the vehicle, underneath Lt. Nazario's raised arms,

without Lt. Nazario taking any hostile action toward him. Despite this, Gutierrez tells Crocker to

back up, and sprays Lt Nazario at least four times within immediate reach of Lt. Nazario. **Ex. 4**

**18:38:40-39:20**.

31.     Defendant Gutierrez and defendant Crocker repeat their orders to Lt. Nazario to

exit the vehicle, and Lt. Nazario exits the vehicle with his hands in the air and defendant

Gutierrez ordered Lt. Nazario straight onto the ground.  **Ex. 7 at 18:40:32**. Defendant Gutierrez

then grabbed Lt. Nazario, and began striking Lt. Nazario in the neck and his legs, and forced him

onto the ground with the help of defendant Crocker where they place Lt. Nazario in handcuffs

and threaten to OC Spray him again. **Ex. 7 at 18:41:02**. After placing Lt. Nazario in handcuffs,

the defendants place Lt. Nazario on a trashcan, **Ex. 7 at 18:43:50**, which defendant Crocker

believes was about five feet away from Lt. Nazario's vehicle.  **Ex. 12 at131:24-132:13**.

32.     After the defendants placed Lt. Nazario on the trashcan, EMTs arrive, and

defendant Crocker obtains Lt. Nazario's license which he runs through NCIC and VCIN to

determine if Lt. Nazario had any outstanding warrants, which he did not. At that time, Dispatch also informed defendant Crocker that Lt. Nazario had a valid Virginia concealed carry permit. **Ex. 12 at 57:6-58:1, 129:4-12; Ex. 7 at 18:49:41**.

33.     When Lt. Nazario prompted by one the EMT's, Lt. Nazario informed the defendants that there was a firearm in his vehicle, **Ex. 4 at 18:53:10**, which was concealed and not in plain view, **Ex. 12 at 130:4-9; Ex. 11, p. 4**. Defendant Crocker entered the vehicle, searched for, and seized the firearm. Defendant Crocker touched it, he grabbed it, ejected it magazine, and removed it from the vehicle.  He then ran the serial number through dispatch to check to see if it was stolen.  **Ex. 12 at 131:8-135:6.  Ex. 7 at 18:53:10-:54:09; Ex. 11, p. 4**. Neither defendant asked for Lt. Nazario's consent to enter the vehicle, and when asked in depositions why defendant Crocker entered the vehicle to retrieve the firearm, defendant Crocker stated it was because "[Lt. Nazario] told [him] it was there.  **Ex. 12 at 131:8-13.**  When asked why he thought the firearm was stolen, defendant Crocker responded "I didn't say I thought it was stolen … I do that on every firearm I interact with.".  **Ex. 12 133:18-134:5**. He then placed it back on the driver's seat and not where Lt. Nazario had originally placed the firearm. **Ex. 7 at 18:53:11 to 18:45:26**.

34.     At the time that he entered into Lt. Nazario's vehicle to search for and seize the firearm, defendant Crocker, and defendant Gutierrez allege that they had probable cause to arrest and charge Lt. Nazario for (1) failure to display a license plate, (2) eluding, (3) obstruction with force, and (4) assault on a law enforcement officer. **Ex. 11, at 4, Ex. at 2.** Failure to display a license plate is not a crime, rather a traffic infraction. Virginia Code §§ 46.2-113, -717 and -718.

35.     When asked in deposition what "Willful and Wanton" meant with regard to the Virginia eluding statute Va. Code. § 46.2-817, deputy Crocker replied that "willful" meant

willfully and willingly, without force, and that "wantonly" meant continuing to do so with knowledge of what is going on, disregard.  When asked in his depositions where defendant Crocker got those definitions, he replied "the Virginia Code." **Ex. 12 at 84:1-19**. Defendant Crocker's definition of willful and wanton is not found in the Virginia Code.  Virginia Code § 46.2-817.

36.     Defendant Crocker, for the obstruction with force, characterized Lt. Nazario's behavior at time Ex. 7 at 18:42 as "active resistance."  **Ex. 12 at 123:22-124:6; Ex. 7 at 18:41:05-:42:21**. This corresponds with Exhibit 6, 18:41 to the end, and defendant Gutierrez describes this as "physical resistance" when the officers attempted to "lower him to the ground to be secured by handcuffs." **Ex. 18 at 4**.

37.     The assault on a law enforcement officer was predicated on the allegation that Lt. Nazario smacked defendant Crocker's hand away. **Ex. 12 at 113:25-114:11.** When asked in depositions where the video shows Lt. Nazario smacking his hands away, Defendant Crocker stated that it happened before defendant Gutierrez OC sprayed Lt. Nazario.  **Ex. 12 at 115:7-10**. When asked to point to the particular instance on the video that shows Lt. Nazario smack defendant Crocker's hand, defendant Crocker stated the following: "You can't see it, and when I was typing my report, I knew you couldn't see it as well, but I vividly remember it happening, so I put it in my report."  **Ex. 12 at 114:16-116:15, 117:18-118:10, 137:13-139:22**.  Defendant Crocker then identifies time stamps 18:38:58, between 18:38:36 and 18:39:11 of CN-4 (Ex. 7) and timestamps 18:38:43 to 18:39:05 on Bates CN-3 (Exhibit 6) as where Lt. Nazario smacked his hand away.  Timestamps 18:38:36 to 18:39:11 of Bates CN-4 (Ex. 7) and timestamps 18:38:43 to 18:39:05 of Bates CN-3 (Ex. 6) correspond roughly to timestamps 0:01:56 to 0:02:25 of Ex. 4.

