UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | |
|---|---|
| **Caron Nazario** | : |
| | : |
| *Plaintiff*, | : |
| | : |
| v. | : Civil Action No. 2:21-cv-00169 |
| | : |
| **Joe Gutierrez,** | : |
| *In his personal capacity* | : |
| | : |
| and | : |
| | : |
| **Daniel Crocker** | : |
| *In his personal capacity,* | : |
| | : |
| *Defendants.* | : |

### REPORT OF BRANDON TATUM

This report was requested by defense counsel to provide a detailed breakdown of the December 5, 2020 traffic stop of the Plaintiff Caron Nazario by the Defendant Officers with the Windsor Police Department, Joseph Gutierrez and Daniel Crocker, and render opinions as to the reasonableness of the officers' actions in classifying the stop as a high-risk/felony stop, the show of force and escalation/de-escalation of force based on the action and inaction of the Plaintiff, the reasonable inferences for police officers when observing a newer model vehicle driving without visible license tags, the risks (and perception) of the Plaintiff's actions in driving below the speed limit for more than one mile prior to pulling over, training of police officers on how to interpret the actions by the Plaintiff and impact on a traffic stop such as the one at the center of this lawsuit.

I have not previously testified as an expert witness in a court proceeding.

EXHIBIT 2

RECORDS REVIEWED:

1. December 5, 2020 cell phone video of the Plaintiff, Caron Nazario, attached as an exhibit to the Plaintiff's complaint;
2. December 5, 2020 body camera footage of the Defendant, Daniel Crocker, attached as exhibits to the Plaintiff's complaint;
3. December 5, 2020 body camera footage of the Defendant, Joe Gutierrez, attached as exhibits to the Plaintiff's complaint;
4. November 7, 2020 body camera footage of Officer William Owens, Windsor Police Department, during the traffic stop of the Plaintiff, Caron Nazario, along US Route 460 in approximately the same location as the December 5, 2020 traffic stop
5. GPS and map data showing the route traveled by the Plaintiff from the initiation of the traffic stop when Officer Crocker activated the lights on his police cruiser until the Plaintiff pulled into the BP Service Station
6. April 11, 2021 broadcast on The Officer Tatum.
7. Windsor Police Department Policies and Procedures
8. Expert Report of Mark G. Bong (Plaintiff's Expert)

OCCUPATION AND QUALIFICATIONS:

From 2011 through October 2017, I served as an officer with the Tucson Police Department. As a police officer, my job duties included Patrol, Field Training (Training new officers in the field), General Instruction at the Academy (Teaching Officers), Spokesperson on behalf of the Police Department, and Special Weapons and Tactics (SWAT). I also had responsibilities that included sitting on oral boards for new officers, Crisis Intervention, and Manual Communication (Sign Language interpreter). I have worked closely with detectives, K-9, the Records Department, Internal Affairs, the Chief of Police, and our Community Outreach Division.

In 2016, while employed by the Tucson P.D., I started a YouTube Channel, the Officer Tatum. In 2017, one of my videos went viral and was viewed more than 70 million times. I am a frequent commentator on current events concerning law enforcement and have appeared as an expert commentator on Fox News, the Ingraham Angle, the Candace Owens show, and have

EXHIBIT 2

provided analysis and review of interactions between law enforcement and citizens, particularly minorities, and explained the interactions from a law enforcement perspective.

In 2021, I joined KWESST Microsystems, Inc. as an advisor and spokesperson for their new line of Low Energy Cartridges for law enforcement, the military, and home defense.

My book "Beaten Black and Blue: Being a Black Cop in an America Under Siege" is scheduled for release on November 30, 2021, published through Amazon. In this book, I write about my experiences as a black police officer in the present-day America. I wrote "Beaten Black and Blue" to educate the civilian public and give insight into what police deal with daily in an increasingly more violent society infused with anti-police rhetoric and violent acts against police officers.

SUBJECT MATTER OF EXPECTED TESTIMONY/SUBSTANCE OF FACTS/SUBSTANCE OF OPINIONS:

1. The reasonableness of the December 5, 2020 traffic stop and designation as a high risk/felony stop

I believe a high risk/felony stop was appropriate regarding the traffic stop in this case. Due to the inherently unpredictable and sometimes violent nature of traffic stops, police officers are trained to recognize cues that may be indicators of concern for officers' safety and the safety of the public. Driving without a license plate displayed on the rear of the vehicle isn't enough for officers to be uniquely concerned independent of other factors. However, in this scenario, the plaintiff had multiple cues that are consistent with high-risk traffic stops that may lead to a dangerously violent encounter. No license plate displayed on a heavily-tinted SUV, that failed to yield after a clear attempt by a marked patrol vehicle utilizing lights and sirens, presents a unique concern. The vehicle also appeared to initially drive by several locations that would be reasonable and, in most circumstances, common places for a vehicle to pull over for marked patrol units

EXHIBIT 2

attempting to conduct a traffic stop. The vehicle was also traveling at slower than usual speeds without any attempt to stop. Based on my training and experience, this driving behavior could be indictive of vehicle occupants searching for a place to escape a vehicle or plan for an assault on police officers. After passing multiple reasonably lit locations, the officer made a fair and reasonable tactical decision to conduct a high risk stop. High risk stops can be conducted to overcome violent actions by the driver or the drivers' occupants and can be tactically deescalated in cases where the driver's behavior changes or shows no signs of violence.

