IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | | |
|---|---|---|
| CARON NAZARIO, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:21CV169 (RCY) |
| | ) | |
| JOE GUTIERREZ, | ) | |
| *in his personal capacity,* | ) | |
| and | ) | |
| DANIEL CROCKER, | ) | |
| *in his personal capacity*, | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION**

This matter is before the Court on three motions: (1) Defendant Crocker's Motion for Summary Judgment (ECF No. 77), (2) Defendant Gutierrez's Motion for Summary Judgment (ECF No. 79), and (3) Plaintiff's Motion for Summary Judgment (ECF No. 81). The motions have been fully briefed, and the Court dispenses with oral argument because the facts and legal contentions are adequately presented in the materials before the Court, and oral argument would not aid in the decisional process. E.D. Va. Loc. Civ. R. 7(J). For the reasons stated below, the Court will: (1) grant in part and deny in part Defendant Crocker's Motion for Summary Judgment (ECF No. 77), (2) grant in part and deny in part Defendant Gutierrez's Motion for Summary Judgment (ECF No. 79), and (3) grant in part and deny in part Plaintiff's Motion for Summary Judgment (ECF No. 81).

## I. FACTUAL ALLEGATIONS[1]

The Court recounts the relevant facts as alleged in the Complaint.  This action arises from a traffic stop involving Caron Nazario ("Plaintiff") and two police officers employed by the Town of Windsor, Joe Gutierrez and Daniel Crocker ("Defendants" or "the Officers"). (Compl. ¶ 2, ECF No. 1.)  Plaintiff is a Second Lieutenant in the United States Army Medical Corps, and he is of Latinx and African American descent. (*Id.* ¶ 9.)  On December 5, 2020, at approximately 6:34 p.m., Plaintiff was driving through the Town of Windsor, Virginia, in his newly purchased 2020 Chevrolet Tahoe. (*Id.* ¶ 13.)  The Department of Motor Vehicles had not yet issued permanent plates for the vehicle, so Plaintiff had a cardboard temporary plate taped to the inside of the rear window. (*Id.*)

Defendant Crocker initiated a traffic stop of Plaintiff by activating his emergency lights and siren. (*Id*. ¶ 14.)  Defendant Crocker initiated the stop because he did not see a license plate on the vehicle. (Def. Crocker Answer ¶¶ 13-14, ECF No. 20.)  Later, Defendant Gutierrez joined in the pursuit. (Compl. ¶ 14.)  Plaintiff put on his turn signal and slowed down but continued driving. (*Id.* ¶¶ 15-16; Compl. Ex. 4 at 0:00-1:45, ECF No. 1-2.)  Once he arrived at a well-lit gas station, approximately a mile down the road, he pulled over. (Compl. Ex. 4 at 1:35-45.)  The Officers exited their vehicles and trained their firearms on Plaintiff. (*Id.* at 1:50-55.)  Plaintiff repeatedly asked the Officers, "What's going on?" and asked why they had their guns drawn. (*Id.* at 1:55-3:30.)  Defendants ordered Plaintiff to put his hands outside of his car window, Plaintiff complied, and Defendants later demanded that Plaintiff exit his vehicle. (*Id*.)  Defendant remained

---

[1] In resolving summary judgment motions and questions of qualified immunity, courts view the facts in the light most favorable to the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 377 (2007).  However, when there is video evidence and there are no allegations that it has been altered in any way, a court should view the facts in the light depicted by the video. *Id*. at 378, 380-81; *Jiron v. Roth*, 519 F. Supp. 3d 971, 977 (D.N.M. 2021).  As such, the Court examines the body camera footage itself rather than solely relying on the facts provided by the parties. *Jiron*, 519 F. Supp. 3d at 977.  When the video is unclear, the Court draws the facts in the light most favorable to the non-moving party. *Id*.

in his vehicle. (*Id.*)  At one point, Defendant Gutierrez warned Plaintiff that he was "fixin' to ride the lightening"[2] by not obeying their orders to exit the vehicle. (*Id.* at 3:30-40.)  Plaintiff told Defendants that he was afraid to leave the vehicle to which Defendant Gutierrez responded, "Yeah, you should be." (*Id.* at 3:50-4:00.)

After several more commands to leave the vehicle, Defendant Gutierrez grabbed Plaintiff's arm in an attempt to remove him from the vehicle. (*Id.* at 4:15-20.)  When that was unsuccessful, Defendant Gutierrez removed his Oleoresin Capsicum spray ("OC spray") and shook it multiple times in front of Plaintiff while ordering Plaintiff to get out of the vehicle. (*Id.* at 4:25-28.) Defendant Crocker then reached through the vehicle's window to unlock the door and attempted to open the door, but he was unable to do so as Plaintiff held the door closed with his elbow. (*Id.* at 4:28-46.)  During this time, Plaintiff repeatedly asked the Officers to calm down and again asked, "What is going on?" (*Id.*)  Defendant Gutierrez then told Defendant Crocker to back up, before using, without warning, his OC spray on Plaintiff four separate times. (*Id.* at 4:45-58.) Defendant Gutierrez then told Plaintiff that if he did not exit the vehicle, he would be sprayed again. (*Id.* at 4:55-5:20.)  Defendant Gutierrez opened the car door and continued his demand for Plaintiff to get out of the car and go straight to the ground. (*Id.* at 5:35-6:25.)  Plaintiff eventually left the vehicle, but he remained standing. (*Id.* at 6:25-35.)  Defendant Gutierrez then kneed him twice before the Officers forced the Plaintiff to the ground and handcuffed him. (*Id.* at 6:35-7:55.) Throughout the Officers' attempts to take him to the ground, Plaintiff attempted to remain in place. (*Id.*)

After handcuffing him, Defendant Crocker asked Plaintiff if he had any weapons on his

---

[2] The parties disagree over the meaning of the phrase "ride the lightening."  Plaintiff contends that this is a "colloquial expression for an execution, originating from glib reference to execution by the electric chair." (Compl. ¶ 28.) Defendant Crocker describes the phrase as "a common reference to being tasered." (Def. Crocker Answer ¶ 28.) Defendant Gutierrez did not address the meaning of this phrase in either his Answer or his briefings.

person or in the vehicle. (*Id*. at 8:15-25.)  Before Plaintiff could respond, Defendant Gutierrez joined the conversation and asked Plaintiff why he had not obeyed their orders. (*Id*. at 8:40-50.) Defendants moved Plaintiff and propped him up against a trashcan several feet from his vehicle and resumed talking with him. (*Id*. at 9:00-:20.)  Defendant Crocker then left to get water for Plaintiff from the gas station. (*Id*. at 9:20-10:15.)  Around the time he returned, two medics arrived at the scene to assist Plaintiff with the effects of the OC spray. (*Id*. 10:15-20.)  During Plaintiff's conversation with the two medics and Defendant Gutierrez, one of the medics asked about the location of the firearm. (*Id*. at 18:48-52.)  Plaintiff said, "It's right there" and pointed his head in the direction of the driver's seat. (*Id*. at 18:50-55.)  After that exchange, Defendant Crocker entered Plaintiff's vehicle and searched for the firearm. (*Id*. at 19:00-25.)  Once Defendant Crocker located the firearm, he radioed the serial number back to dispatch, which reported that the firearm was not stolen. (*Id*. 19:35-55.)  He then returned the firearm to the vehicle. (*Id*. at 19:55-20:05.)

The parties continued their conversation during which Defendant Crocker stated that he understood why Plaintiff waited until a well-lit area to stop but explained why it gave him concern. (Compl. Ex. 5 at 1:40-2:15.)  After calling the Windsor Chief of Police, Defendant Gutierrez gave Plaintiff a choice: he could either be arrested and "fight it . . . which is [his] right as a citizen" or he could "chill and let [it] go." (Compl. Ex. 5 at 04:20-6:57, ECF No. 1-2.)  Plaintiff chose not to be arrested. (*Id*. at 7:40-9:00.)

After the traffic stop, both Defendants wrote narratives of the event for their official records. (Compl. ¶ 58.)  In these narratives, they alleged that Plaintiff's vehicle had no license plate displayed, Plaintiff disregarded Defendant Crocker's lights and siren, Plaintiff did not comply with orders and was actively resisting, Plaintiff assaulted Defendant Gutierrez, and Defendant Gutierrez gave Plaintiff a warning before spraying him with OC spray. (*Id*. ¶¶ 60-63.)

## II. PROCEDURAL HISTORY

Plaintiff filed his Complaint on April 2, 2021. (ECF No. 1.)  On April 16, 2021, this action was reassigned from Judge Robert G. Doumar to the undersigned.  On May 14, 2021, Defendant Gutierrez filed an Answer on May 14, 2021. (ECF No. 17.)  On May 17, 2021, Defendant Crocker filed an Answer. (ECF No. 20.)

On January 12, 2022, Defendant Crocker filed a Motion for Summary Judgment and a Memorandum in Support. (ECF Nos. 77-78.)  Plaintiff filed an Opposition on January 26, 2022. (ECF No. 94.)  Defendant Crocker filed a Reply on February 1, 2022. (ECF No. 99.)

Defendant Gutierrez filed a Motion for Summary Judgment and a Memorandum in Support on January 12, 2022. (ECF Nos. 79-80.)  Plaintiff filed an Opposition on January 26, 2022. (ECF No. 95.)  Defendant Gutierrez filed a Reply on February 1, 2022. (ECF No. 101.)

