### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
**Norfolk Division**

| | | |
|---|---|---|
| Caron Nazario | ) | |
| *Plaintiff*, | ) | |
| v. | ) | Civil Action No. 2:21-cv-00169 |
| | ) | |
| Joe Gutierrez, et. al. | ) | |
| *Defendants*. | ) | |

## PLAINTIFF CARON NAZARIO'S MEMORANDUM IN SUPPORT OF HIS FEE AND COST PETITION

### I. Law

Pursuant to 42 U.S.C § 1988(b), a prevailing plaintiff in an action to enforce his rights under 42 U.S.C. § 1983 is entitled to the award of a reasonable attorney's fees as part of the costs, absent special circumstances. A prevailing plaintiff is one's whose success in the litigation causes "a material alteration in the parties' relationship." *Lefemine v. Wideman*, 133 S. Ct. 9, 11 (2012). Special government immunities such as qualified immunity that restrict civil rights plaintiffs' recoveries weigh in favor of—and certainly not against—awarding § 1988 fees. *Lefemine*, 758 F.3d at 557. Section 1988 is not intended to punish "bad defendants," but to compensate civil rights attorneys who bring civil rights cases and win them. *Id.* (citing *Williams v. Hanover Hous. Auth.*, 113 F.3d 1294, 1302 (1st Cir. 1997) and to promote the important work of civil rights litigation.

The proper calculation of attorney fees involves a three-step process. *McAfee v. Boczar*, 738 F.3d 81, 88 (4th Cir. 2013), as amended (Jan. 23, 2014). The Court must first determine the "lodestar figure" by multiplying the number of reasonable hours expended times a reasonable rate, *Id,* and use twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 717-19 (5th Cir. 1974) to establish the reasonable rate. *McAfee*, 738 F.3d at 88-89; *Barber v.*

1

*Kimbrell's, Inc.*, 577 F.2d 216, 226 n.28 (4th Cir. 1978). The twelve *Johnson* factors are: (1) The time and labor expended; (2) The novelty and difficulty of the questions raised; (3) The skill required to properly perform the legal services rendered; (4) The attorney's opportunity costs in pressing the instant litigation; (5) The customary fee for like work; (6) The attorney expectations at the outset of the litigation; (7) The time limitations imposed by the client or circumstances; (8) The amount in controversy and the results obtained; (9) The experience, reputation, and ability of the attorney; (10) The undesirability of the case within the legal community in which the suit arose; (11) The nature and length of the professional relationship between attorney and client; and (12) Attorneys' fees awarded in similar cases. *McAfee*, 738 F.3d at 88-89 & n.5. There is a "strong presumption" that the lodestar number, that the number of reasonable hours expended times a reasonable rate represents reasonable attorney fees. *Id.* at 88-89.

Second, the Court must subtract fees for hours spent on unsuccessful claims **unrelated to successful ones.** However, a Court is not to deduct times for unsuccessful claims which share common core of facts or are based on related legal theories as to the successful ones even if those unsuccessful claims are against a separate defendant. *See, Henslev. Eckerhart*, 461 U.S. 424, 432 (1983); *Johnson v. City of Aiken*, 278 F.3d 333, 337 (4th Cir. 2002); *Saleh v. Moore*, 95 F. Supp. 2d 555, 566-67 (E.D. Va. 2000); *see, also, Abshire v. Walls*, 830 F.2d 1277 (4th Cir. 1987).

Finally, the Court should award some percentage of the remaining amount depending on the degree of success enjoyed by the plaintiff. *McAfee*, 738 F.3d at 88. The extent of success is a crucial factor. *Hensley*, 461 US at 434. However, the extent of success is not to be determined uniquely by how much money a jury awarded the plaintiff, although that is a factor. Other factors in determining the extent of the success is the difference between the claims that the plaintiff brought and the claims upon which the plaintiff awarded judgment, whether the plaintiff

asked for and was awarded general, special, punitive damages, and whether the verdicts or the litigation itself vindicated important civil rights.  *See*, *e.g.*, *McAfee*, 738 F. 3d at 92-95.

## II. <u>Argument</u>

**IIIa. Caron Nazario Is a Prevailing Plaintiff**

"For the purposes [42 USC] § 1988, a party in whose favor a judgment is rendered, regardless of the amount of damages awarded, is the prevailing party." *McAfee*, 738 F. 3d at 88 (*citing*: *Grissom v. The Mills Corp*, 549 F.3d 313, 318 (4th Cir. 2008)) (internal citations omitted).  Lt. Nazario is a prevailing plaintiff as this Court found defendant Crocker liable for the illegal search pursuant to the 4th Amendment and Gutierrez for the assault.  Therefore, for the purposes of 42 USC § 1988, Lt. Nazario is the prevailing party *at least* vis-à-vis Defendant Crocker.

**IIIb. Lodestar Amount**

**1.     The time and labor expended.**

The attached documentation demonstrates the time and labor expended in this case with contemporaneous billing entries. The total time in this case, through January 25, 2023, is approximately 1577.50 hours in order to bring the litigation against two separate defendants with their own sets of counsel.[1] The labor included without limitation:

- Prefiling investigation: Investigation of claims through interviews with clients, collection and review of client's personnel files, and review of law and potential claims;

- An initial FOIA request to the Town of Windsor and review of the documents produced pursuant to their response.

---

[1] To date, this case has generated 245 separate PACER filings.

- Drafting, reviewing, and editing complaint and related documents with footnoting in preparation for the FRCP 12(b)(6) challenge.

- Responding to the defendants' FRCP 12(b)(6) challenge. **Docs. 15-16, 19, 27 and 102.**

- Responding to the defendant's motion to stay. **Docs. 21-22, 25, 26 102 and 103.**

- Issuing Subpoena *duces tecum* to:

  o The Town of Windsor.

  o The Town of Windsor Police Department.

  o Isle of Wight County Emergency Communications.

  o Isle of Wight County Sheriff's Office.

  o Portsmouth Police Department.

  o Suffolk County Sheriff's Office.

  o Sussex Sheriff's Office, Waverly Police Department, Wakefield Police Department

  o Virginia Department of Criminal Justice Services.