38.    When questioned again about the timestamps of the video showing Lt. Nazario smacking his hand away, the following exchange occurred:

Q:    So, somewhere in the 18:38:59 range [of Bates CN-4 / Ex. 7] is where the video shows him smack—you know, your hand being smacked away.

A:    I didn't say the video shows it.  I said that's when – around the time frame when it happened.

**Ex. 12, at. 117:18 – 118:6**.

39.    When asked about this incident in his depositions, defendant Gutierrez also admitted that the video did not show Lt. Nazario smacking defendant Crocker's hand away, and that it did not happen.  **Ex. 14 at 133:11-135:21**.  Further, and with respect to the Eluding allegations, defendant Gutierrez stated at the scene that driving to the BP Gas station was not the problem.  **Ex. 4 at 18:51:58.**

40.    When asked in depositions where the video footage shows Lt. Nazario pulling away from defendant Gutierrez' grip, a further allegation contained in the defendant's Reports, Ex. 11 at 4 and Ex. 16 at 1, defendant Gutierrez gave the following time stamps: **CN-4 (Ex. 7) at 18:38:40-18:38:43; CN-3 (Ex.6) at 18:38:40-18:38:45. Ex. 14 at 141:4-148:12.** When asked in depositions where the video footage shows Lt. Nazario pulling away from defendant Gutierrez' grip, defendant Crocker gave the following time stamp: CN-3 (Ex. 6) at 18:38:43 and 18:39:07.

41.    In the presence of defendant Crocker, and with Lt. Nazario still in handcuffs, and understanding that criminal charges could end Lt. Nazario's military career, defendant Gutierrez made the following offer to Lt. Nazario, to which defendant Crocker did not object: that if "[Lt. Nazario] fought it [or if he] argued…which was his right as a citizen, [they] would charge [Lt. Nazario with crimes], have [Lt. Nazario] go to court, notify command, and do all that." However, they stated that if Lt. Nazario would "chill and let this go," they wouldn't file charges

and would take the handcuffs off and let Lt. Nazario go. **Ex. 8 at 19:05:55 to End**. Lt. Nazario agreed, and the defendants removed him from the handcuffs and remained with Lt. Nazario at the scene until the defendants felt that effects of the OC spray on Lt. Nazario's eyes had abated to a point where it was safe for him to drive. **Id.; Ex. 12 at 143:15-20; Ex. 10 at 5-6**. The defendants have admitted that Lt. Nazario's complaints about the traffic stop would have been constitutionally protected. **Ex. 8 at 19:06:17-:10:34**.

42.     In all, the defendants detained Lt. Nazario for approximately one hour and twenty-one minutes. **Ex. 7; Ex. 8; Ex. 12 at 144:5-22**. Defendant Crocker stated that a standard traffic stop lasts no longer than 7 to 10 minutes. **Ex. 12 at 59:5-17**. Defendant Gutierrez stated that it should take 15 to 20 minutes. **Ex. 14 at 92:10-23**.

43.     The officers then demonstrated their malicious intent by going to the police station and falsifying their reports to reflect the baseless charges, reports which they use to testify in court. Ex. 11; Ex. 16; **Ex. 12 at 32:1-33:14; Ex. 14 at 82:2-83:14**.

## III.   <u>STANDARD OF REVIEW</u>

The Court grants summary judgment if the movant shows there is no genuine dispute of material fact, and he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party… [and] [a] fact is material if it might affect the outcome of the suit under the governing laws." *Jacobs v. N.C. Admin. Office of the Courts,* 780 F. 3d. 562, 568 (4th. Cir. 2015) (citations omitted). Material facts are those necessary to establish the elements of a party's cause of action. *See, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable factfinder could return a verdict for the non-movant. *Id.* A party

is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. *Williams v. Griffin*, 952 F.2d 820, 823 (4th. Cir. 1991). When the opposing party's story is blatantly contradicted by the record, so no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 379-80 (2007).

## IV.   ARGUMENT

### A.  The Probable Cause for the Detention

#### 1. Legal Standard

The analysis of each claim depends on the limits of the lawful scope of this traffic stop, and so the Plaintiff will address that issue first. To this end, the Court must determine to what extent the traffic stop, and its duration was supported by probable cause and legitimate law enforcement ends. *See, e.g.*, *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998). Probable cause exists when the facts and circumstances within the officer's knowledge warrant a prudent person—one of reasonable caution—to believe a suspect has committed, is committing, or is about to commit an offense. *Id*.

#### 2. Argument

The Plaintiff will assume, for purposes of this motion, that the defendants had probable cause to detain Lt. Nazario for a traffic violation for failure to properly display a valid license plate. This authorizes them to conduct a routine traffic stop, order him from his vehicle, collect his license and registration, issue him a summons, and release him. *See, e.g.*, *United States v. Hill*, 852 F.3d 377, 381 (4th Cir. 2017); *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977); Va. Code §§ 19.2-74; 46.2-388; 46.2-715 to -716.

While Crocker claims that a lack of a license plate on a new vehicle is some indication that the vehicle may have been stolen (SOF ¶ 23), he did not have probable cause to believe that it was stolen. It was lawful to drive a new vehicle, the window tint was legal (SOF ¶ 20), and it was not criminal behavior to fail to properly display a valid license plate. Furthermore, Lt. Nazario promptly responded to the Crocker's emergency lights by slowing his vehicle to well below the speed limit (**SOF ¶ 34**) and continuing on a straight course for about a mile before signaling his intent to, and pulling into, a well-lighted gas station for the traffic stop. (**SOF ¶ 24**) This behavior did not support a suspicion, much less probable cause, that this was a stolen vehicle. And before Lt. Nazario could display any reluctance to get out of his vehicle, Crocker had escalated the stakes by training his firearm on Lt. Nazario, making hesitation reasonable. By that time, an improperly displayed temporary tag was, or should have been, visible to the defendants (**SOF ¶ 20**). Lt. Nazario acted reasonably for the circumstances at each moment, and there was never probable cause to believe that this was a stolen vehicle.