2. <u>The inherent dangers facing law enforcement officers and how the Plaintiff's actions elevated the potential for risk to the officers.</u>

Violent crimes against police officers have been on the rise in America, leading to more concerns by officers of suspicious actions that could lead to unprovoked, violent interactions. According to the FBI's Law Enforcement Officers Killed and Assaulted database (LEOKA), Violent crimes have surged upwards of 55% in 2021 from 2020. 2020 wasn't too far behind that number. Many of the attacks against police officers were unprovoked. Based on a generalized consensus of training held by nearly every police agency in America, the Plaintiff's initial defiant behavior would be considered verbally combative and consistent with a non-compliant subject who could become violent in an attempt to resist all police commands. The Plaintiff refused to obey nearly every command given by both uniformed officers, both of whom announced themselves as such and gave clear, direct commands. Even as the officers deescalated from a threat of deadly force to only one officer threatening and ultimately using non-lethal pepper spray, the plaintiff never fully complied.

3. <u>Analysis of the training and tactics, particularly the reasonableness of the use and/or show of force</u>

I believe the tactics employed during this incident were necessary and reasonable according to the Use of Force Continuum and my personal law enforcement experience. The primary officer (Crocker) immediately gave commands when he exited his patrol vehicle (Officer presence /verbal commands) . Crocker also asked the Plaintiff how many occupants were in the vehicle and to show his hands. These are two important commands that would allow some level of knowledge of subjects needing to be addressed and for Officer Crocker and any other responding officers to make sure the Plaintiff shows his hands in a visible and safe manner for everyone's safety. Due to the Plaintiff disobeying the Officers' commands (Passive Resistance) to show his hands, I find it to be reasonable for Officer Crocker and responding officer Gutierrez to maintain the threat of deadly force. As both officers approached the Plaintiff, who was non-compliant and verbally combative, they were able to observe nonviolent behavioral cues that led them to deescalate force. The plaintiff was non-compliant but not actively aggressive and had his hands relatively visible. Officer Gutierrez appropriately deescalated to a non-lethal taser while Officer Crocker remained his lethal cover. This tactic is used in case the plaintiff produces a lethal weapon or the interaction turns lethal while Officer Gutierrez is at a lethal disadvantage now that he has secured his firearm and is holding a taser.

As both officers approached the plaintiff, he continued to disobey their commands. Officer Gutierrez was unable to effectively use the taser, so he transitioned to a lesser use of force, which was his pepper spray. Officer Cocker also deescalated by holstering his firearm and prepared to use soft or hard hand control to detain the Plaintiff. Officer Gutierrez explained to the plaintiff why he was being stopped and needed to get out of the vehicle. The plaintiff then acknowledged and continued to refuse, which would lead a reasonable officer to believe verbal commands alone will

not gain compliance. As Officer Gutierrez attempted to open the plaintiff's car door, which was legal and reasonable at this point in the high risk stop, the plaintiff was still verbally noncompliant and escalated to active resistance by pulling the door shut, preventing Officer Gutierrez from opening the vehicle door. Officer Gutierrez deployed pepper spray (Hard hand control) to the face of the plaintiff in order to gain compliance. The plaintiff continued to be passive resistant and not compliant to any of the commands the officers have him, even after de-escalation tactics were deployed. The plaintiff eventually took his seatbelt off after several requests to do so. Due to the plaintiffs continued noncompliance, active and passive resistance, both officers ordered him to the ground for their safety. The plaintiff actively resisted both Officer Gutierrez's and Crocker's attempts to detain him. Because the plaintiff had stiffened his body and showed no signs of complying, Officer Gutierrez employed hard control "peroneal strikes" These strikes are implemented for pain compliance and not intended to cause serious injury. When these strikes were ineffective, Officer Gutierrez discontinued the strikes, which is consistent with training. Both officers where eventually able to wrestle him to the ground and handcuff him for their safety and the safety of the public. After both Officers ruled out that the plaintiff was a dangerous threat, they immediately sought medical attention, which is in alignment with reasonableness and protocol.

4. <u>Opinion on the Plaintiff's actions as a contributing factor to the encounter with Officers Crocker and Gutierrez, including resisting officers and refusal to follow commands.</u>

The plaintiff's action necessitated the response by Officer Crocker and Gutierrez. Both officers' reactions were due to the overt actions of the plaintiff. In my opinion, from his driving behavior, his noncompliance, to active resistance, and his overall escalation during the encounter, Officer Crocker and Gutierrez acted appropriately according to the Use of Force Continuum and

EXHIBIT 2

the training and experience that I have had. I believe this encounter would have lasted less than 10 minutes if the plaintiff would have complied with lawful commands clearly given by both officers.

From my training and experience as a law enforcement officer, I believe the officers were reasonable in being cautious and continuing the show of force when the Plaintiff failed to show his hands and exit the vehicle. I believe the plaintiff's immediately setting up his cell phone and making the initial statement, "I'm not getting out of the vehicle", showed he had no intent to comply. As an active duty soldier, the plaintiff knew exactly what was going on. Soldiers are trained for war and combat and are trained to appropriately respond to orders given by those in authority. The plaintiff's nonchalant behavior was an indicator that he was not afraid. When the plaintiff pulled into a well-lit area and still did not comply, this leads me to believe he had no intentions on complying.

BRANDON TATUM

**EXHIBIT 2**