Plaintiff filed a Motion for Summary Judgment and a Memorandum in Support on January 12, 2022. (ECF Nos. 81-82.)  Defendant Crocker filed a Response Brief on January 26, 2022. (ECF No. 90.)  Defendant Gutierrez filed a Memorandum in Opposition on January 26, 2022. (ECF No. 93.)  Plaintiff filed a Reply on February 1, 2022. (ECF No. 100.)

## III. LEGAL STANDARD

### A. Summary Judgment

The Federal Rules of Civil Procedure provide the standard for this matter. Rule 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986).  The evidence must be viewed

"in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).

When both parties have moved for summary judgment, the Court must review "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Republic W. Ins. Co. v. Williams*, 212 Fed. App'x. 235, 237 (4th Cir. 2007). "The fact that both sides moved for summary judgment does not establish that there is no issue of fact and require that judgment be granted for one side or the other." *Am. Fid. & Cas. Co. v. London & Edinburgh Ins. Co.*, 354 F.2d 214, 216 (4th Cir. 1965).

### B. Qualified Immunity

The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Person v. Callahan*, 555 U.S. 223, 231 (2009); *Wingate v. Fulford*, 987 F.3d 299, 310-11 (4th Cir. 2021). The burden of establishing a qualified immunity defense is on the official asserting qualified immunity. *Wingate*, 987 F.3d at 311; *Meyers v. Baltimore County*, 713 F.3d 723, 731 (4th Cir. 2013).

The Supreme Court, in *Saucier v. Katz*, created a two-step procedure for resolving qualified immunity claims. 533 U.S. 194, 201 (2001). First, a court must decide if the plaintiff has sufficiently alleged a violation of a statutory or constitutional right. *Id*. Second, a court then decides if the right was "clearly established." *Id*. Under *Pearson v. Callahan*, the Supreme Court held that this two-step procedure is no longer mandatory but is "often appropriate." 555 U.S. at 236. It is now left to the sound discretion of the court to decide which of the two steps should be addressed first. *Id*. However, it is beneficial to address the constitutional violation prong first, as it "promotes the development of constitutional precedent." *Id*.

A constitutional right is clearly established "not only when it has been specifically adjudicated but also when it is manifestly included within more general applications of the core constitutional principle invoked." *Sims v. Labowitz*, 885 F.3d 254, 263 (4th Cir. 2018) (citing *Clem v. Corbeau*, 284 F.3d 543, 553 (4th Cir. 2002)).  The central question is "would it be clear to a reasonable officer that his or her conduct was unlawful in the particular situation that he or she confronted." *Livingston v. Kehagias*, 803 Fed. App'x 673, 678 (4th Cir. 2020).

### IV. MOTIONS FOR SUMMARY JUDGMENT

#### A. Probable Cause

Several of the claims rely on the presence or absence of probable cause.  To avoid repetitive analysis, the Court will address this issue at the outset.  Probable cause to arrest exists when the "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979).  Probable cause must be supported by more than a mere suspicion but does not require evidence sufficient for a conviction. *Taylor v. Waters*, 81 F.3d 429, 434 (4th Cir. 1996).

#### 1. Failure to Properly Display License Plate

Virginia law requires that "[l]icense plates assigned to a motor vehicle . . . shall be attached to the front and the rear of the vehicle." Va. Code. Ann. § 46.2-715.  Further, license plates must be "fastened to the motor vehicle . . . [i]n a position to be clearly visible, and [i]n a condition to be clearly legible." Va. Code. Ann. § 46.2-716.  The offense is a traffic offense, and Virginia courts may dismiss the summons upon proof of compliance. *Id*.  Based on the body camera video, it is clear that the Officers did have probable cause to execute a traffic stop for failure to display a license plate, as the rear license plate was not in the correct position and was not visible.

### 2. Eluding

Defendants have alleged that there was probable cause to arrest Plaintiff for misdemeanor

eluding. Under Virginia Code § 46.2-817:

> Any person who, having received a visible or audible signal from any law-enforcement officer to bring his motor vehicle to a stop, drives such motor vehicle in a willful and wanton disregard of such signal or who attempts to escape or elude such law-enforcement officer whether on foot, in the vehicle, or by any other means, is guilty of a Class 2 misdemeanor. It shall be an affirmative defense to a charge of a violation of this subsection if the defendant shows he reasonably believed he was being pursued by a person other than a law-enforcement officer.

Va. Code Ann. § 46.2-817.

Given the low bar for probable cause and the contours of the offense, the Officers did have

probable cause to charge Plaintiff with eluding.  In similar situations, courts have found that failing

to immediately pull over can constitute eluding, even when the reason is well-intentioned, as the

officer has no way of knowing the reason for the suspect's delay.  For example, the plaintiff in

*Manners v. Cannella* continued driving for two minutes after a patrol car turned on its sirens and

lights. 891 F.3d 959, 965 (11th Cir. 2018).  The driver was fearful of police brutality and waited

to pull over until reaching a gas station that was well-lit and would have a surveillance camera. *Id.*

The court determined that there was probable cause that the driver had committed the office of

fleeing, a similar offense to Virginia's eluding offense. *Id.* at 971.  *See also Kowalczuk v. Giese*,

No. 19-cv-1230, 2021 WL 1192412, at *1, 5 (E.D. Wis. Mar. 30, 2021) (characterizing the

plaintiff's decision to continue driving to a well-lit area instead of immediately pulling over as

"actively resisting").

### 3. Obstruction of Justice and Failure to Obey

Under Virginia law, "[i]f any person without just cause knowingly obstructs . . . any law-

enforcement officer . . . in the performance of his duties as such or fails or refuses without just

cause to cease such obstruction when requested to do so by such . . . law-enforcement officer . . .

he is guilty of a Class 1 misdemeanor." Va. Code Ann. § 18.2-460(A).  Similarly, "[i]f any person, being required by a conservator of the peace on view of a breach of the peace or other offense to bring before him the offender, refuse or neglect to obey the conservator of the peace, he shall be guilty of a Class 2 misdemeanor." Va. Code Ann. § 18.2-464

"The Fourth Circuit has interpreted Virginia law as drawing a distinction between conduct that 'merely impedes or frustrates the officer, which does not ground liability under the Obstruction Statute, and conduct that intentionally thwarts or prevents an arrest, which does.'" *Carter v. Khan*, No. 1:15-cv-572, 2015 WL 6738607, at *7 (E.D. Va. Nov. 4, 2015) (quoting *Wilson v. Kittoe*, 337 F.3d 392, 400 (4th Cir. 2003)).  In *Coffey v. Morris*, the court found that an officer had probable cause to arrest a driver for obstruction of justice when a driver ignored a lawful order to remain in her vehicle. 401 F. Supp. 2d 542, 547 (W.D. Va. 2005).  Similarly, in *Collins v. Commonwealth*, the Virginia Court of Appeals upheld a conviction for obstruction of justice when the driver refused a lawful order to exit her vehicle. No. 2080-06-02, 2007 WL 4523117, at *2 (Va. Ct. App. Dec. 27, 2007).  Given that Plaintiff refused to comply with a lawful order to exit his vehicle, there was probable cause to charge Plaintiff with obstruction of justice and failure to obey.

**B. Federal Law Claims**

**1. Count I – Unreasonable Seizure**

a. Plaintiff's Argument

Plaintiff argues that he was initially stopped for failure to properly display a valid license plate, and that he was detained for longer than was reasonably necessary to investigate and issue a summons for that offense. (Pl. Br. Supp. at 25, ECF No. 82.)[3]  Plaintiff contends that the stop's duration and scope was excessive. (*Id.*)  Plaintiff argues that the Officers' actions during the stop

---

[3] The Court employs the pagination assigned to all documents referenced herein by the CM/ECF docketing system, except for transcripts which will be cited using the page and line numbers as contained in the original document.

were not reasonably related to the basis for the stop and unreasonably prolonged the stop. (*Id*. at 26.) Specifically, the initiation of a felony stop, display of firearms, refusal to answer reasonable inquiries about the basis of the stop, verbal threats, use of OC spray, and physical violence constituted unreasonable acts that unlawfully prolonged the stop. (*Id*.) Plaintiff further argues that the Officers lacked both reasonable suspicion and probable cause for any crime other than failure to properly display a valid license plate, thus conducting a full custodial arrest was unlawful. (Pl. Reply at 3, ECF No. 100.)

### b. Defendant Crocker's Argument

Defendant Crocker argues that the initial stop was lawful, as there was reasonable suspicion that Plaintiff was driving without a rear license plate. (Def. Crocker Mem. Supp. at 15, ECF No. 78.) Defendant Crocker argues that it was Plaintiff's own actions that extended the stop, not the actions of the Officers. (*Id.* at 16.) Defendant Crocker contends that the following "clues" justified a high-risk traffic stop: (1) driving a heavily tinted vehicle with no visible license plate, (2) failing to yield to lights and sirens, (3) passing by several well-lit areas, and (4) traveling at slower than usual speeds without any attempt to stop. (*Id*. at 17.) Further, by the time Plaintiff was handcuffed, there was probable cause to arrest him for obstruction of justice. (*Id*. at 18.)

### c. Defendant Gutierrez's Argument

Defendant Gutierrez argues that the traffic stop was legitimate, as there was reason to believe that Plaintiff was driving without a license plate and the Officers' commands to exit the vehicle were lawful. (Def. Gutierrez Mem. Supp. at 9-10, ECF No. 80.) Further, Defendant Gutierrez argues that Plaintiff's "evasive and odd behavior" warranted the use of high-risk tactics. (Def. Gutierrez Mem. Opp'n at 12-13, ECF No. 93.) As such, there was no unlawful seizure.