- Discovery:

  o Interrogatories, requests for admissions, requests for production of documents, and 26(a) disclosures[2];

  o Depositions

    ▪ Isle of Wight County Sheriff's Office.[3]

---

[2] Of which the Plaintiff supplements seven times.
[3] These occurred in Isle of Wight County, at best around a three hour round trip from Richmond, Virginia.

- ▪ Windsor Police Department and Chief Rodney Riddle.[4]

- ▪ Defendant Joseph Raymond Gutierrez.[5]

- ▪ Defendant Daniel Allen Crocker.[6]

  - o A series of motions to compel and protective orders regarding the discovery. **Docs. 47-51; 53-54, 56; 60-74.**

  - o Opposition to an untimely IME designation and motion to compel on the part of the defendants. **Docs. 57 60-74.**

- Responding to and interacting with the myriad media outlets wanting to discuss and shed light on the incident.[7]

- Cross Motions for Summary Judgment, Oppositions, and Replies. **Docs. 77-78, 79-80, 81-82, 90, 93, 94, 99, 100, 101, 114 and 115.**

- *Daubert* Motions, oppositions, and replies. **Docs. 84, 85,86, 97, 98, 120, 122, 123, 125, 126, 127, 131**

- A non-standard voir dire process which the pretrial coverage necessitated. **Docs. 121, 124, 128, 129, 130**

- Motions *in limine*, oppositions, and replies. **Docs. 137, 138, 139, 140, 141, 143, 144, 147, 148, 149, 150, 151, 152, 153, 154, 155, 156, 157, 158, 162, 163, 164, 165, 166, 167, 168, 169, 170, 173, 176, 177, 178, 179, 180, 181, 182, 183, 184.**

- The jury instructions and their attendant briefing. **Docs. 174, 185, 186, 187, 204.**

---

[4] These occurred in Virginia Beach, between three and four hours from Plaintiff's Counsel's firm depending on route and traffic.

[5] *See note 4, supra.*

[6] *See note 4, supra.*

[7] As discussed further below, these were instrumental in bringing about substantive change outside the trial arena but nevertheless an important vindication of civil rights and protection of the population at large.

- Stipulations.  **Docs. 175**

- Submitting contested exhibits *under seal* for an in-camera review.  **Docs 189-**

- Witness, Exhibit, and Discovery designations, objections, replies, and revisions.

  **Docs. 193, 215.**

- Legal research and analysis to support and oppose all filings.

- Client consultations and guidance;

- Discussions with the Plaintiff's treating physicians and law enforcement expert.

- Settlement efforts; including a rule 60 offer of judgment tendered two weeks before

  trial and likely below the then current defense costs.

- A five-day jury trial with two additional days of deliberation.

- Post-trial briefing.

- The time and labor expended are addressed in greater detail below and in the

  document attached as **Exhibit A[8]**.

2.    **The novelty and difficulty of the questions raised.**

4th Amendment claims involving a civil rights violation by law enforcement that also

produced probable cause of an alleged criminal infraction, in this case – eluding, obstruction

without force, and failure to obey a lawful command, are far more difficult to prosecute than

ordinary tort claims or even claims against law enforcement where a court has decided that there

was no probable cause. The legal analysis is far more complex, especially when  and such claims

require significant work in developing the record and conducting legal research to facilitate

appropriate application of legal standards.  They are compounded by implicit pro-law

---

[8] Exhibit A is the contemporaneously created billing entries from Plaintiff's Counsel related to this litigation.

enforcement biases that are often shared by judge and jury alike – courts must work with law enforcement daily and the lay-person has likely been watching and enjoying shows and movies such as COPS, Law and Order, NSC, Dirty Harry, and Miami Vice since they were born[9]. Further, these matters have also morphed into a political monster where political alignments can play just as powerful a role in the jury determinations as does the actual law and the jury instructions[10].  They are also generally more difficult than standard tort litigation insofar as the State – or its insurance proxy -  generally covers the entire defense litigation bill, leaving the Defendant with little skin in the game while the Plaintiff and their attorneys generally speaking have no such funding sources and must carry the load of the country on their own.  The difficulty of this particular matter was further compounded by the unsolicited media attention and viral nature of the suit and the attendant videos that circulated.  This landscape had to be navigated from almost the beginning of this suit and it, *inter alia*, amplified the "political" aspect of the matter and polarization.

**3.      The skill required to properly perform the legal services rendered.**

As stated in the previous paragraph, 4th Amendment and the attendant state law corollary claims are unusually difficult, as compared to many other civil claims.  Such claims require a detailed and deep understanding of case law, especially as it pertains to the qualified immunity defenses.  As such when the claims go to trial, they also require the services of trial counsel competent in civil rights issues.  Further, given this particular client's financial status and

---

[9] More problematic with these shows is the fact that the protagonist law enforcement officer often resorts to unconstitutional, and even extra judicial methods in order to "get their man" which functions to normalize the very behavior that 42 USC § 1983 seeks to address and the Court can take judicial notice of these facts under Fed. R. Evid. 201.

[10] The current politicalization of core constitutional issues surrounding law enforcement only heightens the danger that a jury will choose to nullify because a verdict does not comport with their political alignments of beliefs.

limitations, this case had to be tried on a shoe-string budget for third-party costs without the aid of 26(a)(2)(B) medical experts, and with counsel shouldering the majority of the expenses making it that much more difficult to try.

**4.      The attorney's opportunity costs in pressing the instant litigation**

This factor is adequately addressed by the first factor, in that the opportunity cost is appropriately captured with the 1577.50 hours of labor in this case.  This is close to a full billable year for the attorneys at Thomas H. Roberts & Associates, P.C.