Both defendants allege that they had probable cause to charge Lt. Nazario with eluding, obstruction with force, and assault on a law enforcement officer. In fact, they lacked probable cause for all the above.  Neither defendant had probable cause to believe Lt. Nazario was eluding.  Eluding requires a person to drive a motor vehicle in willful and wanton disregard of a visible or audible signal from a law enforcement officer to stop. Va. Code § 46.2-817.  Willful and wanton action requires a lack of justification, a vicious action, evil intent and malice. Slowing down "way below the speed limit" in response to an officer's emergency lights, *See, Willful and Wanton Definitions* Black's Law Dictionary 1613 and 1630 (8ᵗʰ ed. 1990); *see also, Bazemore v. Commonwealth*, 42 Va. App. 203, 222-23 (Va. Ct. App. 2004). Maintaining a continuous, straight course in front of the officer for approximately a mile along a dark road;

14

signaling you are about to, and pulling into a well-lighted space for officer safety, which is "reasonable" and "happens all the time" and was not the problem. (**SOF ¶¶ 24-25, 39** ), is not willful not wanton disregard of the officer's signal. Defendant Gutierrez even admitted on the scene that Lt. Nazario's decision to wait to pull over, not only happens all the time, but was not the problem.  (**SOF ¶ 25**) Therefore, the defendants lacked probable cause to arrest Lt. Nazario for eluding.  It is no excuse that defendant Crocker was mistaken as to the definition of eluding set forth by the Virginia Code (SOF ¶ 35), as an officer's mistake of law based on the officer's inadequate study of the law is objectively unreasonable.  *Jones v. Commonwealth*, 71 Va. App. 375, 383-384 (Va. Ct. App. 2019).

No reasonable officer would have believed that Lt. Nazario obstructed justice. Obstruction requires direct action or opposition; natural and surprised reactions to violence or threats of violence are not obstruction.  *E.g., Jones v. Commonwealth*, 141 Va. 471, 487 (Va. S. Ct. 1925) (avoiding a lawful arrest is not obstruction); *Ruckman v. Commonwealth*, 28 Va. App. 428, 429 (Va. Sup. Ct. 1988) (failing to fully cooperate with an officer or making the officer's task more difficult is not obstruction); *Brown v. City of Danville*, 44 Va. App. 586, 597 (2004) (obstruction requires implies opposition by direct action and in intent to prevent the officers from doing their job). *See, also, Smith*, 781 F.3d at 98, 102-03; *Cromartie*, 298 Va. at. 305-06. This law was all clearly established by December 2020. By initiating the traffic stop as a felony traffic stop, pulling their firearms, refusing to answer Lt. Nazario's questions of what's going on, by threatening to kill him, by confirming that he should be afraid to exit the vehicle, and then employing OC spray on him, striking him, and placing Lt. Nazario in handcuffs (**SOF ¶¶ 25-31**), both defendants "took a situation where there obviously was no need for the use of any significant force and yet took an unreasonably aggressive tact that quickly escalated it to a

violent exchange when [Lt. Nazario] instinctively tried to defend himself."  *Smith*, 781 F.3d at 104. Thus, no reasonable officer would have believed any of Lt. Nazario's actions were obstruction. *Smith*, 781 F.3d at 98, 102-03; *Cromartie*, 298 Va. at. 305-06.  Further, what defendants Crocker and Gutierrez state is active resistance (**SOF ¶ 36**) is in reality a terrified man sobbing on the ground after being OC sprayed, and the allegation that Lt. Nazario "pulled away from Gutierrez grip" (**SOF ¶ 40**) is, in fact, Gutierrez releasing Lt. Nazario so he can grab his OC spray. Finally, no reasonable officer would have believed that Lt. Nazario assaulted Lt. Crocker. Both defendants admit the video doesn't show any such strike; they instead claim that they "remember it happening."  (**SOF ¶¶ 38-39**).  *See, e.g., Harris*, 550 U.S. at 379-80.

Thus, the defendants had no reason to OC spray, strike, or handcuff Lt. Nazario. Doing so caused the traffic stop to exceed the reasonable duration necessary to affect its ends and the arrest was unlawful.  As, due to the OC spraying, the defendants detained Lt. Nazario for over an hour when they themselves admit that the traffic stop should have taken *at most* 20 minutes, (**SOF ¶ 42**) the traffic stop exceeded a reasonable duration and became unlawful.  *United States v. Hill*, 852 F.3d. 377, 381 (2017); *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *United States v. Williams*, 808 F.3d 238, 245 (4th. Cir. 2015); *United States v. Digiovanni*, 650 F.3d 498, 511 (4th. Cir. 2011); *United States v. Palmer*, 820 F.3d 640, 649 (4th. Cir. 2016) and the law on this point was clearly established.  Further, as these events were captured on camera, there is no genuine issue of material fact, and Lt. Nazario is entitled to judgment as a matter of law, *Scott v. Harris*, 550 U.S. 372, 379-80 (2007), the traffic stop detention was illegal and there was no probable cause to believe Lt. Nazario engaged in any criminal action.