### d. Constitutionality of the Seizure

The Fourth Amendment "permits an officer to initiate a brief investigative traffic stop when

he has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)).  The officer must have more than a "hunch" but needs "considerably less" than proof by a preponderance of the evidence. *Id*. (citing *Prado Navarette v. California*, 572 U.S. 393, 397 (1989)).  "To satisfy the reasonableness requirements for an investigative detention, a traffic stop must be legitimate at its inception, and the officers' actions during the stop must be 'reasonably related in scope' to the basis for the stop." *United States v. Hill*, 852 F.3d 377, 381 (4th Cir. 2017) (citing *United States v. Williams*, 808 F.3d 238, 245 (4th Cir. 2015)).  A stop that is justified at its inception may still be unconstitutional "if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

Plaintiff assumes, for the purpose of his motion, that Defendant Crocker had probable cause to initiate the stop. (Pl. Br. Supp. at 13.)  Even if Plaintiff had not conceded this, it is clear that the Officers did have probable cause to initiate a stop for failing to properly display a license plate.  As previously discussed, there was also probable cause for misdemeanor eluding.  Thus, the stop was legitimate at its inception.  As such, this count depends on whether the stop's manner of execution was reasonable.

A valid traffic stop becomes unlawful if it is prolonged beyond the time reasonably required to complete the "mission" of the stop. *Rodriguez v. United States*, 575 U.S. 348, 354-55 (2015). The mission is to address the traffic violation that warranted the stop. *Id*.  Typically, the mission of the stop includes determining whether to issue a traffic ticket, checking the driver's license, inspecting registration and proof of insurance, and determining whether there are outstanding warrants. *Id*. at 355.  The Supreme Court has also determined that the government has an interest in officer safety that "stems from the mission of the stop itself." *Id*. at 356.  However, this interest in officer safety is limited.  The "officer's focus must remain on the bases for the

traffic stop, in that the stop must be 'sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'" *United States v. Palmer*, 820 F.3d 640, 649 (4th Cir. 2016). Here, the issue is whether the Officers' actions were permissible acts in the interest of officer safety or unreasonable acts that needlessly escalated the situation in a manner that unlawfully prolonged the stop.

Given that Fourth Amendment claims are highly fact dependent, it is necessary to outline the specific acts that are relevant for this specific claim. At approximately 6:34 p.m., Defendant Crocker observed a Tahoe, driven by Plaintiff, with no visible license plate, and activated his emergency equipment to initiate a traffic stop. (Def. Crocker Mem. Supp. at 5; Def. Gutierrez Mem. Supp. at 2; Pl. Br. Supp. at 4-5.) Plaintiff reduced his speed but continued driving for approximately one minute and forty-five seconds before stopping at a well-lit gas station. (Compl. Ex. 4 at 0:00-1:45.) After Plaintiff stopped his vehicle, Defendant Crocker ordered Plaintiff to turn off his car and put his hands out of the window. (*Id*. at 1:52-2:28.) Defendant Crocker then instructed Plaintiff to open the door slowly and to get out of the vehicle. (*Id*. at 2:38-55.) Defendant Gutierrez then joined in, ordering Plaintiff to get out of the vehicle. (*Id*. at 2:55-57.) Defendant Gutierrez then ordered Plaintiff to keep his hands outside of the widow before the Officers immediately resumed ordering Plaintiff to get of the vehicle. (*Id*. at 3:05-55.) During the stop, Defendant Gutierrez warned Plaintiff that "[he was] fixin' to ride the lightening." (*Id*. at 3:30-40.) Further, in response to Plaintiff stating that he was afraid to get out of his car, Defendant Gutierrez told him, "yeah you should be." (*Id*. at 3:50-58.) The Officers' firearms were pointed at Plaintiff for the entirety of this interaction. (*Id*. at 1:50-4:15.) After refusing to exit the vehicle, Plaintiff was sprayed with OC spray. (*Id*. at 4:45-5:05.) Upon Plaintiff leaving the vehicle, Defendant Gutierrez ordered Plaintiff to get on the ground, but Plaintiff remained standing. (*Id*. at 6:25-35.) Defendant Gutierrez then kneed Plaintiff repeatedly, and both Officers forced Plaintiff onto the

ground and handcuffed him. (*Id*. at 6:40-8:00.)

The Officers were lawfully permitted to order Plaintiff out of his vehicle.  In *Pennsylvania v. Mimms*, the Supreme Court held that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." 434 U.S. 106, 111 n.6 (1977).  The Court reasoned that the *de minimis* intrusion on the driver's personal liberty was outweighed by the legitimate concerns for officer safety. *Id*.  It is clear that Defendant Crocker and Defendant Gutierrez could lawfully order Plaintiff out of the vehicle after validly stopping him for failure to properly display a license plate and misdemeanor eluding.  Further, the Officers could have effectuated a custodial arrest of Plaintiff, as they had probable cause for the minor crime of eluding. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).  This also would have involved Plaintiff exiting his vehicle.

Since the order to exit the vehicle was lawful, the remaining issue is whether aiming their firearms at Plaintiff, giving conflicting commands, and making threatening statements unreasonably prolonged the stop.  These actions arguably led to Plaintiff's reluctance to leave the vehicle, which in turn led to Plaintiff being sprayed with OC spray, forcibly taken to the ground, and handcuffed.  All of these events extended the length of the stop.

Officers performing a lawful stop are entitled to take reasonable steps to protect their personal safety. *United States v. Soriano-Jarquin*, 492 F.3d 495, 500 (4th Cir. 2007) (citing *United States v. Hensley*, 469 U.S. 221, 235 (1985)).  Defendant Crocker justifies his decision to conduct a high-risk stop on the following observations: the vehicle (1) failed to yield to a marked patrol car utilizing lights and sirens, (2) passed by several well-lit areas, and (3) was traveling at slower than usual speeds without any attempt to stop. (Def. Crocker Mem. Supp. at 17.)  Defendant Crocker found this indicative of occupants searching for a place to escape or preparing for an

assault on police officers. (*Id*.)

It was reasonable for Defendant Crocker's suspicions to be heightened based on these factors. This situation is similar to *Biggs v. City of Maryland Heights* in which a driver slowed down but continued driving for a quarter mile after a marked patrol car initiated its lights and sirens. No. 4:20-cv-1499, 2022 WL 1451670, at *1 (E.D. Mo. May 9, 2022). The driver later explained that "he wanted to find a well-lit spot to pull over." *Id*. at 2. Once the vehicle stopped, the officer pointed his firearm at the driver. *Id*. The court determined that since the officer did not know that the driver was merely waiting for a well-lit spot to pull over, it was reasonable for him to believe that the driver was fleeing and might have been dangerous. *Id*. at *7. Thus, it was reasonable for the officer to point his firearm at the driver "until he was certain the situation was under control and his safety was not threatened." *Id*. Similarly, in *United States v. Miller*, the court determined that a driver being slow to pull over and passing multiple well-lit areas was a reasonable cause for concern that could extend a traffic stop. No. 1:19cr41, 2019 WL 4254910, at *6 (N.D.W.V. Sept. 9, 2019). The court noted that drivers may be slow to pull over, as it gives them an opportunity to hide evidence or line up their stories. *Id*.

However, this increased concern does not automatically justify all of the Officers' actions. Several circuits have held that police officers may approach with drawn firearms when they reasonably believe that the suspect is armed. *See United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994); *United States v. Hardnett*, 804 F.2d 353, 357 (6th Cir. 1986) (upholding a stop where officers ordered occupants out at gunpoint as reasonably since the officers had been told the car had guns in it). However, several circuits have held that it is a constitutional violation to hold individuals at gun point when they are being compliant and present no danger. *See Baird v. Renbarger*, 576 F.3d 340, 346 (7th Cir. 2009); *Motley v. Parks*, 432 F.3d 1072, 1089 (9th Cir. 2005) (*en banc*); *Robinson v. Solano County*, 278 F.3d 1007, 1015-16 (9th Cir. 2002); *Holland v.*

14

*Harrington*, 268 F.3d 1179, 1192-93 (10th Cir. 2001); *Baker v. Monroe Township*, 50 F.3d 1186, 1193-94 (3d Cir. 1995).

In *McNair v. Coffey*, the Seventh Circuit stated that "the circumstances of arrest could become 'unreasonable' without the application of physical force." 279 F.3d 463, 468 (7th Cir. 2002). In *McNair*, the plaintiffs had waited to pull over because it was nighttime and he felt that he was in an "unsavory" area. *Id*. at 465. While this justification was deemed irrelevant by the court, this same justification was deemed relevant for the police officer's decision to call for backup. *Id*.[4] The plaintiffs were then surrounded by eight police cars and ordered to leave the vehicle as police aimed their guns at them. *Id*. The jury determined that the officer "violated the [F]ourth [A]mendment by arranging a show of force that was needlessly frightening." *Id*. The Seventh Circuit overruled the jury's verdict, holding that  the individual officer sued had not personally acted unreasonably and that the show of force was not unreasonable in this particular instance. *Id*. at 467. The court noted that "[t]he use of a swat team to make a traffic stop could have consequences under the fourth amendment.  If, for example, a suspect's consent to search were prompted by fear that the officers would react violently to a refusal, then the consent would be deemed involuntary and set aside." *Id*. at 468.