**5.      The customary fee for like work**

This factor is discussed in Exhibit B[11], as part of establishing the reasonableness of the rates charged. The fees charged in this case were at least commensurate with fees typically charged in such cases if not substantially lower and with greater efficiency that larger firms.  The rates charged by the attorneys are below the prevailing market rates for similarly experienced civil rights attorneys in the metro Richmond area.  For example, in *McAfee*, the plaintiff was awarded less than $3,000.00 in total damages.  Lead counsel was charging $585 an hour with the senior associate charging $365 an hour.  The 4th Circuit approved these rates as reasonable more than six years ago.  The approval was based in part on *Lux v. Judd*, 868 F. Supp. 2d 591 (E.D. Va 2012), which established as reasonable an hourly rate of $275 an hour for a new attorney with less than two years of expirence and $300 per hour for an attorney with approximately 3 years expirence.  Similarly, the Eastern District of Virginia, Richmond Division approved as reasonable a billing rate of $440 per hour for a senior litigator and $295 per hour for the junior associate. *Carmax v. Sibley*, 2017 US Dist. LEXIS 74380 at * 9-10 and note 6 (2017)  In *Haught*

---

[11] Exhibit B is an affidavit from Dennis J. Whelan, Esq. regarding the reasonableness of the rates charged and the hours worked.

*v. The Wireless Ctr., Inc.*, the Eastern District of Virginia, Richmond Division approved as reasonable a rate of $325 per hour for a senior litigator with nine years of expirence, $275 per hour for an associate with six years of expirence, and $135 per hour for paralegal support. Haught, 2017 U.S. Dist. LEXIS 76081 at * 5 (2017).  In *Prison Legal News v. Stolle*, the United States District Court for the Eastern District of Virginia, Norfolk division approved as reasonable a billing rate of $400 per hour for the lead attorneys, $325 an hour for senior associates, and between $190 – $230 per hour for the other associates.  *Stolle*,  129 F. Supp. 3d, 390, 408 (2015)

In this case, lead counsel, Jonathan Arthur – a litigator with nine years expirence, charged $300 per hour and Thomas Roberts, second chair, a litigator and principal of the firm with over thirty-six years expirence charged $400 an hour.  These are below market rates as established by *Lux*, in 2012,  *Stolle* in 2015, and *Haught* and *CarMax* in 2017.  This factor countenances in favor of adjusting the lodestar calculation up as the attorneys in this case charged below fair market value and deployed a modified contingency fee agreement[12] for their services.

## 6.    The attorney expectations at the outset of the litigation

As discussed in greater detail in the attached documentation, Thomas H. Roberts & Associates, P.C. took this case on a modified contingency fee basis. It offered the clients the option of either paying the firm's standard hourly rates for the litigation, due and payable as the fees were incurred, or full financing of the fees without interest under established terms with a possible bonus pure contingency component if there was a recovery making all the hourly fees earned payable from a recovery, if any.  The client elected the latter option. Under this arrangement, legal fees in excess of $0 per hour, that is all the attorney's fees were deferred and

---

[12] The relevant parts of the fee agreement between the Firm and Plaintiff are attached hereto as Exhibit C.

payable only out of the recovery of the case. Any attorney's fees not recovered from the judgement or fee-shifting would be written off by the law firm and the plaintiff would not be held responsible. To compensate the firm for this substantial risk, the firm is entitled to an additional bonus of 25% of the difference between the total recovery and the hourly attorney's fees.

This attorney fee agreement represents the expectations of Thomas H. Roberts & Associates, P.C. In particular, the firm believes in the vigorous enforcement of the Constitutional rights of it clients and its responsibilities pursuant to the oaths of admission to the bar. It recognizes that in many areas of Constitutional law, such as this one, there are not sufficient private donors to pay legal representation. It also recognizes that § 1983 claims are risky, especially in the 4th Amendment arena involving vehicle searches, arrests, and use of force, given the protections of qualified immunity, implicit pro-law enforcement biases, and the deference to the decisions of law enforcement that they engender. The firm recognizes, however, that most clients who suffer Constitutional violations cannot afford the full litigation fees. It therefore provides representation while deferring a significant portion of the attorney fees (in this case, 100% of its fees earned), in hopes of recovery or attorney fee reimbursement to the clients so that it will be paid its below market rates plus a bonus for accepting the lion's share of the risk. Consistent with the Firm's recognition of importance of vigorous enforcement of the Constitutional rights as a check against state power and in order to protect the citizens, it is under certain circumstances willing to take the matters on representation contracts such as this. If it did not, many such important claims will never see the light of day and state-sponsored abuses will go unaddressed. This, the firm believes, would work as a detriment to all citizens – both those in the Commonwealth and the United States at large.

**7.    The time limitations imposed by the client or circumstances**

This is not a meaningful factor in this case.

**8.    The amount in controversy and the results obtained**

This factor is appropriately and more thoroughly addressed through the third step of the fee calculation process, below.

**9.    The experience, reputation, and ability of the attorney**

This factor is discussed in consideration of the reasonableness of the rates, in part IIIc, *infra* and in the attached documentation.

**10.    The undesirability of the case within the legal community in which the suit arose**

As Judge Payne stated in *Saleh v. Moore*, actions against state actors are not desirable within the legal community. They are "fraught with the risk of criticism against the law firms representing the Plaintiffs", and "[the] prosecution of an action against defendants whose defense is funded by the state is a daunting task" making the litigation "less desirable and more risky" than other cases where the defendants are not state actors whose defense is funded by the State. *Saleh v. Moore*, 95 F. Supp. 2d. 555, 583-84 (2000). Although *Saleh* involved actions against administrators and faculty at Virginia State University, this same analysis applies, if not more so, to actions against law enforcement – the task of litigating against a State-funded defense is daunting. Actions against law enforcement are even more difficult. Juries and judges often harbor implicit law-enforcement biases that are amplified by the immunity analyses, such litigation can be looked upon with disdain by others in the legal community – leading to lost opportunities, and there is the very real threat of retaliation and violence against the Plaintiff's attorneys by the law-enforcement community or their supporters (this was an acute issue in this