## B.  Counts II, V, and VI – The Officers Used Excessive Force

### 1.  Legal Standard

16

Using more force in an arrest than what is objectively reasonable violates the Fourth Amendment. This is judged by the facts and circumstances confronting the officer when the force was used. *Graham v. Connor*, 490 U.S. 386, 388, 396-97 (1989); *Smith v. Ray*, 781 F.3d 95, 100-01 (4th Cir. 2015). To judge the force, in the Fourth Amendment context, the Court balances the individual's interests against the relevant government interests. *City of L.A. v. Mendez*, 198 L. Ed. 2d 52, 60 (2017); *Graham*, 490 US at 396, 109 S. Ct. at 1872; *Smith*, 781 F.3d at 101. In the Fourth Circuit, the balancing test uses the following three common *Graham* factors: (1) the severity of the crime at issue – judged by the actions constituting the crime; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396; *Smith*, 781 F.3d at 101. The Court cannot use artificial divisions in the timing or sequence of events in its evaluation of the force. *Smith*, 781 F.3d at 101. When these three factors strongly favor a plaintiff, the defendant is not entitled to qualified immunity. *E.g., Smith*, 781 F. 3d at 102; *Rowland v. Perry*, 41 F.3d, 167, 174 (4th. Cir., 1994); *Cromartie*, 298 Va. at 302-303.  This law was all clearly established by December 2020.

Additionally, while an officer has the right to use reasonable force to make a lawful arrest, use of unreasonable force supports a claim for assault and battery. *See Parker v. McCoy*, 212 Va. 808, 813 (1972); *Davidson v. Allam*, 143 Va. 367, 380 (1925), and a person may use reasonable force to defend themselves against unlawful force and an illegal arrest. *E.g.*, *United States v. Moore*, 332 F. Supp. 919, 902-21 (4th. Cir., 1971).

**2. Argument**

**i. The first *Graham* factor – the severity of the crime at issue.**

There was no crime at issue in this case. The Plaintiff assumes, for purposes of this motion, that the defendants had probable cause to detain Lt. Nazario for a traffic violation for failure to properly display a valid license plate; but they lacked probable cause to believe he had committed *any* criminal offense.  Failure to display a license plate was only a minor traffic violation.  In fact, the offense is so minor, the law allows the judge to dismiss the summons upon proof on compliance on or before the court date. Code § 46.2-715 and -716(D). This factor strongly favors the Plaintiff.

Lt. Nazario's behavior, as observed by the officers, in responding to their unfolding threats and use of violence against him, does not change this analysis. At no time did Lt. Nazario make any threatening statements to the officers. Once Crocker activated his emergency lights, Lt. Nazario slowed to way below the speed limit, continued his straight course, and then pulled into a well-lighted gas station about a mile later, and Gutierrez admitted that this was not a problem at all. SOF ¶¶ 19, 24-25. The officers then displayed firearms and issued commands. SOF ¶ 27. Lt. Nazario complied with the command to open the window and put his hands out within a reasonable time, while verbally engaging the officers in a calm, reasonable tone. SOF ¶ 27. The officers refused to respond to his inquiries, and escalated the situation by ordering him out of the vehicle. SOF ¶¶ 27-28. Though it was lawful for them to order him from his vehicle, *Pennsylvania v. Mimms*, 434 U.S. at 111, Lt. Nazario's reluctant hesitation in complying was reasonable, given the way the officers had immediately escalated this situation without provocation. SOF ¶¶ 27-28; *E.g.*, *Perry*, 41 F.3d at 174. At most, this only slightly elevated the severity of the conduct under this prong of the analysis. But rather than attempting to demonstrate calm judgment to allay Lt. Nazario's fears, the officers continued their excited and inconsistent demands, and then Gutierrez threatened to kill Lt. Nazario. SOF ¶¶ 28 Once Lt.

18

Nazario calmly and verbally explained that he was afraid to get out, Gutierrez responded that he *should* be afraid. SOF ¶¶ 29. At that point, a reasonable officer would recognize that a reasonable person would be afraid to comply with the officers' commands to exit the vehicle. As the situation continued to unfold, the officers approached the vehicle, without cover, and without being threatened by Lt. Nazario. SOF ¶¶ 28-30. Lt. Nazario did nothing unreasonable to escalate the situation. As such, this prong of the analysis strongly favors Lt. Nazario.

### ii. The second *Graham* factor – whether the suspect posed an immediate threat to the safety of the officers or others.

At no point did the officers know of any threat from Lt. Nazario. The only risk in the situation, apart from the risks inherent in their behavior, was the risk of the unknown inherent in almost every traffic stop. In particular, the tinted windows of the vehicle did not create a known threat, even if the officers were reasonably wary of situation. Lt. Nazario's verbal communications were measured and reasonable. Lt. Nazario complied with the command to put his hands outside the vehicle with reasonable promptness, SOF ¶ 27, objectively reducing the risks he might pose. Under the circumstances, Lt. Nazario's reluctance to get out was not an active threat against the officers.  Lt. Nazario did not threaten the officers as they moved around him, maintaining this cool demeanor even as Gutierrez threatened him and told him that he should be afraid while defendant Crocker trained his firearm at him. **SOF ¶¶ 28-29**. This was evidence that he had no intent to harm the officers. As the situation continued to unfold, Gutierrez approached the vehicle, without cover, and without being threatened by Lt. Nazario **SOF ¶¶ 29-30**. Lt. Nazario did nothing unreasonable to escalate the situation. Despite this, while Crocker trained a firearm on him, Gutierrez administered OC spray and struck him in the neck and legs, then Gutierrez and Crocker employed physical violence against Lt. Nazario without Lt. Nazario retaliating. **SOF ¶¶ 29-31**.  As such, this factor strongly favors Lt. Nazario.