Further, even if it is justified to approach the vehicle with firearms drawn, it does not follow that officers may threaten suspects.  In *Thompson v. Rahr*, the Ninth Circuit held that pointing a gun at a suspect's head and threatening to kill the suspect during an arrest was objectively unreasonable. 885 F.3d 582, 586-67 (9th Cir. 2018). *Jeffries v. Ayoub* also dealt with threats made

---

[4] "At trial they contended that they had delayed because they wanted to get out of an unsavory neighborhood before surrendering, but this reason is not relevant; people ordered to stop must halt immediately; they cannot make their own decisions about when and where they will surrender.  Because it was dark (after 5 p.m. on December 20), the neighborhood posed risks, and the McNairs did not immediately stop, Coffey called for backup. Given the risks entailed even in ordinary traffic stops, this was a sensible decision." *McNair*, 279 F.3d at 465 (internal citations and parentheticals omitted).

by an officer.  In that case, the plaintiff pulled over in the "first safe place" to stop. No. 8:17-cv-2973, 2019 WL 3306017, at *1 (D. Md. July 23, 2019).  After realizing the police officer was trying to pull him over, the plaintiff decreased his speed and continued driving for half a mile until he found a well-lit place to pull over. *Id*.  Once the vehicle stopped, the officer unholstered his gun and began shouting orders at the plaintiff. *Id*.  Specifically, the officer told the plaintiff that "it would go from 'bad to real bad' if [he] did not comply." *Id*.  The officer and another officer who had arrived as back up yelled at the plaintiff to exit the vehicle while the plaintiff questioned the officers' orders. *Id*.  While analyzing this scenario as an excessive force claim, the court determined that a factfinder could determine that the officers were acting unreasonably. *Id.* at *5.  Specifically, the court noted that the officer's threats "escalat[ed] tensions." *Id*.  In *Anderson v. Willis*, the Kansas District Court denied summary judgment, as a jury could find that an officer waving his firearm around and implying that he would physically assault the plaintiff was unreasonable. 917 F. Supp. 2d 1190, 1197 (D. Kan. 2013).[5]

Whether the conflicting orders of both Officers, the aiming of firearms, and the threats made by Defendant Gutierrez unreasonably prolonged the stop is a question of fact for a jury. Therefore, Plaintiff has properly alleged a constitutional violation.

### e. Qualified Immunity

Finding that Plaintiff has stated a plausible claim against the Defendants for the violation of a constitutional right, the Court must now determine whether this right was clearly established at the time of the violation. *Saucier*, 533 U.S. at 201.  Specifically, "the rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) (quoting *Saucier*, 533 U.S. at

---

[5] The specific claim at issue in this case was excessive force and not unreasonable seizure. *Anderson*, 917 F. Supp 2d at 1198.

202).

The contours of the right are not so well defined that it would be clear to a reasonable officer that Defendants' conduct was unlawful. There are no Fourth Circuit or Supreme Court decisions that address whether conflicting instructions, aiming of firearms, or threats unreasonably prolong a stop. Meanwhile, there are Fourth Circuit cases justifying the broader actions of the stop. For example, in *Pegg v. Klempa*, the Fourth Circuit determined that police officers were justified in detaining a vehicle, ordering the driver to exit the vehicle, and arresting the driver for obstruction of justice when he refused to leave the vehicle. 651 Fed. App'x 207, 210-11 (4th Cir. 2016). Furthermore, issues of threats or an unreasonable show of force are typically analyzed in the context of an excessive force claim. *See Jeffires*, 2019 WL 3306017, at *6; *Anderson*, 917 F. Supp 2d at 1198. Thus, in the context of an unreasonable seizure claim premised on unreasonably prolonging a traffic stop, Defendants did not have notice that the conduct at issue was unlawful. Therefore, Defendants are shielded from liability on this count by qualified immunity.

Therefore, the Court will grant the Defendants' motions and deny Plaintiff's motion on this count.

### 2. Count II – Excessive Force

#### a. Plaintiff's Argument

Plaintiff contends that this claim is governed by the factors elucidated in the Supreme Court case of *Graham v. Connor*. He argues that all three *Graham* factors–(1) the severity of the crime, (2) whether the suspect posed an immediate threat to the safety of the officers, and (3) whether the suspect was actively resisting arrest or attempting to evade–favor the Plaintiff. (Pl. Br. Supp. at 17); *see Graham v. Connor*, 490 U.S. 386, 396 (1989). Plaintiff argues that there is no crime at issue, as the Officers only had probable cause for a traffic infraction. (*Id.* at 18.) Plaintiff did not make any threatening statements or threatening movements. (*Id.*) Plaintiff argues that slowing

down, finding a well-lit space, and using his turn signal showed his intent to submit to the officer's authority. (*Id.* at 20.)  His only resistance was in response to needless escalation by the Officers. (*Id.*)  Plaintiff contends that the Officers' use of OC spray, display of firearms, use of body-blows, and tackling the Plaintiff constituted excessive force. (Pl. Reply at 15.)

### b. Defendant Crocker's Argument

Defendant Crocker argues that the force he used was reasonable and necessary in light of Plaintiff's active resistance and repeated refusal of commands to exit his vehicle. (Def. Crocker Mem. Supp. at 21.)  Defendant Crocker argues that the first *Graham* factor should be analyzed using the offense of obstruction of justice for which the Officers had probable cause based on Plaintiff's repeated refusal to get out of his car. (Def. Crocker Reply at 2, ECF No. 99.)  For the second factor, his suspicions were raised by Plaintiff's failure to yield to police lights and sirens and Plaintiff's resistance after being pulled over. (*Id.*)  Similarly, under the third factor, Defendant Crocker argues that Plaintiff did resist their attempts to remove him from the vehicle and handcuff him. (*Id.*)  Defendant Crocker also addresses a fourth *Graham* factor claiming that any injuries suffered by Plaintiff were minimal and that he only sought treatment months after the incident. (*Id.* at 3.)  Defendant Crocker also argues that the Officers reasonably escalated their use of force, in response to Plaintiff's failure to comply with lawful orders, by starting with hands-on attempts to remove him before resorting to the next-lowest use of force by deploying OC spray. (Def. Crocker Br. Opp'n at 20, ECF No. 90.)  The Officers refrained from further use of OC spray and did not tase Plaintiff despite his failure to comply after being sprayed with the OC spray. (*Id.* at 21.)

### c. Defendant Gutierrez's Argument

Defendant Gutierrez argues that his use of force was lawful and reasonable. (Def. Gutierrez Mem. Supp. at 10.)  He argues that the Officers witnessed Plaintiff commit two misdemeanor offenses, failure to obey and obstruction of justice, in their presence. (*Id.* at 11-12.)  Defendant

Gutierrez argues that Plaintiff's failure to immediately pull over in response to the police lights and sirens and Plaintiff's refusal to exit the vehicle placed him "on high alert." (*Id*. at 12.)  He perceived Plaintiff as a potential threat to his safety. (*Id*.)  Further, he deployed OC spray only after Plaintiff repeatedly refused to exit the vehicle and physically resisted the Officers' attempts to remove him. (*Id*. at 13.)  Defendant Gutierrez contends that Plaintiff's active resistance to the Officers' attempts to safely "guide him to the ground" necessitated Defendant Gutierrez's use of knee strikes. (*Id*. at 13.)  Additionally, Defendant Gutierrez argues that Plaintiff suffered no physical injuries and only sought treatment for alleged psychological injuries months later. (*Id*. at 13-14.)

d. Constitutionality of the Force Used

"Indisputably, the Fourth Amendment prohibition on unreasonable seizures bars police officers from using excessive force against a free citizen." *Clem*, 284 F.3d at 549-50 (citing *Graham*, 490 U.S. at 395).  The standard for excessive force claims is objective reasonableness. *Id.* at 550; *see E.W. v. Dolgos*, 884 F.3d 172, 179 (4th Cir. 2018).  Courts must balance the "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *E.W.*, 884 F.3d at 179 (citing *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015)).  The central question is "whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting him." *Scott*, 550 U.S. at 381; *Graham*, 490 U.S. at 397.  To make that determination, the Court weighs the following factors from *Graham v. Connor*: (1) the severity of the crime at issue, (2) whether the plaintiff posed an immediate threat to the safety of the officers or the public and, (3) whether the plaintiff was actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396.  In the Fourth Circuit, courts also weigh a fourth factor: the extent of the plaintiff's injuries. *Hupp v. Cook*, 931 F.3d 307, 322 (4th Cir. 2019); *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994).  However,

19

these factors are not exclusive. *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). Instead, the overarching test is whether the force was proportional in light of the circumstances. *Smith*, 781 F.3d at 101.

The first factor weighs in favor of the Plaintiff. The initial stop was for failing to properly display a license plate, which is a traffic infraction. Before force was applied, the Officers claim to have had probable cause to arrest Plaintiff for failure to obey and obstruction of justice. (Def. Crocker Br. Opp'n at 22; Def. Gutierrez Memo Opp'n at 17.) As previously discussed, the Court agrees that there was probable cause for these two misdemeanor offenses.

In *Jeffries*, the plaintiff "at worst, committed a misdemeanor offense by failing to pull over for one-half mile. Notably, [the plaintiff] did not create a public danger by driving at a reckless speed, leading the officer on a high-speed chase, or taking evasive maneuvers." 2019 WL 3306017, at *5 (internal quotation marks omitted) (alterations adopted). The court noted that the plaintiff slowed down during the half-mile drive and that the officer had no evidence that the plaintiff was armed. *Id*. The court ultimately denied the officer's motion for summary judgment on the excessive force claim. *Id*. at *6. Similarly, in *Stutzman v. Krenik*, the plaintiff was arrested for misdemeanor fleeing or eluding police. 350 F. Supp. 3d 366, 382 (D. Md. 2018). The court found that the first *Graham* factor weighed in his favor, as the plaintiff "did not create a public danger" by speeding, driving recklessly, or taking evasive maneuvers. *Id*.