particular matter given its exposure).[13] Therefore, a case such as this one tends to be undesirable in the local legal community. It involves a lawsuit against law enforcement officers in the town of Windsor. Criminal attorneys who represent clients in the community understandably wish to maintain working relationships with the local police department, a relationship that can be marred by a suit such as this. This case involved substantial risks of present and future conflicts of interests for larger firms experienced in municipal suits – especially when they have practice groups who work in part on the government-backed, compensation assured defense side of the "v". This case involved obvious risks that there would be no compensatory award due to defendants' qualified immunity and the substantial risk of an appeal in the event that the Trial Court made its immunity determinations incorrectly.   It involved a client who could not afford to afford the litigation costs and fees, even at the reduced rate, given his limited financial circumstances.  There were significant risks even if this case went to jury that the jury would rubber-stamp the defendant's actions or let their pro-law enforcement biases, political leanings, and the evidence of legal infractions cloud their judgment.  The dangers of a complete defense verdict were particularly acute given the ideas of probable cause and the concern that the court would rule that the defendants had probable cause for any one of the alleged charges that the defendants highlighted in their reports, which is what actually occurred.  These and other factors, discussed in the attached documents and elsewhere herein, made this case undesirable within the legal community and the community at large.

**11.    The nature and length of the professional relationship between attorney and client**

---

[13] For example, counsel received letters and telephone calls threatening various degrees of bodily harm because of this litigation throughout this litigation.  These threats prompted counsel to re-assess their personal protective measures and "up-arm" themselves, that is purchase new and more powerful firearms to carry in the event of an attack. Further, Mr. Roberts' truck was vandalized, and a tire flattened shortly before the trial.

This is not a significant factor in this case.

**12.    Attorneys' fees awards in similar cases**

As discussed in the attached supporting documents, the fees requested in this case are commensurate with if not less than fees awarded in similar § 1983 and 4th Amendment cases, owing to the below market rates and efficiency of the law firm.

**III.c Reasonableness of Rates**

This litigation was primarily handled by Attorney Jonathan Arthur, Esq., whose fees represent more than 80.3 % of the total attorneys' fees in this litigation.  As noted in the attached supporting documents, Mr. Arthur is an associate of Thomas H. Roberts & Associates, P.C., He has approximately 9 years of experience as an attorney conducting civil rights jury trials and appellate work. His rate is $300.00 per hour for this litigation.

Andrew T. Bodoh, Esq., another associate at Thomas H. Roberts & Associates, P.C. participated in the litigation.  Mr. Bodoh's fees represent 7% of the total attorney's fees in this litigation. As noted in the attached supporting documents, Mr. Bodoh is an associate of Thomas H. Roberts & Associates, P.C. with over 12 years of litigation experience as an attorney. His hourly rate is $300.00 per hour. As discussed above, these fees are reasonable if not below the standard market rate for an associate with nine years of civil rights and jury trial expirence.

Thomas H. Roberts, Esq., the principle of Thomas H. Roberts & Associates, P.C. assisted in this litigation. His fees represent a little more than 12.7% of the attorney's fees in this litigation. His hourly rate is $400 to $500 an hour ($400 in this case) which is commensurate with his experience and expertise. Mr. Roberts has over 36 years of civil right and trial expirence.  As discussed above, these fees are reasonable if not below the standard market rate for Mr. Roberts.

The Federal District Court in Alexandria recently approved rates of $250/hour for associates and $400/hour for partners in federal matters. *Am. Bird Conservancy v. U.S. Fish & Wildlife Serv.*, 110 F. Supp. 3d 655, 673-74 (E.D. Va. 2015), *Route Triple Seven, L.P. v. Total Hockey, Inc.*, 2015 U.S. Dist. LEXIS 115664, at *30 (E.D. Va. Aug. 28, 2015). In *McAfee v. Boczar*, 738 F.3d 81, 91 (4th Cir. 2013), the Fourth Circuit approved of rates of $585 for a lead counsel and $365 for his senior associate. The Federal District Court in Richmond approved of a rate of $695 hour for a partner and $310 as the average rate for an associate. *Suntrust Mortg. v. AIG United Guar. Corp.*, 2013 U.S. Dist. LEXIS 34922 (E.D. Va. Mar. 7, 2013). The same court approved of rates between $470 for a litigator with 30 years' experience, $360 for a litigator with 10 years' experience, $265 for junior associates, and $180 for a paralegal. *Stewart v. VCU Health Sys. Auth.*, 2012 U.S. Dist. LEXIS 47355 (E.D. Va. Apr. 3, 2012). In 2010, the same court approved of fees between $270 and $595 for attorneys and $128 for a paralegal. *W.A.K. v. Wachovia Bank, N.A.*, 2010 U.S. Dist. LEXIS 79074 (E.D. Va. Aug. 5, 2010). Also, that year, that Court accepted fees of $450 and $425 an hour. *Randle v. H&P Capital, Inc.*, 2010 U.S. Dist. LEXIS 74994 (E.D. Va. July 21, 2010).

In *McAfee*, the plaintiff was awarded less than 3,000.00 in total damages.  Lead counsel was charging $585 an hour with the senior associate charging $365 an hour.  The 4th Circuit approved these rates as reasonable  years ago.  The approval was based in part on *Lux v. Judd*, 868 F. Supp. 2d 591 (E.D. Va 2012), which established as reasonable an hourly rate of $275 an hour for a new attorney with less than two years of expirence and $300 per hour for an attorney with approximately 3 years expirence.  Similarly, the Eastern District of Virginia, Richmond Division approved as reasonable a billing rate of $440 per hour for a senior litigator and $295 per hour for the junior associate. *Carmax v. Sibley*, 2017 US Dist. LEXIS 74380 at * 9-10 and note 6

14

(2017)  In *Haught v. The Wireless Ctr., Inc.,* the Eastern District of Virginia, Richmond Division approved as reasonable a rate of $325 per hour for a senior litigator with nine years of expirence, $275 per hour for an associate with six years of expirence, and $135 per hour for paralegal support.  *Haught*, 2017 U.S. Dist. LEXIS 76081 at * 5 (2017).  In *Prison Legal News v. Stolle*, the United States District Court for the Eastern District of Virginia, Norfolk division approved as reasonable a billing rate of $400 per hour for the lead attorneys, $325 an hour for senior associates, and between $190 – $230 per hour for the other associates.  *Stolle*,  129 F. Supp. 3d, 390, 408 (2015)  The attached supporting documents further discuss the reasonableness of the rate; however, these cases demonstrate that the firm was charging at or below the reasonable market rate.