19

### iii.  The third Graham factor – whether the suspect was actively resisting arrest or attempting to evade arrest by flight.

Lt. Nazario did not try to flee or resist arrest, and thus the third *Graham* factor strongly favors Lt. Nazario.  Lt. Nazario submitted to defendant Crocker's show of authority by slowing below the posted speed limit. SOF ¶ 24. He drove for about a mile to find a safe, well-lit space and used a turn signal to signal his intent to pull over. SOF ¶ 24.  He placed his hands out of the vehicle, palms open and kept them that way until he was grabbed by the defendant. **SOF ¶¶ 27-31**.  He repeatedly asked them to tell him what was going on, and they refused. **SOF ¶¶ 27-31**.  Thus, the third *Graham* factor strongly favors Lt. Nazario.  Again, to the extent that Lt. Nazario offered up any resistance, it was a surprise reaction in response to the defendants who took a situation where there obviously was no need for the use of any significant force and yet took an unreasonably aggressive tact that quickly escalated it to a violent exchange when [Lt. Nazario] instinctively tried to defend himself.  *Smith*, 781 F.3d at 104

As all three Graham factors so strongly favor Lt. Nazario, the defendants are not entitled to qualified immunity.  As these issues were video recorded in almost their entirety, there is no genuine issue of material fact about them. *see Scott v. Harris*, 550 U.S. 372, 379 - 380 (2007).  Pulling firearms, OC spraying Lt. Nazario, in his vehicle, with his hands out and open, and subsequently striking him and throwing him to the ground and handcuffing him was excessive as a matter of law and Lt. Nazario is entitled to judgment as a matter of law.

### iv.  Common Law Assault and Battery.

Because the officers used manifestly unreasonable force, sufficient to support a claim on summary judgment of excessive force, the facts also support summary judgment on a claim of common law battery. *Cf. Cromartie*, 298 Va. at 308 (finding that a jury finding of battery during a traffic stop was sufficient to support a finding as a matter of law as to excessive force under the

Fourth Amendment). Further the video shows that Lt. Nazario feared an imminent battery. Not only did he verbally acknowledge his fear of getting out the vehicle—receiving the response that he should be afraid—but he also repeatedly asked Gutierrez to not to "do that" as Gutierrez prepared to use the OC spray. SOF ¶¶ 29-30. No reasonable jury could conclude that this was not the expectation of an imminent battery.

### C. Counts I, III, and VIII – Crocker Conducted an Illegal Search of the Vehicle and Firearm, and Seized the Firearm

#### 1. Legal Standard

The Fourth Amendment protects against unreasonable searches and seizures, without a warrant and without probable cause. *Cromartie v. Billings*, 298 Va. 284, 299 (Va. Sup. Ct. 2020). A search occurs any time a government official physically intrudes upon or occupies a space, the interior of a vehicle for example, for the purposes of gathering information. *United States v. Jones*, 565 U.S. 400, 404-405 (2012) (holding that occupying a private vehicle's space for the purpose of gathering information is a search); *New York v. Class*, 475 U.S. 106, 116-117 (1986) (entering a vehicle to obtain a VIN number is a search); *Cromartie v. Billings*, 298 Va. 284, 299 (Va. Sup. Ct. 2020) (entering a vehicle to retrieve a purse, and then looking through the purse for a driver's licenses was a search).

A search of a vehicle incident to a *lawful* arrest involving an automobile is judged under *Arizona v. Gant*, 556 U.S. 332 (2009) and its progeny. Under *Gant*, a warrantless search of an automobile pursuant to a lawful arrest is justified where (1) the arrestee is unsecured and within reaching distance of the passenger compartment during the time of the search, or (2) when it is reasonable to believe, i.e. when the officer has probable cause to believe, that evidence relevant to the crime of arrest might be found in the vehicle. *E.g.*, *Gant* 556 U.S. at 338*; Megginson v. United States*, 556 U.S. 1230 (May 18., 2009); *United States v. Megginson*, 340 Fed. Appx. 856,

875 (4th Cir., August 12, 2009); *United States v. Graham*, 686 Fed. Appx. 166, 173 (4th. Cir.

2017); *Cromartie v. Billings*, 298 Va. 284, 298-99  (Va. S.Ct. 2020). This was clearly established

law in December 2020.

A seizure of an object occurs whenever a government official meaningfully interferes

with the owner's possessory interest in the object.  This can occur when the owner yields to an

official's show of authority over an object within the suspect's custody or control, or once an

officer touches the object.  *United States v. Lestinger*, 93 F.3d 140, 143-144 (4th. Circuit 1996)

(citing *United States v. Jacobson*, 446 U.S. 109, 113 & n.5 (1984); *United States v. Place*, 462

U.S. 696, 702 (1983*)).* This was clearly established law in December 2020.

Virginia Code § 19.2-59 allows a civil action for an illegal search. *Cromartie*, 298 Va. at

296-97. Violation of clearly established law constitutes willful and wanton conduct, and so

sovereign immunity does not apply. *Id.* at 297-98.

### 2.  Argument

By entering Lt. Nazario's vehicle to look for the firearm, defendant Crocker searched Lt.