The second factor can favor either party, depending on in whose favor the evidence is viewed. "[T]he Fourth Circuit has made clear that an officer cannot simply treat everyone as an equally grave threat to officer safety simply because of the abstract possibility that a person could be armed, or dangerous in some other way." *M.Y.M. v. Chavis*, No. 3:21cv102, 2022 WL 264463, at *8 (E.D. Va. Jan. 27, 2022). Being non-cooperative does not automatically render a suspect a threat. *See id*. at *9. At the time the OC spray was used, Plaintiff had his arms outside of the

window and was asking the Officers to explain why he had been stopped. His tone and posture were non-combative.  When the facts are viewed in this light, Plaintiff did not pose an immediate threat to the Officers.

However, given that Plaintiff was in a military uniform, it would not be unreasonable for the Officers to believe Plaintiff was armed.  And, as previously discussed, a reasonable officer may have viewed Plaintiff's failure to immediately pull over as an indicator that the driver was dangerous. When the facts are viewed in this light, Plaintiff could be considered a safety threat.

The third factor weighs slightly in favor of Plaintiff given the nature of his resistance. Officer Crocker believed that Plaintiff was fleeing when he failed to immediately pull over; however, by the time force was applied, that was no longer the situation.  Plaintiff had stopped his vehicle and had his hands out of the window.  Plaintiff did refuse lawful orders to exit the vehicle, but he was not actively fleeing and did not engage in active resistance.

When police lawfully order a driver to exit his vehicle and the driver refuses, police may use reasonable force to remove the driver. *See, e.g., Estate of Armstrong v. Village of Pinehurst*, 810 F.3d 892, 901 (4th Cir. 2016) ("Noncompliance with lawful orders justifies some use of force, but the level of justified force varies based on the risks posed by the resistance"); *Gwazdavskas v. Tharp*, No. 7:19cv426, 2020 WL 3256824, at *2, 7 (granting an officer's motion to dismiss an excessive force claim when the officer shattered a driver's window who was refusing to exit his vehicle).  A key determination in the reasonableness inquiry is whether the resistance is active or passive.

This distinction, between passive and active resistance, is particularly important when the force involved is the use of chemical sprays like OC spray or pepper spray.  The Eleventh Circuit has amply described the existing precedent regarding when it is reasonable to use OC spray, or pepper spray, during the course of an arrest or investigatory detention:

> Courts have consistently concluded that using pepper spray is excessive force in cases where the crime is a minor infraction, the arrestee surrenders, is secured, and is not acting violently, and there is no threat to the officers or anyone else. Courts have consistently concluded that using pepper spray is reasonable, however, where the plaintiff was either resisting arrest or refusing police requests, such as requests to enter a patrol car or go to the hospital. Furthermore, "'as a means of imposing force, pepper spray is generally of limited intrusiveness,' and it is 'designed to disable a suspect without causing permanent physical injury.'"

*Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002) (citations omitted); *also see Vandyke v. Hall*, 743 F. Supp. 2d 561, 567 (E.D. Va. 2010).

Passive resistance takes the form of tensing ones body to make it harder to be handcuffed, clinging to the steering wheel, verbally refusing to exit a vehicle, or keepings one's hands in their pockets in disregard of an officer's order. *See Garcia v. Dutchess County*, 43 F. Supp. 3d 281, 293-94 (S.D.N.Y. 2014); *Bryant v. Meriden Police Dep't*, No. 3:13-cv-449, 2017 WL 1217090, at *9 (D. Conn. Mar. 31, 2017).

In *McGowan v. Prince George's County*, a plainclothes officer treated a driver's question of whether he was actually a police officer as resisting arrest. 401 F. Supp. 3d 564, 574-75 (D. Md. 2019).  Immediately after responding that he was a real police officer, the officer grabbed the driver's wrist and stuck the back of the driver's legs to take him to the ground. *Id*. at 574.  In denying the officer's motion for summary judgment, the court stated:

> If the standard is that officers are automatically justified in using force when a reasonable request is made to see a plainclothes officer's identification after the officer asks the person for his or her own ID or to exit a car, there would seem to be no limit to the application of physical force in almost any routine investigatory or traffic stop.

*Id*. at 575.  Likewise, it seems reasonable to at least have provided an answer to Plaintiff recurring question of "what is going on?" or his other requests to know the reason why he was stopped.

*Lawyer v. City of Council Bluffs* provides a good example of when the line between active and passive resistance gets murky. 361 F.3d 1099 (8th Cir. 2004).  In that case, the driver refused multiple orders to exit the vehicle. *Id*. at 1101-02.  The driver had his window open, but kept the

door locked. *Id*. at 1102.  The officer reached in the vehicle to unlock the door, the driver started rolling up the window, and the officer pepper sprayed the driver. *Id*.  The Eight Circuit concluded that it was objectively reasonable for the officer to fear for his safety, as the officer's arm could have been pinned by the window and he could have been dragged by the car if it had moved. *Id*. at 1105.  As such, the Eight Circuit determined that the use of pepper spray was not excessive force. *Id*.

The fourth factor seems to weigh in favor of the Officers, but it is not dispositive and is ultimately a question for the jury.  The Fourth Circuit has stated that "minor injuries, however, are but one consideration in determining whether force was excessive." *Hupp v. Cook*, 931 F.3d at 323.  The Fourth Amendment "does [not] absolve police officers of liability so long as their conduct, however unreasonable, only results in *de minimis* injuries." *Smith v. Murphy*, 634 Fed. App'x 914, 917 (4th Cir. 2015).  Defendants' argument that Plaintiff suffered at most minor injuries is insufficient to prove that this claim cannot survive as a matter of law.

The overarching test is whether the amount of force used was proportional in light of the totality of the circumstances. *Smith*, 781 F.3d at 101.  As previously discussed, the use of firearms and threats can be considered an excessive use of force. *See Jeffries*, 2019 WL 3306017, at *5 (holding that a jury could find that an officer's threats were unreasonable and constituted excessive force); *Anderson*, 917 F. Supp 2d at 1197 (holding that a jury could find an officer's decision to threaten a driver and wave around his firearm to be excessive force).  Given that the reasonableness of an officer's actions is a question for a jury, this count cannot be resolved on summary judgment. *See Clem*, 98 Fed. App'x at 201.

### e. Qualified Immunity

Since this count cannot be resolved on the first step of the *Saucier* analysis, the Court must move to the second step.  While the exact conduct at issue need not have been deemed unlawful,

there must be cases of controlling authority or a consensus of persuasive authority for the right to be free from such conduct to be considered clearly established. *See Wilson v. Layne*, 526 U.S. 603, 617 (1999); *Sims*, 885 F.3d at 262; *Amaechi v. West*, 237 F.3d 356, 362 (4th Cir. 2001). In a similar case, the Court decided that a similar use of force did not violate a clearly established right. *Omeish v. Kincaid*, No. 1:21-cv-35, 2022 WL 2904876, at *4 (E.D. Va. July 22, 2022). In *Omeish v. Kincaid*, an officer used OC spray and forcibly removed a driver from her vehicle after repeatedly refusing to provide her driver's license. *Id*. at *1. The Court held that there was no precedent clearly establishing that this use of OC spray was unlawful and granted the officer's motion for summary judgment based on qualified immunity. *Id*. at *4.

The Court finds that there is neither controlling authority nor a consensus of persuasive authority for the proposition that there is a clearly established right prohibiting the aiming of firearms, the use of threats, or the use of OC spray against a suspect who has repeatedly refused to comply with lawful commands to exit a vehicle.

Therefore, the Court will grant the Defendants' motions and deny Plaintiff's motion on this count.

### 3. Count III – Illegal Search

#### a. Plaintiff's Argument

Plaintiff alleges two illegal searches occurred during the traffic stop. First, Plaintiff argues that entering Plaintiff's vehicle to search for a firearm constitutes an illegal search by Defendant Crocker. (Pl. Br. Supp. at 22.) Second, Plaintiff argues that examining the firearm for its serial number is another illegal search by Defendant Crocker. (*Id.*) As to Defendant Gutierrez, Plaintiff argues that there is bystander liability, as Defendant Gutierrez had knowledge of the search and an opportunity to intervene but failed to do so. (Pl. Opp'n Def. Gutierrez at 23, ECF No. 95.)

Plaintiff contends that he was already handcuffed, incapacitated by the OC spray, and away

from his vehicle when the search occurred. (Pl. Br. Supp. at 22.)  Further, Defendant Crocker did not have a warrant, consent, or a legal justification for the search. (*Id*. at 22-23.)  The firearm could not be construed as evidence for any crime that Defendants could reasonably believe to have occurred. (*Id.* at 23.)  Plaintiff also contends that the firearm was not in plain view. (Pl. Opp'n Def. Crocker at 24-25, ECF No. 94.)

Even if it were to be in plain sight, Defendant Crocker knew that Plaintiff had a concealed carry permit, so the firearm did not have an immediately apparent incriminating character as required by the plain view exception. (*Id*. at 25.)  Since there was no immediately apparent incriminating character and Defendant Crocker had no lawful right to access the weapon, entering the vehicle to obtain information about its legality constituted an illegal search. (*Id*. at 26.)