### III.d Reasonableness of Hours

The time spent in this case, approximately 1577.50 billable hours, was a reasonable sum considering the foregoing factors.[14]

As evident from the supporting documentation and the materials filed with this case, as well as the PACER docket, this matter generated a near obscene number of filings, oppositions, and replies.  Defense counsel and Plaintiff's counsel fought hard at every turn – from the initial defensive pleadings to the discovery issues, to the pretrial filings.  The case also involved extensive legal research which was necessary at every step of the way to counter the Defenses' legal strategies and claims of immunity.  Settlement stalled when each party tendered offers that the other believed was in "bad-faith", and which culminated in offers of judgment 14 days before that the defendants knew, or should have known, by that point were not only below their actual

---

[14] The reductions to these hours based on the unrelated, unsuccessful claims and the overall success are addressed in the second and third step of the analysis. This step addresses only the hours as a whole.

defense costs but below the Plaintiff's likely incurred attorney's fees.  After tendering their Rule 68 offer, the defendants refused to entertain further settlement discussions even after the 14-day window had expired. [15]

The case went to trial. Trial preparation involved extensive and reasonably necessary trial preparations including witness preparation, preparation of the defendant's depositions used at the plaintiff's case in chief, including the video deposition of Defendant Crocker and the read deposition of Defendant Gutierrez (as the videographer "lost" the Gutierrez' video deposition) and timestamping the relevant portions of the video in order to show the jury exactly what they needed to see as well as to appropriately cross examine the defenses' "expert" witnesses – one of whom seemingly made intentionally false statements to the jury under oath on behalf of the defendants.

**III.e Total Lodestar Amount**

Given the foregoing, the total lodestar amount in this case is calculated as follows:

| Name | Rate | Hours | Total |
|---|---|---|---|
| Jonathan Arthur, Esq. | 1268.00 hours | $300/hr. | $379.057.50 |
| Andrew T. Bodoh, Esq. | 108.90 hours | $300/hr. | $32,670.00 |
| Thomas H. Roberts, Esq. | 200.60 hours | $400/hr. | $80,240.00 |
| **LODESTAR TOTAL** | 1577.50 | | $491.967.50 |

## IV.    Reduction for Unrelated, Unsuccessful Claims

After determining the lodestar amount, the Court is to subtract the time incurred as a result of the unsuccessful claims unrelated to the successful claims.  In *Abshire v. Walls*, 830

---

[15] The court is permitted to consider this recalcitrance in the fee award.  McAfee, 738 F.3d at 90-91.

F.2d 1277 (4th Cir. 1987)[16] provides a detailed picture on what it is to be an unsuccessful, unrelated claim and what is not.  Succinctly put, a claim is "unrelated" if it was based on an unrelate legal theory *and* an unrelated common nucleus of operative fact.  In this matter, the claims theories were related and the nucleus of fact identical – thus, there were no unrelated unsuccessful claims.  In *Abshire*, the Plaintiff filed suit under 42 USC § 1983 and 42 USC 1985. The facts of the case are as alleged were that the Plaintiff, a deputy sheriff for Baltimore County was walking to his fiancée's house at night, tripped, hit his head on the curb, and was rendered unconscious.  Officers Walls and Queen responded to the call where they found the Plaintiff unconscious.  Walls and Queen helped the Plaintiff to his feet and saw a pistol.  Queen secured the weapon and asked Plaintiff why he was carrying it.  Plaintiff identified himself as a deputy sheriff and produced his badge.  Queen and Walls continued to question him about the firearm, the contents of his briefcase, and why he was in the neighborhood.  When the Plaintiff attempted to leave, officers Queen and Walls along with Barber (who had recently arrived on the scene) arrested the Plaintiff for disorderly conduct.  At the police station, the Plaintiff was processed and handcuffed to a railing.  In response to the Plaintiff's repeated requests for a phone call, Officer Krach decided to strip-search him in retaliation.  Krach took him to a room, and he was strip searched by Walls and Queen with a number of other officers in the room.  After the search, the plaintiff was placed in a holding cell and released on an PR bond the next day.  *Abshire*, 830 F.2d at 1278 - 1279.

---

[16] The United States Supreme Court has referred to *other* holdings in *Abshire* unfavorably – particularly those that the 4th. Circuit held regarding the District Court's application of Fed R. Evid. 403 without first ruling on 609(a) matters. *Green v. Bock Laundry Mach. Co*. 490 U.S. 504, 524 n. 30, (1989).  This does not touch or alter the 4th Circuit's discussion regarding what an unsuccessful and unrelated matter is under 42 U.S.C. § 1988 in *Abshire*.

When the Plaintiff sued, he alleged that Walls and Queen falsely arrested him.  In Count II, he alleged that three defendants Walls, Queen, and Joynes (the front desk sergeant falsely imprisoned him.  Count III alleged that three of the defendants Walls, Queen, and Barber maliciously prosecuted him.  In Count IV, he alleged that all eight defendants and the Agency and the County of Baltimore under *Monell* conducted an illegal and unconstitutional strip search of him).  In Count V, he alleged that Walls, Queen, Joynes, Krach, Cook, and Barber conspired against him to violate his civil rights under 42 USC § 1985.  *Id* at 1279.