Nazario's vehicle.  *Jones*, 565 U.S. at 404-405; *Class*, 475 U.S. at 116-117; *Cromartie*, 298 Va.

at 299.  By examining the firearm for its serial number after having removed the firearm from the

vehicle, defendant Crocker searched the firearm.  *Jones*, 565 U.S. at 404-405; *Class*, 475 U.S. at

116-117; *Cromartie*, 298 Va. at 299.  **SOF ¶¶ 32-34.**

At the time of the search, Defendant Crocker had no warrant or consent to search the

vehicle or the firearm. Lt. Nazario was outside and away the vehicle, on a trashcan and in the

custody of defendant Gutierrez, in handcuffs, and was incapacitated by OC spray. Defendant

Crocker had already determined that Lt. Nazario possessed a valid Virginia concealed carry

permit and had no outstanding warrants. **SOF ¶¶ 32-33**. Defendant Crocker searched for and

22

seized the firearm for no better reason than Lt. Nazario told him that there was a weapon in the vehicle. After searching the vehicle, defendant Crocker seized the firearm, and searched it for its serial number to radio back to dispatch to check to see if it was stolen, , though deputy Crocker denies believing it to be stolen. **SOF ¶¶ 33**.  Thus, the first *Gant* exception is not available.

The second *Gant* exception is not available, either.  Defendant Crocker entered the vehicle solely to search for the firearm.  **SOF ¶¶ 33**. None of the "crimes" which defendant Crocker alleges Lt. Nazario committed involved a firearm or are even crimes of which the Vehicle might contain evidence.  **SOF ¶¶ 34**. A firearm cannot be evidence of driving with a plate improperly displayed, and nothing *in* the vehicle would be evidence: that evidence would be on the outside of the vehicle.   A firearm is not evidence of eluding, and nothing in the vehicle would be evidence of eluding, and the defendants have not alleged the firearm was used to elude. The firearm was not evidence of obstruction with or without force and nothing in the vehicle would have been evidence of the alleged obstruction, as the defendants have not alleged the firearm was used to obstruct.   The firearm was not evidence of the alleged assault – as the assault did not occur.  Further, defendant Crocker did not, and could not have believed that the firearm itself was illegal or illegally concealed. **SOF ¶¶ 32**.  Therefore, the second prong of the *Gant*  exception does not apply.  Since neither the first nor the second prong of the *Gant* exceptions apply, the automobile search incident to a lawful arrest exception does not apply.

This law was clearly established at the time of the searches, and such searches violated Lt. Nazario's clearly established constitutional rights.  *Gant*, 556 U.S. 332 (2009); *Megginson*, 556 U.S. 1230 (May 18., 2009); *Megginson*, 340 Fed. Appx. 856, 875 (4th Cir., August 12, 2009); *Graham*, 686 Fed. Appx. 166, 173 (4th. Cir. 2017); *Cromartie*, 298 Va. 284, 298-99  (Va.

S.Ct. 2020). *As* such, it also constituted a violation of Code § 19.2-59, and sovereign immunity does not apply.

In this matter, after locating the concealed firearm, defendant Crocker touched it, he grabbed it, ejected it magazine, and removed it from the vehicle. He then placed it back on the driver's seat and not where Lt. Nazario had originally placed the firearm. **SOF ¶ 33**. Therefore, defendant Crocker "seized" the firearm. *Lestinger*, 93 F.3d at143-144; *Place*, 462 U.S. at 702. As this seizure was warrantless and outside of judicial oversight, it is presumptively illegal, that is, illegal, unless one of the specifically delineated well defined exceptions to the warrant requirement applies. *E.g. Gant*, 556 U.S. at 338; *Graham*, 686 Fed App. at 169. None of the specifically delineated well-defined exceptions applies and the search and seizure violated clearly established law. And since it is caught on video, there is no genuine issue of material fact and Lt. Nazario is entitled to judgment.

### D.  <u>Counts I and VII – The Officers Unreasonably and Unlawfully Extended the Traffic Stop</u>

#### 1.  **Legal Standard**

Traffic stop constitutes a "seizure" under the Fourth Amendment and is subject to review for reasonableness. *United States v. Hill*, 852 F.3d 377, 381 (4th Cir. 2017). To satisfy the reasonableness requirements for an investigative detention, a traffic stop must be legitimate at its inception, and the officers' actions during the stop must be reasonably related in scope to the basis for the stop. *Id.* If a traffic stop is extended in time beyond the period that the officers are completing tasks related to the traffic infractions, the officers must either obtain consent from the individuals detained or identify reasonable suspicion of criminal activity to support the extension of the stop. *Id.* The authority for the seizure ends when tasks tied to the traffic infraction are—or reasonably should have been—completed. *Id.* Extending a stop by even a de minimis length of

24

time violates the Fourth Amendment. *Id.* The acceptable length of a routine traffic stop, however, cannot be stated with mathematical precision. *Id.* An officer must be reasonably diligent and must use the least intrusive means reasonably available. *Id.* at 381-82. An officer may engage in certain safety measures during a traffic stop, but generally must focus his attention on the initial basis for the stop. *Id.* at 382. Pursuing unrelated activity is only permitted only as long as that activity does not prolong the roadside detention for the traffic infraction. *Id.* This was clearly established law in December 2020.

In Virginia, false imprisonment is an intentional restriction of a person's freedom of movement without legal right. A false imprisonment results from the intentional use of force, words, or acts which the person restrained is afraid to ignore or to which she reasonably believes she must submit. *Cromartie*, 298 Va. at 293; *Lewis v. Kei*, 281 Va. 715, 724 (2011). Unreasonable delays in releasing a person from a lawful arrest will constitute false imprisonment. *McHone v. Commonwealth*, 190 Va. 435, 441 (1950); *Mullins v. Sanders*, 189 Va. 624, 630 (1949); *Sands & Co. v. Norvell*, 126 Va. 384, 400 (1919). *Cf. Cromartie,* 298 Va. at 308 (concluding that a jury verdict of false imprisonment supported a finding of a Fourth Amendment unlawful arrest).