Plaintiff argues that the evidence has already shown that Defendant Gutierrez was aware of the search.  He contends that the body camera footage shows that Defendant Gutierrez was looking at Defendant Crocker, that Defendant Crocker informed Defendant Gutierrez that he found a firearm, and that Defendant Gutierrez was right behind Defendant Crocker when Defendant Crocker radioed dispatch to run the serial number of the firearm. (Pl. Opp'n Def. Gutierrez Mot. at 23.)

### b. Defendant Crocker's Argument

Defendant Crocker argues that there was no search. (Def. Crocker Mem. Supp. at 25.)  He contends that Plaintiff told him where the firearm was located and, upon looking in the vehicle, he saw the firearm in plain view. (*Id*.)  Defendant Crocker also relies on the right to privacy being "greatly reduced" for vehicles. (*Id*.)  Similarly, Defendant Crocker argues that "[t]here is no reasonable expectation of privacy in a serial number etched in plain view on a firearm." (*Id*.)  Thus, running the serial number was not a search. (*Id*. at 26.)  Further, Defendant Crocker argues that he was in legal possession of the firearm when he ran its serial numbers. (*Id*.)

### c. Defendant Gutierrez's Argument

Defendant Gutierrez argues that he had no knowledge of the search, nor did he consent to, direct, or participate in the search. (Def. Gutierrez Mem. Supp. at 15.)  Further, he argues that Plaintiff has not pled any theories of vicarious responsibility that would render him liable for Defendant Crocker's conduct. (*Id*.)

### d. Bystander Liability

Plaintiff has alleged that Defendant Crocker conducted an unlawful search of his vehicle and firearm, and he is attempting to hold both Officers liable.  Under § 1983, an officer may be held liable "if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Randall v. Prince George's Cty., Md.*, 302 F.3d 188, 204 (4th Cir. 2002).  The Fourth Circuit places specific emphasis on the knowledge requirement:

> Although some of our sister Circuits have employed slightly different formulations of the knowledge prong, this requirement has substantively been the same: namely, that a bystanding officer must know of his fellow officer's misconduct. The rationale underlying the bystander liability theory is that a bystanding officer, by choosing not to intervene, functionally participates in the unconstitutional act of his fellow officer. If the bystander lacks such specific knowledge, he cannot be a participant in the unlawful acts, and the imposition of personal liability is impermissible.

*Id*. at 204 n.24.

The parties disagree about whether Defendant Gutierrez was aware of the search. (*See* Def. Gutierrez Mem. Supp. at 15; Pl. Opp'n Def. Gutierrez Mot. at 23.)  This dispute cannot be resolved by the video. Immediately prior to the search, Plaintiff discussed the location of the firearm with the two Officers and the two medics. (Compl. Ex. 4 at 18:45-55.)  So, Defendant Gutierrez was aware that Defendant Crocker was looking for the firearm.  However, Plaintiff also said, "I am sure you already saw it." (*Id*. at 18:50-55.)  From the video, it is unclear if the firearm was actually in plain view. (*Id.* at 18:55-19:05.)  It is also unclear where Defendant Gutierrez was looking when

Defendant Crocker conducted the search. (*Id*. at 18:50-19:15.)  Further, Defendant Gutierrez was still engaged in conversation with Plaintiff at this time. (*Id*.)

When the facts are viewed in the light most favorable to Plaintiff, the inference is that Defendant Gutierrez was aware that the search was occurring.  However, when viewed in the light most favorable to Defendant Gutierrez, it would be reasonable to conclude that either he  was focused on his conversation with Plaintiff and was not aware of the search or he thought the search was justified by the plain view doctrine.  As such, this issue cannot be resolved on summary judgment.

<u>e. Constitutionality of the Search</u>

<u>1. Search of the Vehicle</u>

The Supreme Court has outlined a "two-part rule under which an automobile search incident to a recent occupant's arrest is constitutional (1) if the arrestee is within reaching distance of the vehicle during the search, or (2) if the police have reason to believe that the vehicle contains evidence relevant to the crime of arrest." *Davis v. United States*, 564 U.S. 229, 234-35 (2011) (citing *Arizona v. Gant*, 556 U.S. 332, 343 (2009)); *see Chimel v. Cal.*, 395 U.S. 752, 763 (1969). This exception is derived from the governmental interests of officer safety and evidence preservation. *Gant*, 556 U.S. at 338.  While there does not have to be an arrest for the search to be incident to an arrest, there must have been probable cause for an arrest at the time the search occurred. *See United States v. Patiutka*, 804 F.3d 684, 688 (4th Cir. 2015); *United States v. Han*, 74 F.3d 537, 541 (4th Cir. 1996); *see also Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980).

Another possible avenue to justify this search would be the automobile exception to the warrant requirement.  Under this exception, "officers may search a vehicle without a warrant if the vehicle 'is readily mobile and probable cause exists to believe it contains contraband or evidence of criminal activity.'" *United States v. Graham*, 686 Fed. App'x 166, 173 (4th Cir. 2017) (quoting

*United States v. Baker*, 719 F.3d 313, 319 (4th Cir. 2013)); *see Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996). Officers have probable cause when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *Graham*, 686 Fed. App'x at 173. If probable cause exists, then the officer can search any part of the vehicle that could conceal the object of the search. *Graham*, 686 Fed. App'x at 173 (citing *United States v. Ross*, 456 U.S. 798, 825 (1982)).

A third possibility is that this search could be justified based on the plain view doctrine. As previously discussed, it is disputed whether the firearm was actually in plain view. Under the plain view doctrine, "law enforcement officers may seize an object without a warrant if '(1) the officer was lawfully in a place from which the object could be viewed; (2) the officer had a lawful right of access to the seized items; and (3) the incriminating character of the items was immediately apparent.'" *United States v. Gardner*, 554 Fed. App'x 165, 167 (4th Cir. 2014) (citing *United States v. Davis*, 690 F.3d 226, 233 (4th Cir. 2012)). The Court does not find Defendant Crocker's plain view doctrine argument persuasive. Plaintiff was not being stopped for a firearms-related offense nor was he suspected of any other offense that would give a firearm an immediately incriminating appearance. In fact, all the facts apparent to the Officers at the time would have pointed to Plaintiff's firearm possession being lawful. Thus, the Court's analysis will focus on the search incident to arrest and automobile exceptions.

When the search occurred, Plaintiff was already in handcuffs and away from his vehicle, receiving medical treatment for his eyes due to the OC spray. (Compl. Ex. 4, at 18:20-20:12.) Defendant Gutierrez was gripping Plaintiff's arm. (*Id*.) Plaintiff was compliant and was engaging in a calm discussion with the two Officers and two medics. (*Id*.) At one point, Defendant Crocker undid the handcuffs to reposition Plaintiff's arm, so he would be more comfortable. (*Id*. at 14:10-14:40.) Plaintiff made no attempt to resist or flee. (*Id*.) Defendant Crocker left the conversation

to search the driver's seat area for weapons. (*Id*. at 18:50-19:20.)   After finding a firearm, Defendant Crocker removed it from the vehicle and called in the serial number to see if the firearm was registered. (*Id*. at 19:30-19:55.)   He then returned the firearm to the vehicle. (*Id*. at 19:55-20:05.)

In *McDaniel v. Arnold*, police conducted a traffic stop for speeding, handcuffed the driver, and had him sit on edge of the shoulder of the road. 898 F. Supp. 2d 809, 823-24 (D. Md. 2012). The officer asked the driver whether there was a gun in the car, and the driver stated that there was a gun in the trunk. *Id*. at 824.   It was disputed whether the driver said that the gun was unloaded or not. *Id*. The officer then searched the entire vehicle. *Id*.   The driver was then arrested for traveling with a loaded firearm which was a violation of Maryland law. *Id*. at 825.   Even though the stop was before the *Gant* decision, the court determined that neither search incident to arrest nor the automobile exception would apply if the driver had said the gun was unloaded. *Id*. at 840 n.29, 840-41.   As such, the court denied the officer's motion for summary judgment. *Id.* at 846.

In *Sherrill v. Cunningham*, a woman was pulled over by police in a poorly lit area. No. 18-476, 2018 WL 3533550, at *1 (D. Md. July 23, 2018).   The plaintiff partially rolled down her window and attempted to hand the officer her driver's license and registration. *Id*.   The officer demanded that she fully roll down her window and retrieved a tool to break her window. *Id*. at *1-2.   The driver then fled and was later forced to stop by another officer. *Id*. at *2.   The plaintiff claims that she was then aggressively removed from the vehicle and handcuffed. *Id*.   Officers then searched her car but did not find anything illegal. *Id*.   The court determined that the search incident to arrest exception did not apply to this situation. *Id*. at *13.   The plaintiff was handcuffed and on the ground, so the contents of the car were not in her reaching distance. *Id*. at *12-13.   Further, the only crime for which the Officers had probable cause was eluding, and there was no reason to believe that there would be evidence of eluding in the vehicle. *Id*. at *13.

In *United States v. Graham*, a police officer noticed an illegally parked vehicle that was about to leave. 686 Fed. App'x at 167. Upon shining a light in the vehicle's window, the officer noticed two open containers of alcohol. *Id*. at 167-68. The officer then discovered that there was a warrant out for the driver and that he was to be considered "armed and dangerous." *Id*. An officer then arrested the driver and handcuffed him, and another officer moved him to a grassy area away from his vehicle. *Id*. The officer asked the driver if he had any weapons, and the driver responded that there was one under the front seat. *Id*. The driver was later charged with being a felon in possession of a firearm. *Id*. The Fourth Circuit determined that the search incident to arrest did not apply to this situation, as the driver was not in reaching distance of the car and it was not reasonable to believe that there would be evidence of the crime of the arrest in the vehicle. *Id*. at 173. Further, the Fourth Circuit determined that the automobile exception also did not apply as "there was no evidence that [the driver's] possession of the firearm was illegal." *Id*. at 174. As such, there was no probable cause to search the vehicle for firearms. *Id*.