The district court granted summary judgment in favor of Joynes on counts III and IV, in favor of Cook, the Chief of Police, the Police Department and the County on count IV and permitted the remaining claims to proceed to trial.  At the end of Plaintiff's case in chief, the Court directed a verdict in favor of the defendants on Count V – the § 1985 conspiracy claim. The jury found in favor of the defendants on Counts I, II, and III as well as in favor or Barber in Count IV.  The jury found in favor of Plaintiff against Walls, Queen, and Krach for Count IV – the strip search claim and awarded him compensatory and punitive damages. *Id*. That is, the Plaintiff prevailed on only one of five claims and against only 3 of the 10 named defendants. When the Plaintiff moved for his fees, the District Court relied on the Supreme Court's precedent as set forth in *Hensely* and awarded the Plaintiff one-quarter of his fees determining that the successful strip search claims were unrelated to the unsuccessful false arrest, false imprisonment, and malicious prosecution  and *Monell* style claims.  *Abshire*, 830 F.2d at 1279 and 1282

The Plaintiff appealed, and the Fourth Circuit reversed.  Relying on the proper interpretation of *Hensley*, the Fourth Circuit ruled, *inter alia*, that when a Plaintiff's claims were based on both a different set of legal theories and a completely different set of facts, the plaintiff

should not be compensated for the time expended pursuing claims that ultimately proved unsuccessful.

However, the Fourth Circuit stated that when a plaintiff's claims for relief involve a common core of facts or are based on related legal theories, much of counsel's time will be devoted to generally to the litigation as a whole, making it difficult to divide hours expended on a claim-by-claim or defendant-by-defendant basis.  Thus, the Fourth Circuit instructed the district courts that such a lawsuit involving either a common core of facts of related legal theories cannot be viewed as a discrete series of unrelated claims for the purposes of 42 USC § 1988, and instead directed the district courts to focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended in the litigation. *Abshire*, 830 F.2d at 1282 – 1283.

Then, the Fourth Circuit, then determined that although Abshire's claims were based on different legal theories, they all arose from a common core of facts: the facts surrounding the strip search were intertwined with the facts surrounding the initial confrontation, the arrest, and the later imprisonment.  It then noted that in it's view, it would have been impossible to isolate the inquiry into the unconstitutional strip search from the other facts, and that the plaintiff's counsel could not have presented the constitutional aspects of the case without developing and presenting the facts surrounding the entire sequence of events that transpired the morning of Plaintiff's arrest.  The Fourth Circuit held that the district court's determination that the unsuccessful claims for false arrest, false imprisonment, and malicious prosecution were unrelated to the successful strip-search claim was in error.  It then vacated the fee award and remanded the fee award back to the district court for a recalculation based on significance of the

overall relief obtained in relation to the hours reasonably expended in the litigation. *Abshire*, 830 F.2d at 1283.

As was the case in *Abshire*, Lt. Nazario's successful Illegal Search claim was related on a common core of facts as were the assault, battery, and false imprisonment claims (and the 4th Amendment corollary claims). Lt. Nazario could not have presented the constitutional aspects of the search, for example, without also developing and presenting the facts surrounding the entire sequence of events of December 5, 2020 leading up to the search. For example, without exploring factually what occurred *prior* to the search, what probable cause the defendants did and did not have, the reasons for the search, the legality of the refusals and the right to resist, the plaintiff would have been unable to show under *Gant* and its progeny that the defendants had no legal right to search Lt. Nazario's vehicle for a firearm.[17] Thus, all claims brought share a common nucleus of fact and under both *Hensley* and *Abshire* all claims are related even if currently unsuccessful.

## V.    Overall Success

The United States Supreme Court held that the "extent of a plaintiff's success is a crucial factor in determining the proper amount of an attorney's fee award under 42 USC § 1988." *Hensley*, 461 U.S. at 440. While the amount of damages that the plaintiff recovers is relevant to the amount of attorney's fees to be awarded under [42 USC] § 1988, it is, however, only one of many factors that a court should consider in calculating an award of attorneys' fees*." City of Riverside v. Rivera*, 477 U.S. 561, 568 (1996); *Saleh*, 95 F. Supp. 2d at 567.

This is because the important civil and constitutional rights that the suits seek to vindicate cannot be valued solely in monetary terms. And Congress has determined in passing 42 USC §

---

[17] This is not intended to be an exhaustive analysis.

1988 that the public as a whole has an interest in the vindication of the rights conferred by the statutes enumerated in [42 USC] § 1988, over and above the value of a civil rights remedy to a particular plaintiff. Regardless of the form of relief that she actually obtains, a successful civil rights plaintiff often secures social benefits that are not reflected in nominal or relatively small damage awards.  *Rivera*, 477 US at 574; *Saleh*, 95 F. Supp. 2d at 568.  As explained below, this suit had substantial success in reshaping the Windsor Police Department and terminating Joseph Gutierrez.

Additionally, the *Rivera* and *Saleh* courts have explained that while the damages a plaintiff recovers can contribute significantly to the deterrence of civil rights violations in the future it recognized, as did Congress, that a plaintiff who obtains relief in a civil rights law suit does not do so for himself alone, **but also as a private attorney general**, vindicating a policy that Congress Considered of the highest importance.  *Rivera*, 477 US at 575-76 (citing  H.R. Rep. No. 94-1588, p.2 (1976))(internal quotations omitted).

This was a major success of this litigation that was not reflected in the jury's verdict and was only possible due to the filing of the suit, the resulting media coverage, and Plaintiff's counsel's willingness to work with the media.[18]  The suit engendered rigorous debate at the local, state, national, and international levels.  It spawned a myriad of criminal and civil investigations and a referral from the special prosecutor to the Department of Justice.[19]  It prompted the Virginia Attorney General's Office to file suit against the Town of Windsor Police Department under the Virginia Human Rights Act (Case No. CL21001186-00 – Isle of Wight County Circuit

---

[18] The court should take judicial notice of the following pursuant to Fed. R. Civ. P. 201.
[19] Exhibits D and E.