## 2. Argument

During this encounter, the defendants, at best, only had probable cause to believe that Lt. Nazario had committed a traffic violation for failure to properly display a valid license plate, but they detained Lt. Nazario longer than was reasonable to investigate and issue a summons for this offense. Though there is no mathematical precision for how long a stop should last, this detention, on a traffic stop for failure to properly display a valid license plate, was excessive in its duration and scope.

The traffic stop was extended because the officers' actions during the stop were not reasonably related in scope to the basis for the stop. This was at most a failure to properly display a valid license plate, but the officers initiated a felony traffic stop, with firearms displayed. **SOF ¶ 26**. They refused to answer reasonable inquiries as to the reason for the traffic stop, and used implied and express threats, OC spray, and physical violence, prolonging the detention. **SOF ¶¶ 27-31**. They were not acting with reasonable diligence, focusing the attention on the initial basis of the stop, but instead threatened him with arrest while lacking probable cause, and searched his vehicle without consent as he was detained, handcuffed, and incapacitated by OC spray. **SOF ¶¶ 27-34**. This was, in no way, the least intrusive means of conducting the detention reasonably available. As such, this detention which lasted almost one and a half hours, instead of twenty minutes, it was unlawful. **SOF ¶ 42**. The unreasonable extension of this detention also establishes the common law false imprisonment claim.

**E. <u>Counts IV– The Officers Violated Lt. Nazario's First Amendment Rights</u>**

**1. Legal Standard**

The First Amendment safeguards the right to speak and to petition the government for a redress of grievances. This right is "one of the most precious of the liberties safeguarded by the Bill of Rights." *Lozeman v. City of Rivera Beach*, 138 S. Ct. 1945, 1954-55 (2018); *BE&K Constr. Co, v. NLRB* 536 U.S. 516, 524 (2002). To establish an actionable, First Amendment injury, a Plaintiff must prove: (1) the speech at issue must be constitutionally protected, (2) the defendant must engage adverse action, and (3) there must be a causal link between the adverse action and protected speech. *See Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000).

Under the first element, where the action involves a *prospective* restraint on future speech, the Court will consider whether the government conduct was content neutral or targeted the constitutionally protected speech. *See, e.g., Bantam Books Inc. v. Sullivan*, 372, U.S. 58, 67 (1963) (suppressing publication and distribution of books with "objectionable content"); *Ward v. Rock Against Racism*, 491 U.S. 781, 792-73 (1989) (discussing content neutrality in prospective restraint).  ( Cf. *PETA, Inc. v. Stein*, 737 F. App'x 122, 128-29 (4th Cir. 2018); *Vista-Graphics, Inc. v. Va. DOT*, 682 F. App'x 231, 235 (4th Cir. 2017); *Cooksey v. Futrell*, 721 F.3d 226, 240 (4th Cir. 2013).  However, as the Supreme Court has warned, *any* suppression of future speech "comes to this Court bearing a heavy presumption against its constitutional validity." *See, Sullivan*, 372, U.S. at 70.

Under the second element, determining whether a plaintiff's First Amendment rights were adversely affected by retaliatory conduct is a fact intensive inquiry that focuses on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts. *Suarez Corp. Indus.*, 202 F.3d at 686. A plaintiff alleging retaliation does not need to show that the action taken in response to the plaintiff's exercise of constitutional rights independently deprived the plaintiff of a constitutional right. Such a rule would make a cause of action for retaliation wholly redundant of the protections provided by the Constitution itself. *Am. Civil Liberties Union, Inc. v. Wicomico Cty.*, 999 F.2d 780, 786 n.6 (4th Cir. 1993).  Where there is no special relationship between the speaker and the retaliator, however, speech of a government agent constitutes adverse action if it is threatening, coercive, or intimidating so as to intimate that punishment, sanction, or adverse regulatory action will imminently follow. *Blankenship*, 471 F.3d at 528. The test is an objective one; namely, the conduct must be such that it must chill the speech of a person of ordinary firmness similarly

situated to the plaintiff. Id. at 530; *Balt. Sun Co. v. Ehrlich*, 437 F.3d 410, 416-18 (4th Cir. 2006). The plaintiff need not demonstrate that they ceased their First Amendment protected activities to prevail on the person of ordinary firmness standard, as the cause of action targets conduct that tends to chill such activity, not just conduct that freezes it completely. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005).

When the adverse action pertains to an arrest or citation, the plaintiff may have to prove the arrest or citation was lacking probable cause, though this rule is not absolute. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1727 (2019) (plaintiff must establish lack of probable cause or provide objective evidence that similarly situated persons were treated differently); *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018) (probable cause irrelevant where City acted on a pre-determined policy of retaliation). However, the lack of probable cause in a case of an actual or threatened arrest has "powerful evidentiary significance" of constitutionally impermissible causative animus and that establishes an actionable First Amendment violation. *See, Hartman v. Moore*, 547 U.S. 250 260-61 (2006); *Nieves*, 139 S. Ct. at 1727; *Lozman*, 138 S. Ct. 1945 (2018).

The plaintiff establishes a prima facie case of causation if the protected speech at issue was a substantial or motivating factor in the adverse action. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568, 576 (1977).

This law was all clearly established in December 2020.

### 2. Argument

#### i. The first element – constitutionally protected speech.

The Defendants instructed Lt. Nazario that if he complained or argued about their behavior, which was his right as a citizen, they would criminally charge him, but if would chill and let this go, they would not charge him. **SOF ¶ 41**. The defendants have admitted that Lt.