In *United States v. Ferebee*, the Fourth Circuit rejected a defendant's challenge to a warrantless search. 957 F.3d 406, 420 (4th Cir. 2020). In that case, police searched the defendant's backpack as a search incident to arrest during a traffic stop. *Id*. at 419. The key distinguishing fact from the cases described above was that the defendant was not under the officer's "physical control." *Id*. So, despite being handcuffed, the police could have reasonably believed that the defendant could have accessed the backpack. *Id*.

Here, Plaintiff was handcuffed, surrounded by a police officer and two medics, and his arm was being held by Defendant Gutierrez throughout the search. Plaintiff was far enough away that nothing in the vehicle could be considered in his "reaching distance." The firearm was not relevant evidence for the crimes of eluding or obstruction of justice. Furthermore, there was nothing to suggest that his possession of the firearm was unlawful. As such, the search of his vehicle was

30

unlawful.

2. Search of the Firearm

If this was a criminal action, and if the firearm been incriminating in some way, then the records check on the firearm's serial number may well have been suppressed as "fruit of the poisonous tree." However, "fruit of the poisonous tree arguments are not applicable to civil actions under § 1983. *See Chadwell v. Brewer*, 59 F. Supp. 3d 756, 765 n.6 (W.D. Va. 2014); *Johnson v. Cty of Greenville*, No. 6:13-cv-1652, 2015 WL 4508812, at *6 (D.S.C. July 24, 2015) (collecting cases). As such, this alleged search must be analyzed separately.

Checking a firearm's serial number is not a violation of the Fourth Amendment. Several courts have noted that there is no privacy interest in a firearm's serial number and that reading it does not constitute an independent, unlawful search. *See, e.g., United States v. Kinney*, 953 F.2d 863, 866 (4th Cir. 1992) ("The only fact that the officers could determine from the serial numbers was whether the guns were contraband. This fact . . . cannot be the source of a privacy expectation . . . ."); *United States v. Kendricks*, 758 Fed. App'x 687, 691 (11th Cir. 2018) ("[The officer's] subsequent call to run the serial number did not result in any additional invasion into [the plaintiff's] privacy interests and was not an independent search."); *United States v. Reynolds*, No. CR-07-86-B-W, 2009 WL 1090674, at *11 (D. Me. Apr. 21, 2009) ("Several courts have observed that viewing and recording a serial number on a firearm lawfully possessed by police is not a Fourth Amendment search because such conduct does not compromise a privacy expectation that our society is prepared to consider reasonable.").

This can also be seen from *Arizona v. Hicks*. In *Hicks*, police officers responded to a shooting and searched an apartment looking for the shooter or firearms that may have been used in the shooting. 480 U.S. 321, 323 (1987). One officer noticed some nice stereo equipment, and, suspecting that it might have been stolen, moved the equipment to find its serial number. *Id*. The

31

Supreme Court determined that moving the equipment was an additional search, as it was not related to the shooting that had provided the exigent circumstances that justified the search of the apartment. *Id*. at 324-25.  The Court held that inspecting the bottom of the equipment was not a separate search, as it produced no additional invasion into the defendant's privacy interests. *Id*.

Therefore, the separate act of calling in the serial number was not an unlawful search, as Plaintiff did not have a privacy interest in the serial number.

### f. Qualified Immunity

When determining whether a right is clearly established, courts must identify the right at a high level of particularity. *Edwards v. City of Goldsboro*, 178 F.3d 231, 250-51 (4th Cir. 19990 (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)).  The right at issue in this count is the right of a person to be free from search of his vehicle when he is handcuffed, out of reaching distance of the vehicle, and there is no reason to believe that there is evidence of a crime in the vehicle.  This right is clearly enumerated in *Davis*, and the contours of this right have been described in a long line of cases, including *Chimel* and *Gant*. *See Sherril*, 2018 WL 3533550, at *13. As such, a reasonable officer would have been aware of this right.

Therefore, Plaintiff's motion is granted on this count as to Defendant Crocker.  However, it is denied as to Defendant Gutierrez, as there are still triable issues of fact related to bystander liability.  Further, the Court will deny Defendants' motions on this count.

### 4. Count IV – Freedom of Speech

### a. Plaintiff's Argument

Plaintiff alleges that the Officers gave him two choices: (1) exercise his freedom of speech by complaining or arguing about their behavior and be arrested, or (2) be silent about their misconduct and not be charged. (Pl. Br. Supp. at 28-29.)  Plaintiff argues that this offer was targeting the content of his speech and constitutes a non-content neutral prior restraint. (*Id*. at 29.)

The threat also constitutes an adverse action that would deter a similarly situated person of ordinary firmness. (*Id*.)  The Defendants' conduct was motivated by a desire to prevent constitutionally protected speech. (*Id*.)  As such, the implied threat of future arrest violated his First Amendment rights.

### b. Defendant Crocker's Argument

Defendant Crocker argues that the presence of probable cause defeats a claim for retaliatory arrest and argues that Plaintiff's speech was not chilled. (Def. Crocker Mem. Supp. at 27-28.) Defendant Crocker alleges that there was no threat regarding future arrest, as all communication related solely to the stop. (Def. Crocker Br. Opp'n at 29.)  Defendant Crocker argues that there was no chilling effect, as Plaintiff stated that he was going to tell his command about the incident and because Plaintiff himself brought publicity to the incident. (*Id*. at 28-30.)

### c. Defendant Gutierrez's Argument

Defendant Gutierrez argues that Plaintiff's First Amendment rights were not violated and, even if they were, the existence of probable cause would defeat the claim. (Def. Gutierrez Mem. Supp. at 18.)  Defendant Gutierrez contends that no adverse action was taken against Plaintiff. (*Id*. at 19.)  Plaintiff was never arrested or charged, and the filing of police reports documenting the incident was legal and appropriate. (*Id*.)  Thus, there are no facts to support an allegation that Plaintiff suffered any injury that would chill his speech. (*Id*.)  Defendant Gutierrez claims that "[a]t no point in time was the issuance of the tickets conditioned upon [Plaintiff's] silence." (*Id*. at 20.) Further, since no charges were ever filed, there is no "'chain of causation' linking the allegedly retaliatory animus of Defendants to any purported injury." (*Id*. at 22.)

### d. Constitutionality

"The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right."

*Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 687 (4th Cir. 2000) (citing *ACLU v. Wicomico County*, 999 F.2d 780, 785 (4th Cir. 1993)).  A claim for First Amendment retaliation has three elements: (1) the plaintiff engaged in constitutionally protected activity; (2) the defendant took an action that adversely affected that protected activity; and (3) there was a causal relationship between the plaintiff's protected activity and the defendant's conduct. *Suarez*, 202 F.2d at 686-87; *Blankenship v. Manchin*, 471 F.3d 523, 528 (4th Cir. 2006); *Roncales v. Cty. of Henrico*, 451 F. Supp. 3d 480, 495 (E.D. Va. 2020).

Defendant Gutierrez does not dispute that Plaintiff was engaged in constitutionally protected activity. (Def. Gutierrez Mem. Supp. at 18.)  However, Defendant Crocker claims that Plaintiff "has not alleged any constitutionally protected speech and thus fails the first prong of analysis." (Def. Crocker Br. Opp'n at 29.)

The First Amendment provides for the right to petition for redress of grievances and "protects a significant amount of verbal criticism and challenge directed at police officers." *See City of Houston v. Hill*, 482 U.S. 451, 461 (1987); *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 524 (2002); *see also Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1954-55 (2018).  As such, Plaintiff's complaints regarding his treatment during the traffic stop constitute protected action.

Under the second element, the adverse action is the threat to arrest, and the adverse effect is the chilling of free speech. The test for determining if an action chills speech is whether the "retaliatory conduct would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005).  The Court has already determined that a similarly situated person would have his speech chilled by a threatened arrest. *Nazario v. Gutierrez*, No. 2:21cv169, 2022 WL 319831, at *4 (E.D. Va. Feb. 2, 2022).

A threatened arrest may be the basis for a First Amendment violation claim. In *Jiron v.*

*Roth*, police unlawfully entered a woman's home and threated to arrest her when she complained. 519 F. Supp. 3d at 981, 999.  In that case, the defendants argued that there had to be an actual arrest for there to be a retaliatory arrest claim. *Id*. at 999.  In finding that a threat to arrest can constitute First Amendment retaliation, the court noted that "[n]umerous courts of appeal have found that a mere threat of official or legal action qualifies as constitutionally actionable harm." *Id*.  In *McCormick v. City of Lawrence*, the plaintiff alleged first amendment retaliation stemming from several interactions with police. 253 F. Supp. 2d 1172, 1178-83 (D. Kan. 2003).  In several of these interactions, police threatened to arrest the plaintiff if he did not cease his first amendment activity or leave the scene. *Id*. at 1180-82.  The court framed the issue as "whether a person of ordinary firmness would be deterred from exercising his or her First Amendment right to orally challenge police officers if such officers threatened to arrest him or her." *Id*. at 1196.  The court held that "the threat of arrest by a police officer is exactly the sort of act that would deter a person of ordinary firmness from exercising his or her First Amendment right to orally challenge that officer." *Id*.  In *Daniels v. Dixon*, a driver was pulled over and refused to provide identification in response to the officer refusing to provide an explanation for why she was stopped. No. 8:21-cv-223, 2021 WL 4468940, at *2 (C.D. Cal. Aug. 13, 2021).  The driver continued to ask for a reason for the stop, asserted that the stop was unlawful, and asserted that the officers were oppressing her. *Id*. at *2-3.  Eventually, an officer demanded that she provide identification, or she would be arrested. *Id*. at *3.  The driver consented out of fear of being arrested. *Id*.  The court determined that the claim, based on a threat to arrest in response to verbally criticizing and challenging police officers, was a cognizable First Amendment retaliation claim. *Id*. at *11-12.