Court).  It led to the termination of Joseph Raymond Gutierrez.[20] And perhaps most importantly, it caused the Town of Windsor Police Department to revamp their training[21] to include de-escalation and implicit bias[22], updated and *tripled the* policies and procedures that the Town of Windsor Police Department used, so much so that it required them to deploy them in two separate tranches.[23] It caused Windsor Police Department to rethink hiring practices and seek civilian input.[24] It caused Windsor Police Department to seek alternative means of traffic enforcement to limit the interactions their officers had with the public.[25] In short, it triggered an almost complete restructuring of the Town of Windsor Police Department which will have long lasting implications for that agency and others.  This has made the citizens of Virginia and all who travel down US 460 through the Town of Windsor far safer than they were prior to Lt. Nazario launching his litigation.  None of this would have occurred absent Lt. Nazario's litigation and in this respect – notwithstanding the jury verdict – it vindicated substantive civil rights, protected the citizens, forced changes generally unobtainable in civil litigation.  Therefore the under the *Rivera*, 477 US at 574 and *Saleh*, 95 F. Supp. 2d at 568 rubric of success means that the Plaintiff was wildly successful in his overall litigation.

That this case was overall very successful is consistent with both Congress and the *Rivera* court's discussion of damages and the underlying purpose of 1983 litigation and the 1988 fee shifting structure.  Both noted that because damage awards do not reflect fully the public benefit advanced by civil rights litigation, fees in civil rights cases, unlike most private law cases, do not

---

[20] Exhibit F, Exhibit G; Exhibit H – Riddle Deposition Transcript, p. 46, ll. 2-10; 48, l.23 – p.49, ll. 7.
[21] Exhibit I, pp. 1-2; Exhibit H – Riddle Deposition Transcript, p.77, ll. 3 – p.78, ll.14.
[22] Exhibit I, pp. 1-2; Exhibit H – Riddle Deposition Transcript, p.77, ll. 3 – p.78, ll.14.
[23] Exhibit I, p. 1 and 3-14; Exhibit H; Riddle Deposition Transcript, p.77, ll. 3 – p.78, ll.14.
[24] Exhibit I, p.2; Exhibit H; Riddle Deposition Transcript, p.77, ll. 3 – p.78, ll.14.
[25] Exhibit I, p. 2; Exhibit J, p. 2; Exhibit H; Riddle Deposition Transcript, p.77, ll. 3 – p.78, ll.14.

deploy a rule limiting attorneys' fees in civil rights cases to be proportionate to the damage award. That, the courts have stated, as that would "seriously undermine Congress' purpose in enacting 42 USC § 1988.  Id.

Thus, Courts have explicitly rejected the idea that the fees must be proportional to the amount of damages that a jury awards to the Plaintiff, though a court may consider proportionality.  *Rivera*, 477 U.S. at 574; *Saleh*, 95 F. Supp. 2d at 567.   The other factors that the courts are to examine are: (1) Whether the plaintiff sought, and the jury awarded compensatory damages, and how closely they tracked the proof presented.  *E.g., Saleh*, 95 F. Supp. 2d at 576; (2) The amount of damages sought to the amount of awarded, *McAfee*, 738 F.3d at 93, and importantly, (3) whether or not the jury returned an award of punitive damages. *McAfee*, 738 F.3d at 93-94, and n.10 (citing: *Mercer v. Duke Univ.*, 401 F. 3d 199, 202 (4th Cir. 2005)) (*Lewis v. Kendrick*, 944 F. Supp. 949 (1st Cir 1991)).  Therefore, although the jury's actual verdict was shocking, the Overall Success factor of *Johnson* does not require any major reduction on the lodestar calculations.

**Proportionality**

As of January 24, 2023, $491,967.60 (deferred pursuant to the agreement).  Although he recovered from the jury only $2,685.00 in compensatory damages against Gutierrez and $1,000.00 in punitive damages against Crocker for the illegal search, such a shocking award is not only contrary to the law, but is offset by the other non-financial successes of the litigation. These non-financial successes should be considered in the proportionality discussion  Using the multiplier as a lose metric, *see*, *McAfee*, 738 F. 3d at 91-93,   The fees are roughly 136.33 times the total jury award (*not* including the non-financial successes of the litigation).  This is withing the grounds of a reasonable multiplier as discussed in *inter alia McAfee*.  In *McAfee*, the fee

ultimately awarded was 34 times the amount of the jury award ($100,000 in fees and a $2943.60 jury award) Id at 85, 95. However, the 1st Circuit, in *Lewis v. Kendrick* as cited favorably by the *McAfee* Court intimated that under appropriate circumstances a payment of fees and costs amounting to 140 times the value of the judgment awarded would not have been unreasonable. *See*, *McAfee*, 738 F. 3d at 94, note 10 (citing: *Lewis v. Kendrick*, 944 F.2d 949 (1st Circuit, 1991). Thus, the Plaintiff's attorneys' fees sought, roughly 135 times the compensatory and punitive damages award, are reasonably proportionate as compared to *McAfee*, *Rivera*, and *Lewis*. Therefore, this factor counsels against a great reduction in the lodestar calculation.

**Compensatory Damages**.

Both the *McAfee*, and *Saleh* courts placed emphasis, in determining the proper amount of attorneys' fees under lodestar, on the types of compensatory damages that the jury awarded; that is whether they awarded special damages in addition to general damages, *McAfee*, 738 F.3d at 91-92; *Saleh*, 95 F. Supp 2d. at 574-575. Adjusting fees down when the plaintiff had asked for general, special, and punitive damages and were awarded only general damages. *McAfee*, 738 F.3d at 91-92. However, where the plaintiff asked for and was awarded general and special damages, the opinions intimate that a fuller fee is appropriate. *See*, *Saleh*, 95 F. Supp 2d. at 574-575. *Cf. McAfee*, 738 F.3d at 91-92.

In this matter, the jury awarded compensatory and punitive damages although for different counts and against different defendants. Therefore, this factor favors the Plaintiff as being overall successful, and countenances against a fee reduction.

**Amount of Damages Sought and Damages Awarded.**

Courts are also instructed to see whether the amount of damages sought are commensurate with the amount of the damages awarded, stating that in some cases, a substantial

difference between the judgment recovered and the judgment sought suggests that a victory is purely technical. *McAfee*, 738 F.3d at 92-93 (citing: *Ferrar v. Hobby*, 506 U.S. 103, 116, 120-121 (1992) ($17 Million sought and $1 awarded). However, it is far from clear as to whether the court is to compare the ultimate verdict to the ad damnum, or to what plaintiff explicitly asked the jury for in closing. For example, the *McAfee* court focuses on what the Plaintiff asked the jury for at trial, and not the ad damnum. *McAfee*, 738 F.3d at 93.