Nazario's complaints about the traffic stop would have been constitutionally protected. **SOF ¶ 41**. Their words demonstrate they were targeting the *content* of his protected speech. Thus, this was an instance of non-content neutral, prior restraint. *E.g., Sullivan*, 372, U.S. at 70.

### ii.   The second element – adverse action.

After threatening Lt. Nazario, battering him with OC spray, striking him, and handcuffing him, and while Lt. Nazario remained in their custody, the officers promised to charge Lt. Nazario with crimes if he exercised his right to speak about their conduct, but not to charge him if he would remain silent about the incident. **SOF ¶ 41**. Gutierrez specifically emphasized the fact that charges would ruin Nazario's career. **SOF ¶ 41**. In this context, these threats were adverse action. *See, Suarez*, 202 F.3d at 686; *Ehrlich*, 437 F.3d at 416-18; *Constantine*,411 F.3d at 500. The officers then demonstrated their malicious intent by going to the police station and falsifying their reports to reflect the baseless charges, reports which they use to testify in court. SOF ¶ 43.

As discussed above, they had no probable cause for the charges they threatened. A reasonable jury could only conclude that these threats, made in this context, would deter—at least to some degree, and for some time—a similarly situated person of ordinary firmness. As such, there is no dispute of material fact on this point. If, however, the Court determines that this element remains to be proved, it can find the remaining elements of this claim satisfied.

### iii.   The third element – causal connection.

There can be no doubt that the desire to prevent constitutionally protected speech motivated the defendant's conduct. SOF ¶ 43. *Doyle*, 429 U.S. at 287.  But it is further evidenced by the false statements in their police reports—statements whose only value lay in the potential to use them later to prosecute Lt. Nazario. SOF ¶ 43. The officers had no probable cause for alleged crimes; these threats were simply intended to intimidate Lt. Nazario into remaining

silent.  The law on these points was clearly established, and the incident was caught on camera.
Thus Lt. Nazario is entitled to judgment as a matter of law.

## V.        CONCLUSION

The defendants took what should have been a simple traffic encounter and escalated it
into a Constitutional nightmare.  They initiated a high-risk traffic, stop, pulled their firearms on a
citizen, issued mutually inconsistent commands, threatened to kill him, told him he should be
afraid to exit the vehicle, beat him, handcuffed him, searched his vehicle without probable cause,
and then threatened to destroy his military career if he spoke up against them.  They then went
and falsified their official reports in the event the defendants needed to use them against him.
Not only did these actions violate Lt. Nazario's Constitutional rights, they did so in such a
flagrant manner, and the law was so clearly established, that no reasonable officer would have
believed that the actions were anything but illegal, and all of this was caught on camera.  Thus,
there remains no genuine issue of material fact, and Lt. Nazario is entitled to judgment as a
matter of law.

**WHEREFORE,** the Plaintiff, Caron Nazario, respectfully requests this honorable Court to:

(1) Enter an order denying Qualified Immunity to the defendants for all Federal claims;

(2) Enter an order denying the Defendants sovereign immunity for the state-law search
claim;

(3) Enter an order for liability only, leaving damages for the jury, in favor of Lt. Nazario
and jointly and severally against defendants Crocker and Gutierrez for all counts alleged
herein; and

(4) Any further relief as this Court deems warranted pursuant to law, equity and under the
Rules, including Fed. R. Civ. P. 56(f).

January 12, 2022

Respectfully submitted,

By: __/s/__ Jonathan M. Arthur, Esq.
Counsel

Jonathan M. Arthur, Esq. VSB # 86323
j.arthur@robertslaw.org
Thomas H. Roberts, Esq. VSB # 26014
tom.roberts@robertslaw.org
Andrew T. Bodoh, Esq. VSB # 80143
andrew.bodoh@robertslaw.org
Thomas H. Roberts & Associates, P.C.
105 South 1st Street
Richmond, VA 23219
(804) 991-2002 (Direct)
(804) 783-2000 (Firm)
(804) 783-2105 (Fax)
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was filed with the Court's CM/ECF

system, which caused a Notice of Electronic Filing to be emailed to the following:

John B. Mumford, Jr. (VSB No. 38764)
Coreen A. Silverman (VSB No. 43873)
HANCOCK DANIEL & JOHNSON, P.C.
4701 Cox Road, Suite 400
Glen Allen, Virginia 23060
Tel: (804) 967-9604
Fax: (804) 967-9888
jmumford@hancockdaniel.com
csilverman@hancockdaniel.com
*Counsel for Defendant Joe Gutierrez*

Robert L. Samuel, Jr. (VSB No. 18605)
Richard H. Matthews (VSB No. 16318)
Anne C. Lahren (VSB No. 73125)
Bryan S. Peeples (VSB No. 93709)
PENDER & COWARD
222 Central Park Avenue, Suite 400
Virginia Beach, Virginia 23462
Tel: (757) 490-6293

31

Fax: (757) 502-7370
rsamuel@pendercoward.com
rmatthew@pendercoward.com
alahren@pendercoward.com
bpeeples@pendercoward.com
*Counsel for Defendant Daniel Crocker*

This the 12th day of January, 2022

By:   /s/  Jonathan M. Arthur, Esq.
              Counsel
Jonathan M. Arthur, Esq. VSB # 86323
j.arthur@robertslaw.org
Thomas H. Roberts, Esq. VSB # 26014
tom.roberts@robertslaw.org
Andrew T. Bodoh, Esq. VSB # 80143
andrew.bodoh@robertslaw.org
Thomas H. Roberts & Associates, P.C.
105 South 1st Street
Richmond, VA 23219
(804) 991-2002 (Direct)