Under the third element, both Defendants have argued that the presence of probable cause defeats the claim. (Def. Gutierrez Reply at 13, ECF No. 101; Def. Crocker Br. Opp'n at 30.) Unfortunately, none of the cases described above analyze whether the presence of probable cause

would have defeated the claim.  The Court has found no case stating whether absence of probable cause is required for a threaten retaliatory arrest claim.  The logic of the standard retaliatory arrest suggests that the presence of probable cause would defeat this claim. Because of the lack of clear precedent, this issue is best addressed in the qualified immunity section.

e. Qualified Immunity

The Officers are entitled to qualified immunity on this claim, as it would not be clear to a reasonable officer whether or not one may threaten to arrest an individual when there is probable cause for that arrest.  In *Nieves v. Bartlett*, the Supreme Court reiterated that probable cause analysis "provides an objective inquiry that avoids the significant problems that would arise from reviewing police conduct under a purely subjective standard." 139 S. Ct. 1715, 1728 (2019).  In *Hartman v. Moore*, the Court described the rationale for requiring an absence of probable cause in retaliatory arrest claims, as "[d]emonstrating that there was no probable cause for the underlying criminal charge will tend to reinforce the retaliation evidence and show that retaliation was the but-for basis for instigating the prosecution, while establishing the existence of probable cause will suggest that prosecution would have occurred even without a retaliatory motive." 547 U.S. 250, 261 (2006).  In *Nieves*, the Court stated that the same logic applies to retaliatory arrest claims. 139 S. Ct. at 1723.

Given the Supreme Court's repeated insistence that probable cause defeats a retaliatory arrest claim, the Officers are entitled to qualified immunity on this claim.   Therefore, the Court will grant the Defendants' motions and deny Plaintiff's motion on this count.

**C. State Law Claims**

**1. Counts V and VI – Common Law Assault and Battery**

a. Plaintiff's Argument

Plaintiff argues that the same facts that give rise to the excessive force claim also support

the common law assault and battery claims. (Pl. Br. Supp. 20.)  Further, the video makes it clear that he feared an imminent battery, as he verbally acknowledged fear and repeatedly asked not to be sprayed with OC spray. (*Id*. at 21.)  Additionally, Plaintiff contends that sovereign immunity does not apply to intentional tort claims against law enforcement officers. (Pl. Opp'n Def. Gutierrez Mot. at 26.)

### b. Defendants' Argument

Defendant Crocker argues that legal justification is a defense to this claim. (Def. Crocker Mem. Supp. at 28.)  Virginia law allows police officers to use reasonable force when executing their lawful duties. (*Id*.)  Given that the Officer's force was reasonable, this claim must fail. (Def. Crocker Br. Opp'n at 23.)  Defendant Gutierrez makes these same arguments. (Def. Gutierrez Mem. Supp. at 23-24.)

### c. Discussion

The validity of Plaintiff's claims for assault and battery depends on the same determinations made with regard to the excessive force claim.  Typically, courts subsume state assault and battery claims within parallel federal excessive force claims. *See Rowland*, 41 F.3d at 174; *Wilson v. Painter*, No. 3:20cv645, 2020 WL 7497801, at *13 (E.D. Va. Dec. 2020).  The Court has already decided that the reasonableness of the Officers' actions is a matter for a jury to decide.  The same reasoning applies to these two counts.

Instead of recognizing the federal doctrine of qualified immunity, Virginia applies the doctrine of sovereign immunity. *Cilman v. Reeves*, 452 Fed. App'x 263, 268 n.4 (4th Cir. 2011); *Lawhon v. Edwards*, 477 F. Supp. 3d 428, 450 n.18 (E.D. Va. 2020).  Sovereign immunity only provides local officials immunity from suits alleging negligence. *Lawhon*, 477 F. Supp. 3d at 450 n.18; *Cromartie v. Billings*, 837 S.E.2d 247, 254 (Va. 2020).  As such, it does not apply to suits for intentional torts. *Lawhon*, 477 F. Supp. 3d at 450 n.18; *Cromartie*, 837 S.E.2d at 254.  Thus,

Defendants are not shielded from liability by sovereign immunity.

Therefore, the Court will deny Plaintiff's and Defendants' motions on these two counts.

### 2. Count VII – Common Law False Imprisonment

#### a. Plaintiff's Argument

Plaintiff argues that false imprisonment can result from an unreasonable delay in releasing a person from a lawful arrest. (Pl. Br. Supp. at 25.)  Thus, the unreasonable extension of the stop that constituted an unreasonable seizure also constituted false imprisonment. (*Id*. at 26.)  Plaintiff again argues that sovereign immunity does not apply to this claim, as it is an intentional tort.  (Pl. Opp'n Def. Gutierrez Mot. at 26.)

#### b. Defendants' Argument

Defendant Crocker argues that a law enforcement officer may not be held liable for false arrest if the officer had probable cause and acted in good faith. (Def. Crocker Mem. Supp. at 29.)  Given that the officer's force was reasonable, this claim must fail. (Def. Crocker Br. Opp'n at 23.)  Defendant Gutierrez makes these same arguments. (Def. Gutierrez Mem. Supp. at 23, 25.)

#### c. Discussion

Under Virginia law, false imprisonment is "the direct restraint by one person of the physical liberty of another without adequate legal justification." *Unus v. Kane*, 565 F.3d 103, 117 (4th Cir. 2009).  "The gist of false imprisonment is the illegal detention of the person, without lawful process, or the unlawful execution of lawful process." *Dill v. Kroger Ltd., P'ship I*, 860 S.E.2d 372, 381 (Va. 2021) (quoting *Montgomery Ward & Co. v. Wickline*, 50 S.E.2d 387, 389 (Va. 1948)) (alterations adopted).  Further, lack of probable cause is not an element. *Id*.  Given that the Court has found that there is a triable issue as to the reasonableness of the manner in which the traffic stop was conducted, there is a triable issue on this claim as well.  As previously discussed, sovereign immunity does not apply to intentional torts. *Lawhon*, 477 F. Supp. 3d at 450 n.18.

Therefore, the Court will deny Plaintiff's and Defendants' motions on this count.

### 3. Count VIII – Illegal Search in Violation of Virginia Code § 19.2-59

#### a. Plaintiff's Argument

Plaintiff contends that his arguments for an unlawful search under the Fourth Amendment also establish an illegal search under Virginia law. (Pl. Br. Supp. at 23-24.)  Additionally, Plaintiff argues that sovereign immunity does not apply to willful and wanton misconduct, and that a violation of *Gant* would constitute willful and wanton misconduct. (Pl. Opp'n Def. Gutierrez Mot. at 26-27.)

#### b. Defendant Crocker's Argument

Defendant Crocker argues that Virginia Code § 19.2-59 only provides the protections afforded by the Fourth Amendment. (Def. Crocker Mem. Supp. at 29.)  Since he did not violate the Fourth Amendment, he did not violate Virginia law. (*Id*.)

#### c. Defendant Gutierrez's Argument

Defendant Gutierrez reiterates the argument that he made for the unlawful search claims. He contends that he was not aware of, nor did he consent to, direct, or participate in the search of Plaintiff's vehicle. (Def. Gutierrez Mem. Supp. at 26.)

#### d. Discussion

Virginia Code § 19.2-59 has consistently "been held to provide the same protections as the Fourth Amendment." *Amato v. City of Richmond*, 875 F. Supp. 1124, 1143 (E.D. Va. 1994); *Carter v. Commonwealth*, 163 S.E.2d 589, 592 (Va. 1968).  Searches "performed contrary to well-established law . . . exceed[] simple negligence." *Cromartie*, 837 S.E.2d at 255.  Thus, a search that violated *Gant*'s "reaching distance" rule would not be protected by sovereign immunity. *Id*. Since the Court has already found that the search of Plaintiff's vehicle violated *Gant*, the search also violated Virginia Code § 19.2-59.  As such, the Court's decision on this count will mirror that

of the § 1983 claim for an unlawful search.

Therefore, the Court will grant Plaintiff's motion as to this count against Defendant Crocker, deny Plaintiff's motion on this count as to Defendant Gutierrez, and deny the Defendants' motions on this count.

## V. CONCLUSION

For the foregoing reasons, the Court will: (1) grant in part and deny in part Defendant Crocker's Motion for Summary Judgment (ECF No. 77), (2) grant in part and deny in part Defendant Gutierrez's Motion for Summary Judgment (ECF No. 79), and (3) grant in part and deny in part Plaintiff's Motion for Summary Judgment (ECF No. 81).

An appropriate Order shall issue.

_____
/s/
Roderick C. Young
United States District Judge

Richmond, Virginia
Date: August 9, 2022