In *Saleh*, the Court declined to place much emphasis on the amount of the ad damnum, noting that in federal court, the amount of an ad damnum clause is a "pertinent, but not very helpful measure of success because, as expirence has taught us, those figures more often than not are more aspirational than factual in nature." *Saleh*, 95 F. Supp. 2d at 576. In this matter, the plaintiff asked in closing for 1.5 million in compensatory damages and was able to chalkboard close to $600,000.00 in past and future medical damages *alone*. That the jury failed to return such a verdict compensating the Plaintiff for his actual damages does not change the analysis that the amount sought was reasonable based upon the supported damage calculations. Thus, this factor does not suggest a large reduction, if any, in the lodestar calculation.

**Punitive Damages.**

As the *McAfee* court and the *Saleh* court both noted, punitive damages can be particularly important in determining the overall success. As the *McAfee* court explained, the point of punitive relief is to punish what has occurred and deter its repetition. A jury sitting on a civil rights trial that awards punitive damages has signaled that deterrence and vindication of civil rights was important to them. *McAfee*, 738 F.3d at 94 (*citing*: *Rivera*, 477 U.S. at 595 (Rehnquist, J., dissenting). The *McAfee* court, and the *Saleh* court then link the vindication

25

aspect of punitive damages to the purposes of 42 USC § 1988 discussed above.  *McAfee*, 738 F.3d at 94; *Saleh*, 95 F. Supp. at 582.  Footnote 10 in *McAfee* is particularly instructive.

In this case, the jury awarded the Plaintiff judgment for punitive damages.  But as important to the public policy underlying the focus on punitive damages are the changes that this lawsuit caused within Windsor Police Department, the criminal and civil investigations, and the removal of an unfit officer – none of which would have been possible with a jury.  Therefore, pursuant to *Rivera*, *McAfee*, and *Saleh* the punitive damage award strongly counsels against any reduction in the lodestar calculations.

In short, (1) having obtained relief at the summary judgment and trial level,  (2) having obtained both general and special compensatory damages, (3) having obtained a punitive damage award from the jury, (4) having obtained substantial non-monetary relief via the lawsuit which will protect the Citizens of Virginia and the Country, and (5) that the proportion of the fees to the award and the other non-jury based successes is reasonable, Lt. Nazario's overall success was overall very good notwithstanding the verdict and it vindicated important publicly held rights, punished the defendant for his conduct.  Pursuant to *Hensley*, *McAfee*, *Saleh*, and *Abshire* Lt. Nazario's attorney should recover a fully compensatory fee without any substantial reduction in the lodestar calculations.

VI.    **COSTS**

In addition to the fees that Lt. Nazario is entitled to under 42 U.S.C. § 1988, he may also recover all costs reasonably expended and not previously awarded through the various cost taxing mechanisms. *See*, *e.g., Sheppard v. Riverview Nursing Ctr.*, 88 F.3d 1332, 1335-36 (4th Cir. 1996).  As the attached documents indicate[26], Lt. Nazario's costs for the are $52,692.25.

_____
[26] Exhibit K.

26

## VII.    FINAL CALCULATIONS

Based on the foregoing Johnson factors, the plaintiff's attorneys' fees for the trial and post- trial work were reasonable, and the court should not make any reductions to the lodestar based on unrelated or unsuccessful claims or based on the overall success.  If anything, the lodestar analysis indicates that the court should grant an increase in the fees as the attorneys were charging below the accepted market rates for attorneys of their skill and reputation and taken on a modified contingency basis with the law firm shouldering almost all the financial risks in this matter.  If the Court determines a fee reduction appropriate, the reduction should be *de minimis*. The appropriate fee award would be no less than $350,000.00, plus the outstanding costs of $52,692.25.

Wherefore, Plaintiff Lt. Nazario asks this Court to award attorney fees of between $350,000.00 and $500,000.00, and, their costs incurred of $52,692.25, and all further and additional relief as may be appropriate and order Defendant Crocker, Defendant Gutierrez, or both to pay the same.

**JANUARY 31, 2023**

**Respectfully requested,**
**CARON NAZARIO**

By: /s/ Jonathan M. Arthur, Esq.

27

Counsel

Jonathan M. Arthur, Esq. (VSB 86323)
j.arthur@robertslaw.org
Thomas H. Roberts, Esq. (VSB 26014)
tom.roberts@robertslaw.org
Andrew T. Bodoh, Esq. (VSB 80143)
andrew.bodoh@robertslaw.org
**THOMAS H. ROBERTS & ASSOCIATES, P.C.**
105 South 1st Street
Richmond, Virginia 23219
Tel: 804-783-2000
Fax: 804-783-21058
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was filed with the Court's CM/ECF system, which caused a Notice of Electronic Filing to be emailed to the following:

John B. Mumford, Jr. (VSB No. 38764)
Coreen A. Silverman (VSB No. 43873)
HANCOCK DANIEL & JOHNSON, P.C.
4701 Cox Road, Suite 400
Glen Allen, Virginia 23060
Tel: (804) 967-9604
Fax: (804) 967-9888
jmumford@hancockdaniel.com
csilverman@hancockdaniel.com
*Counsel for Defendant Joe Gutierrez*

Robert L. Samuel, Jr. (VSB No. 18605)
Richard H. Matthews (VSB No. 16318)
Anne C. Lahren (VSB No. 73125)
Bryan S. Peeples (VSB No. 93709)
PENDER & COWARD
222 Central Park Avenue, Suite 400
Virginia Beach, Virginia 23462
Tel: (757) 490-6293
Fax: (757) 502-7370
rsamuel@pendercoward.com
rmatthew@pendercoward.com
alahren@pendercoward.com
bpeeples@pendercoward.com
*Counsel for Defendant Daniel Crocker*

This the 31th day of January, 2023

By:  /s/  Jonathan M. Arthur, Esq.
      Counsel